BEFORE AN INDEPENDENT HEARING OFFICER
APPOINTED BY THE INDIANA SUPERINTENDENT OF PUBLIC INSTRUCTION
PURSUANT OF 511 IAC 7-45-3
DUE PROCESS HEARING DECISION

**HEARING NO.: HR 062-2024**

This matter came before this Independent Hearing Officer (IHO) on September 30, October 1, 2 & 3, 2024 for Due Process Hearing.  The purpose of this hearing was to receive evidence and testimony in preparation for rendering a decision regarding issues presented by the Petitioner pursuant to provisions of 511 IAC 7-45-3 ("Article 7") and the Individuals with Disability Education Act ("IDEA" 20 U.S.C. Sec. 1400 et seq.). Adjudicative authority to conduct the proceedings is conferred by the Indiana Administrative Orders and Procedures Act ("AOPOA" IC 4-21.5-3, et seq.).

Introduction and Procedural History

This matter is properly before this Independent Hearing Officer.  The request for this hearing was filed by the parents of the student on February 21, 2024. The IHO was duly appointed on February 21, 2024 by the Indiana Department of Education.  This IHO has jurisdiction to hear this matter under 511 IAC 7-45-3, 20 U.S.C. 1415, 34 C.F.R. Part 300.507-300.512, Indiana Code IC 4-21.53 and 4-21-5-5.  The IHO on February 21, 2024 issued a *Preliminary Scheduling Order* setting forth various due dates including deadlines for scheduling the initial prehearing conference. The initial telephonic prehearing conference was held on March 14, 2024.     The initial telephonic prehearing conference was continued to May 9, 2024.  Additional telephonic prehearing conferences

were conducted throughout the pendency of this matter with a final prehearing conference being conducted prior to the start of the hearing on September 30, 2024.

The Parties filed their *Joint Motion to Extend the Mediation Deadline* which was granted. On March 25, 2024 Petitioners filed their *Motion to Extend the Decision Deadline* to June 17, 2024. On June 2, 2024 the Parties filed their *Joint Motion to Extend Final Decision Deadline*. The Motions were granted. The final decision deadline was extended to December 15, 2024.

The IHO entered numerous Prehearing Orders concerning hearing procedures. Respondents filed EVSC's[1] Amended Response to Request for Due Process Hearing. Petitioners filed their Motion to Strike Amended Answers and numerous documents were filed regarding the timeline issue. Petitioner's Motion to Strike was granted. On May 9, 2024 the IHO issued a *Summary of Prehearing Conference and Associated Orders* framing the issues for the Due Process Hearing. The IHO gave the Parties the opportunity to object to or to propose changes to the proposed issues. Petitioners filed a response with suggested amendments to the proposed issues. Respondents filed their response proposing that the IHO's Proposed Issues be adopted but such be consolidated to exclude the 2022-2023 school year. Further, that any issues involving the 2022-2023 school year are irrelevant, as the parties had resolved all outstanding issues for that school year. A number of responses and surreplys were filed. On September 3, 2024 the IHO filed the *Summary of Prehearing Conference and Associated Orders* finalizing the Issues and allowing the timeline to include 2022-2023 -2023-2024 school years as outlined in the Due Process Complaint. On September 9, 2024 Respondent filed their

---

[1] Respondent's filings included EVSC for Evansville Vanderburg Community School Corporation. The terms "EVSC" and "school" may be used interchangeably for Respondents.

**EXHIBIT B, Page 2 of 56**

*Notice of Affirmative Defenses.*  On September 12, 2024 Petitioners filed their Response to *Respondent's Notice of Affirmative Defenses*. On September 12, 2024 Respondents immediately filed their *Response to Petitioner Motion to Strike Affirmative Defenses*.

On September 13, 2024 the IHO timely received the Parties Exhibit and Witness Lists.  On  September 13, 2024  Petitioners filed a *Motion for Order for Limited Expedited Discovery.*   On September 13, 2024 Respondent's filed a *Motion to Continue Hearing and For Emergency Prehearing Conference*, alleging that not only did Petitioner's produce over 600 pages of new discovery including evidence that the Student will be moving to a new residential facility, they also filed over 500 pages of medical records. Petitioners immediately filed *Petitioner's Response and Objection to Motion to Continue Hearing Dates and Motion for "Emergency" Prehearing*.  Respondents replied and this IHO set the matters for Emergency Hearing, via ZOOM, on September 18, 2024.  The Parties appeared and the IHO addressed and resolved *Respondent's Motion to Strike Affirmative Defense* -Denied; *Petitioner's Motion for Order for Limited Discovery* – Denied; *Respondent's Motion to Continue Scheduled Due Process Hearing* – Denied; and Respondents were given until the close of business on Monday, September 23, 2024 to amend their Exhibit List[2].  Respondents filed a *Motion to Open the Hearing* as a result of an internet post by the Petitioners and subsequent Television News Media coverage, alleging that the Respondent School City's response to the due process hearing was

---

[2] Although this IHO advised the Parties of her decision during the Emergency Hearing via ZOOM, due to uncontrollable circumstances the Order, resolving all issues, was not entered until September 24, 2024.

**EXHIBIT B, Page 3 of 56**

causing a danger to the Parent, School, and City of Evansville. On September 25, 2024 Respondent's Motion was denied[3].

All subpoenas requested by the Parties were signed and all other procedural matters in this hearing were routine.

The student and his parents were represented by attorneys.  The local public school was represented by legal counsel.

The hearing was held on November 30, October 1,2, & 3, 2024. The parties present were the student's mother, father and parent's attorneys; the school was represented by the school's attorneys and the school's Director of Exceptional Learners.

The hearing was closed, and the student did not attend the hearing[4].

All Exhibits were admitted at the start of the hearing, per agreement of the parties, which included Petitioners Exhibits 1 – 108 and Respondent's Exhibits 1- 28. On September 30, 2024 at 8:00 a.m. CDT a final Prehearing Conference was held with the Parties agreeing to all Exhibits, many of which are discussed and detailed hereinafter. Petitioners advised that they filed *Petitioners' Pre-trial/Hearing Bench Brief On Applicable Case Law and Legal Standards*.  Respondents reserved the right to file their own brief. Opening statements were given, first by the Petitioners and then by the Respondents. The Petitioner called their witnesses and testimony was heard from their witnesses. Testimony was heard from eight witnesses over two and one half (2½ ) days. Respondents began the presentation of their case and testimony was heard from four

---

[3] Parties were admonished to refrain from further contact with the media for the duration of the hearing process. Parties were further advised to review Indiana Rules of Professional Conduct Rule 3.6 Trial Publicity and Rule 8.4(c) & (d) Misconduct.

[4] The student did not attend the hearing although it was reported by the Director of Whetstone Ranch that he was at home at the time on one of his earned family visits.   "He is actually home with his family this week…We have four one-week long quarterly family visits, and then in addition to that the boys earn visitations through meeting their different progress points". (TR. Oct 1 page 242: 15-24).

4

witnesses over one and one half (1½) days.  No rebuttal witnesses were called. Each of the parties rested.  Written Closing Arguments were to be submitted ten (10) days after the receipt of the transcripts. On October 15, 2024 Petitioners filed their  Motion for Clarification and to Ensure Transmission of Transcripts for Closing Brief.  The Order was issued clarifying the ten (10) day timeline (after receipt of transcripts) for written closing arguments and allowing up to fifty (50) pages.  The Parties timely submitted their Post Hearing Briefs.

The Petitioner's called Ellyn Husley, Director of Exceptional Learners for the Evansville Vanderburgh Schools; Dr. Janet Hahn, Special Education Advocate; Beth Bolling, Counselor, Blue Cross Church; Janice Sanders, Clinical Social Worker; Jeremy Thompson, Director at Whetstone Boys Ranch; Carissa Rice, Behavior Consultant; Dr. Melody Dilk, Esq., Clinical Neuropsychologist; Mother; and  Stanley K. Metzger, License Clinical Social Worker as witnesses during the Petitioner's case -in-chief.

Respondents called, Caroline Paleski, Board Certified Behavioral Analyst; Brenna Kelley, Director Psychological Services; Dr. Jillian Wise, Psychologist; and Dr. Tina Evans Robinson, Adolescent Psychiatrist.

### I. ISSUES

The statutory timeframe in this matter is two (2) years from February 21, 2024 back to February 21, 2022; including the 2022-2023 school year and the 2023-2024 school year.

**Issue 1.** Whether during the 2022-2023 and 2023-2024 statutory period the IEP was appropriate and was reasonably calculated to provide meaningful educational benefit, including behavioral assessments, behavior intervention plans, accommodations and the development of appropriate goals and services, the required elements, including:
  a. Whether the IEP included updated Present Levels of Academic Achievement and Functional Performance, and if not, did this violate 511 IAC 7-32-42 and 511 IAC 7-42-6.
  b. Whether the IEP included necessary accommodations, and if not, did this

5

violate 511 IAC 7-42-6(f)(6)(A); 511 IAC 7-32-9.
c. Whether the IEP included special education and related services, and if not did this violate 511 IAC 7-32-79.
d. Whether the IEP included supplementary aids and services, and if not, did this violate 511 IAC 7-42-6(e)(2).
e. Whether the IEP included specific and measurable goals drafted to meet all his needs, and if not, did this violate 511 IAC 7-42-6(f)(2)(A)(i)(ii); 511 IAC 7-42-6(f)(3).

Whether any of the foregoing issues resulted in a procedural violation or multiple procedural violations, and if so, did that/those procedural violation(s):
i.  Impeded the Student's right to a free and appropriate public education.
ii. Caused a deprivation of educational benefit, that resulted in a denial of a free appropriate education pursuant to 511 IAC 7-32-40; 511 IAC 7-32-12; 511 IAC 7-32-14(a); and 511 IAC 7-33-2.

**Issue 2.** Whether during the 2022-2023 and 2023-2024 statutory period Respondents conducted an appropriate evaluation and/or a reevaluation sufficiently comprehensive to identify all of the students' special education and related services' needs [including speech therapy, occupational therapy and assistive technology], and if not, did this violate 511 IAC 7-32-30; 511 IAC 7-40-3; and 511 IAC 7-40-8; 511 IAC 7-32-79; 511 IAC 7-43-1.

**Issue 3.** Whether during the 2022-2023 and 2023-2024 statutory period the series of removals of the student including multiple classroom removals, time-outs, and seclusions constitute a pattern that amounted to a disciplinary change of placement in violation of 511 IAC 7-44-4.

**Issue 4.** Whether during the 2022-2023 and 2023-2024 statutory period the Respondent provided or designed an appropriate Functional Behavioral Assessment and/or an appropriate Behavior Intervention Plan, and if not, did this violate 511 IAC 7-40-3(e) and (f); 511 IAC 7-32-4; 511 IAC 7-32-41; 511 IAC 7-32-54; 511 IAC 7-32-96; 511 IAC 7-44-5; 511 7-44-5(e)(1)(A); 511 IAC 7-42-6(c)(1); 511 IAC 7-32-10; 511 IAC 7-43-1(g) and (o).

**Issue 5.** Whether during the 2022-2023 and 2023-2024 statutory period Respondents provided accurate educational records in a timely manner, including IEP progress reports, daily sheets, and disciplinary action, and if not, did this violate 511 IAC 7-38-1.

**Issue 6.** Whether during the 2022-2023 and 2023-2024 statutory period Respondents educated the parent on the continuum of placements, and if not, did this violate 511 IAC 7-42-10(b)(4).

## II. FINDINGS OF FACT

The following findings of fact are numbered to clarify their relationship to specific hearing issues. Findings of Fact beginning with "F0". are general findings and have been made

6

after considering all oral testimony and written evidence admitted at hearing[5]. The numbering of the findings does not limit the relevance of the finding to other hearing issues. Any cites to the transcript or documentary evidence are for illustrative purposes only.[6]

## GENERAL FINDINGS OF FACT

F 0.1 The Indiana Department of Education (IDOE) properly assigned the Petitioner's complaint for due process hearing to this IHO pursuant to IC 4-21.5 et. seq, and 511 IAC 7-45-3 et. seq. establishing authority to this IHO to hear and rule upon all matters presented. This Hearing Officer's jurisdiction is pursuant to 511 IAC 7-45-3, 20 U.S.C. 1415, CFR Part 300.507-300.512 and Ind. Code 4-21.5-3 and 4-21.5-5.

F 0.2   All Findings of Fact that can be deemed Conclusions of Law are hereby deemed Conclusions of Law.  All Conclusions of Law that can be deemed Findings of Fact are hereby deemed Findings of Fact.

F 0.3 The student is a thirteen (13) year old junior high school seventh grader.  He was born prematurely and required breathing assistance and treatment in the Neonatal Intensive Care Unit (NICU) for 4 days following his birth.

F 0.4   At a young age he was described as being hyperactive and having frequent traumas.

F 0.5   At 2 years of age, he was dismissed from his first preschool due to aggression and noncompliance.  He transitioned to a different preschool at 4 years of age and his mother …removed him after persistent behavior problems.

F 0.6   RO[7] has had ongoing counseling since he was four years old. (Tr. Oct 2 page 120:3-5).

F 0.7   He attended Friends Forever Preschool and Olivet Preschool in Evansville, IN.

F 0.8  RO was evaluated by both St Mary's and the Easter Seals …paid for by his parents and or their private insurance.(Tr. Oct 2 page 121:16-19).

F 0.9   The student was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) at 4 years of age, anxiety and depression at 6 years of age and Disruptive Mood Dysregulation Disorder (DMDD) at 12 years of age.

---

[5] The findings of fact are numbered to clarify their relationship to specific hearing issues.  Findings of Fact beginning with "F 0" are general findings.  The numbering of the findings does not limit the relevance they may have to other hearing issues.

[6] Citation examples: (Tr. Sept 30 page 10:1-5) Transcript Date, page 10: Lines 1-5.
                    (P. Ex. 21, page 97) Petitioner's Exhibit 21 page 97.
                    (ESVC Ex. page 0105) Respondent's Exhibit page 0105.

[7] RO will be used interchangeably with the student.

F 0.10   The student has a significant psychotropic medication history beginning at 5 years of age.  The student is currently prescribed Latuda, Lexapro, Jornay and Guafacine.

F 0.11  The student lives at home with his mother, father, younger brother and sister.

F 0.12  The student  is described as being trusting of others, works independently, and learns easily.  RO is very inquisitive about topics that interest him and he enjoys being a leader in the classroom. (P. Ex. 4, page 1).

F 0.13  The student's mother has a bachelor's degree in elementary education along with a special education certificate. She is currently employed with Evansville Community School Corporation (EVCS) as a first grade teacher.  The father owns and operates a business.

F 0.14  The student was determined eligible for special education services in February of 2021. He continues to be eligible with a primary disability of Other Health Impairment (OHI). (P. Ex. 2).

F 0.15   RO educational history as reported by easterseals Rehabilitation Center includes the following: "since preschool, RO's educational history is significant due to frequent changes in school placement, due to significant behavior difficulties, according to his mother. In preschool (Olivet Preschool) RO left due to "aggressive behaviors" towards peers; for grades 2nd to 4th, RO received several suspensions while attending Highland Elementary; he transitioned to Evansville Lutheran School for the 5th grade, yet "left (after fall semester) due to daily behavioral meltdowns in the office; RO returned to Highland Elementary for the spring semester of his 5th grade year and began 6th grad at Thompkins Middle School". (P. Ex. 22, page 2).

F 0.16 The first IEP created during the statutory period was completed at Highland elementary – the Move in IEP reported on 04/07/2022. (P. Ex. 4, page 1) (Tr. Nov 30 page 81).

F 0.17   The student began his sixth grade year with Thompkins which is a "general education, or a general school.  It feeds into Central High School. Traditional middle School". (Tr. Nov 30 page 154:23-25).

F 0.18   At the time of the filing for Due Process Hearing the student was a 7th grade student at Thompkins Middle School.

F 0.19  The student was evaluated at easterseals Rehabilitation Center by Brooke Frazer, Pediatric Psychologist – The "[c]urrent concerns were noted regarding pervasive issues with irritability, oppositionality, and severe episodes of emotional dysregulation… Parent reported that from a very young age (approximately 2 years of age) RO displays significant irritability over minor situations (e.g. being prompted to make siblings more hot chocolate when he had drank their portions), in which he will yell, cry, and engage in

8

negative statement ("I'm not their slave"), when "mildly upset." These episodes are reported to occur daily. When RO becomes severely dysregulated, his behavior is described as "unsafe" by his mother, and he will engage in the following: throw objects and belonging in his room, engage in head banging, pulls out his hair, punches holes into his walls, screams, and appears to be in a "rage," which can occur for approximately 20 to 30 minutes. These more sever behaviors are reported to occur at least once per month, in both home and school environments, and RO is able to calm himself when left alone, rather than being engaged with. ( P. Ex. 22, page 1).

F 0.20   Dr. Frazer summarized RO as having cognitive functioning abilities superior to his peers, he experiences significant difficulty regulating his emotions and mood in comparison to individuals his age. Further, RO is a very bright boy who struggles to regulate his emotional state and moderate his desires in order to accommodate the needs of others. Therefore, given the significant mood component for RO, these difficulties are best explained by a diagnosis of Disruptive Mood Dysregulation Disorder (DMDD) (F34.81). (P. Ex. 22, page 6).

F 0.21   Dr. Frazer recommended that RO's school and parents consider the diagnoses of DMDD when determining appropriate IEP accommodations; thus the eligibility criteria for special education via the categorization of Emotional Disability[8].  (P. Ex. 22, page 7).

F 0.22   The student had many maladaptive behaviors at home. RO pushed brother down and scratched him; threw a brick at his brother; push sister down and admitted having thoughts of harming his sister. Stole from brother; threw away electronics while at Disney Theme park, wrap seatbelt around his neck and bang head against car window.  RO's therapy goal at Southwestern Behavioral Healthcare was to be respectful toward others and be able to tolerate his sister.

F 0.23   The student had many behaviors while at Thompkins his behavior escalated from 7 to 79 referrals.

F 0.24   The student behaviors during the 2022-2023 school year at Thompkins included:
   a. *"hit a student in the face with his Chromebook as he was leaving the classroom," (Tr. Sep 30 page 129:19-22).*
   b. *"Googling 'hot anime girls' and 'Pornhub' while monitoring GoGuardian. (Tr. Sep 30 page 130:15-16).*
   c. *"kicking and punching the door to Miss Tyler's classroom… asked him to stop and he continued to do so.  Then he started jokingly punching another student in the back.  R.O. then tried to touch another student's trapper keeper/papers and called him a 'faggot". (Tr. Sep 30 page 131:19-24).*

---

[8] "It is likely that RO will greatly benefit from and it is strongly recommended that RO continue with in-person educational instruction and IEP that his CCC and caregivers developed, in order to advance his academic and behavioral progress.  Additionally, it is recommended that RO's mother share this report with his school in order to update his current IEP as needed and appropriate". (P. Ex. 22, page 7).

**EXHIBIT B, Page 9 of 56**

     d. *…on 12/15/22 … he put his hands on and went after a student he was not supposed to have contact with..," (Tr. Sep 30 page 132:10-12).*

     e. *…on 1/12/23 " R.O.. said F'U' to a teacher and called a group of teachers retarded." He tried to take his Chromebook out of a staff member's hand when it had been removed to investigate content." (Tr. Sep 30 page 132:21-24).*

     f. *… on 1/25 "R.O." pulled a boy's pants down at the ends of recess in the small gym when everyone was lining up. (Tr. Sep 30 page 133:17-20).*

     g. *…on 2/23/23 … "Student got up and smacked two students on the back of the neck, then farted on a third. Spoke with mom." (Tr. Sep 30 page 134:13-15).*

F 0.25  The student was suspended pending expulsion because of the following behaviors:

     "*On March 22, 2023 while at breakfast.  It was alleged that the student continue to call another student 'Peter' and "Peter Griffin". The complaint stated that the student was separated from all other students at breakfast, and at his own table, but he turned around and continued to be a problem.  He also turned around and started yelling to the other student 'Why did you ask that boy to the dance?'. He was told to stop, eat his food, and go to homeroom.  He continued.  He was told to stop again and he continued to call the student 'Peter".  He was told that he is bullying people by calling them names.   He then started yelling the other student's name, did you ask that boy out, and said it's not bullying since he used the student's real name. … The  witness felt that this had gone past bullying and harassment because it was a daily issue*".  (P. Ex. 6, page 3).

F 0.26  On 04/13/2023, the CCC convened for a Reevaluation Review and  Manifestation Determination. The participants included the parents, teacher of record, instructional strategist, assistant principal, special education coordinator, school psychologist, general education teacher and public agency rep. (P. Ex. 6, page 10).

F 0.27  The Student was placed on homebound instruction due to a disciplinary change of placement. The student was scheduled to receive 1 hour of services each day.

F 0.28  Parents objected and file a Complaint with the Indiana Department of Education (IDOE). (P. Ex. 9).

F 0.29  A mediation was scheduled by a Mediator appointed by (IDOE).

F 0.30  Parties met prior to scheduled mediation and agreed on or about May 1, 2023, the student would be placed at The Learning Center (TLC) in a self-contained classroom from 8-2pm.

F 0.31  Parties advised the Mediator that they came to an agreement and that both parties had agreed to drop the complaint and the mediation. (EVSC Ex. page 0012).

F 0.32  On May 18, 2023 Mom issued an email to Elijah Farmer, Special Education Teacher at TLC confirming that RO will be attending TLC at the beginning of next year. (P. Ex. 54, page 689).

F 0.33  On August 15, 2023 RO was admitted to Deaconess Midtown Campus Hospital (Deaconess).  Mom states pt told her he would overdose on his medication.[9] (P. Ex. 32, page 1).

F 0.34   RO remained at Deaconess for approximately 10 days.[10]  Pt is already in treatment with Lifestance, Southwestern Behavioral Healthcare (SWBH) (wraparound). (P. Ex. 32, page 46) (Tr. Oct 2, page 136:1-3).

F 0.35  RO expressed that his behavior was impulsive and that he wanted to get across to his mother that he was mad.[11]

F 0.36  RO was admitted to Deaconess Psych Unit on August 15, 2023 and released on August 21, 2023.

F 0.37  While at Deaconess RO was threatened with removal from the therapeutic recreation group. While being prompted to draw a picture of themselves as a superhero and write positive songs that would act as their theme, "Pt created two inappropriate pictures, not following the directions presented at the beginning of group, pt was also noted to make inappropriate noises while in group". (P. Ex. 32, page 65).

---

[9]     Mom states pt has been escalating behaviors recently.  Earlier this summer he threw a brick at his brother who had to be taken for xrays.  Dad says last night pt got mad and threw his sister down.  Mom states today, pt got up and eloped from therapy session he has done these previously as well.  On the way here, mom states pt was having a "melt down" and was wrapping the seatbelt around his neck, hitting his head on the window, etc. (P. Ex. 32, page 1).

RO "stated that mom lied to him and he got mad and then got into trouble. He says then he did not want to be alive. Pt continues to endorse that he does not want to be alive through out assessment.  Pt has marks on arm from pencil at school where he said he was "mad" and also mom says pt hit self and head". (P. Ex. 32, page 1).

[10] Mom does not feel safe taking pt home at this time as pt again began to decompensate, hitting/kicking walls, saying he hates mom, etc. Dad states they have tried everything and they do not what else to do anymore. (P. Ex. 32, page 46).

[11] RO "[s]tates…  "mom lied to me & that I could spend my allowance & then she changed her mind, I told her I hated her & then I got grounded.  I said I wanted to die...it was impulsive.  I was just really mad. I was trying to get across that I was mad".  Asks when he can go home.  We discussed ELOS & he began to cry. States "I just want to go home. I'm sorry".  He does endorse struggling lately with depression, anger & anxiety.  Continues to state "I just want to go home".  States he did get mad & kicked a hole in the wall because he had to clean the cow stall.  States he did throw a brick at his brother a couple months ago. States he does take his medicine everyday. Reports supportive relationship with mom & dad. Continues to cry & states I want to go home so bad". . (P. Ex. 32, page 46).

11

**EXHIBIT B, Page 11 of 56**

F 0.38  The music therapist reported that "Pt was noted to make inappropriate noises throughout the session and needed redirections throughout the session.  Pt was noted to be distracted by peers throughout the session as well. Pt would respond to redirections after multiple attempts. (P. Ex. 32, page 65).

F 0.39  RO had many maladaptive behaviors upon arrival at TLC:

> 8/15/23   *Head down, cursed at a peer, broke two pencils, laid his head on the desk, absent for numerous days.*
> 8/23/23   *he was asleep, he refused whole group ELA.*
> 8/25/23   *refused testing.*
> 8/28/23   *he was whistling during instructions and was asleep.*
> 8/29/23   *whistling during whole group, ELA instruction and GAIN."*
> 9/6/23   *asleep,*
> 9/8,9,11/23 *absent,*
> 9/12/23   *asleep,*
> 9/13/23   *He's cussing at staff, crying about his wrist, banging on the desk, kicking the wall and argumentative with staff.*
> 9/14/23   *Broke pencil, cursed, yelled about having to show his work in math, asleep*
> 9/15/23   *absent*
> 9/18/23   *he cursed at a peer, provoking peers, saying "go kill yourselves." Removed from the room to deescalate. Told a peer to "go suck a penis"--*
> 9/18/23   *cursed at pier, provoking Pierce saying "go kill yourselves" removed from the room to de-escalation, told a pier "go suck a P"*
> 9/19/23   *provoking peers*
> 9/25/23   *asleep*
> 9/26/23   *absent*
> 10/2/23   *required 12 redirection in p.m.*
> 10/3/23   *absent*
> 10/4/23   *disabled go guardian (computer monitoring software) and argued when STAFF removed his computer to check to see if it was disabled, tearing up worksheets, broke pencil, talking out/disruption in PM 31 instances*
> 10/16/23   *asleep*
> 10/17/23   *asleep refused to show work on math, cried and screamed at his desk asleep*
> 10/18 through 19/23 *absent*
> 10/20/23   *late arrival arguing with peer at small group table refusal to complete math works sheet*
> 10/23/23   *crying about having hemorrhoids to entire class told teacher to shut up when given a math assignment, asleep asked to walk to*

12

*cafeteria during his instruction time and when he was told "no" he left his small group instruction*
10/24/23  *absent*
10/25/23  *absent*
10/26/23  *asleep*
10/27/23  *said he needed water from the drinking fountain, elope from classroom to his meeting, he was removed from, interrupting teacher table, refused to spit out gum, inappropriate comments to staff and peers*
*(EVSC page 0173-0174)*

F 0.40   On October 27, 2024 the Case Conference Committee (CCC) wrote in its *Determination After Review of Existing Data* statement, "[t]he CCC determined that there is sufficient data to plan appropriately for the student.  Therefore, reevaluation is not required at this time for the purposes of considering eligibility or providing additional information regarding the student's special education and related service needs.  The school must consider reevaluation for each student receiving special education and related services a least once every three (3) years unless the parent and the school agree that it is unnecessary.  In addition, the school must consider reevaluation if the school determines at any time during the three (3) year cycle that additional information is need to address the special education or related services needs of the student, or if the student's parent or teacher requests and evaluation". (P. Ex. 7, page 8).

F 0.41   On October 27, 2023 the Annual Case Conference was held.  The Committee found that RO had met the criteria to transition from The Learning Center (TLC).

F 0.42   The exit criteria from TLC is 100% Safe Body, Communication 80% and Task attention 80%. (EVSC page 0175).

F 0.43   RO was disruptive during the CCC because he could not attend Thompkins for a one half (½)  day. The CCC thought it would be wise to return him to TLC.[12]

F 0.44   RO returned to The Learning Center where his maladaptive behaviors markedly increased.

F 0.45   RO's behaviors increased after he was told that he could not go to half day status*.*
10/30/23   *verbally disruptive during whole group ELA and GAIN*
10/31/23   *provoking peers, verbally disruptive*

---

[12] RO "*disrupted the conference multiple times to complain that other students were on a reduced day and he was not.  He brought up a specific student multiple times and said it was not fair that this student was allowed to be on a reduced day and RO was not.  He stated that it was not fair that just because the other student's life "sucked" that he got to come to school for a shorter day.  RO was redirected multiple times and staff stated that RO would not be going on a reduced day and he would remain on a full day because he was capable of doing so.  At that time RO stated he would stop doing all of his work and start acting out in order to try and be placed on a reduced day.  He also stated that he wanted to return to Thompkins and mom stated that TLC was best for him.* ( P. Ex.65, page 1).

13

**EXHIBIT B, Page 13 of 56**

| | |
|---|---|
| 11/1/23 | *computer removed (off task), removed for provoking peers* |
| 11/3/23 | *absent* |
| 11/6/23 | *asleep refusal to make up work and teacher table* |
| 11/7/23 | *absent* |
| 11/18/23 | *refusal to work, complaining of migraine, crying about head hurting, flipping off peers* |
| 11/19/23 | *asleep* |
| 11/10/23 | *asleep calling peers "tranny's" meowing and making bird noises during instruction, mimicking peer repeatedly* |
| 11/13/23 | *refusal to work all day* |
| 11/14/23 | *indicated he was happy. Grandma was picking him up early and completed schedule.* |
| 11/15/23 | *all day, refusal* |
| 11/16/23 | *Verbally disruptive, through pencil at peer, Drew penis on Assignments* |
| 11/17/23 | *cursed at staff times 11, writing inappropriate jokes about staff, wrote "penis" on assignment, crawled inside a cabinet* |
| 11/20/23 | *asleep* |
| 11/27/23 | *asleep wakes up and refuses work. Staff sits next to RO during whole group to model, appropriate behavior and responses.* |
| 11/28/23 | *absent* |
| 11/30/23 | *absent* |
| 12/1/23 | *absent* |
| 12/4/23 | *arrive late* |
| 12/5/23 | *"you can get food for free at McDonald's if you bring a gun* |
| 12/6/23 | *immediate refusal upon arrival, banging on desk, making noise, playing with window blinds, and papers* |
| 12/7/23 | *disruptive during NWEA testing and sent back to desk, left early* |
| 12/8/23 | *absent* |
| 12/11/23 | *curse when asked to sit before leaving the class for water, crush water cup, through glasses. Was given opportunity to start on math on his computer, but was disrupting others testing, and it was removed.* |
| 12/13/23 | *repeating "what is dick short for? I want to be called Dick!" repeatedly.* |
| | *Suspended 3 days* |

*(EVSC page 0173-0174)*

F 0.46    On November 10, 2023 … Ashton O'Keefe, System of Care Coordinator, Southwestern Behavioral Healthcare stated that "The family is pursuing residential whether we approve to refer him to Evansville Childrens Psychiatric Center (EPCC) or not but we feel EPCC would be more beneficial than what they have planned. Currently, the family is planning to send RO to a therapeutic boarding school (Whetstone) in Missouri when they have an open bed in January. We feel EPCC would be better as there is

significant family strain and family therapy is going to be a crucial part of treatment". (EVSC Ex. page 0526).

F 0.47   SDS Cody Flores met with RO at Culver Family Learning Center.  RO's teacher said that RO had his head down for most of the morning and struggled with being respectful.  His teacher said that RO has all F's and could be struggling with the fact that he could not go back to Thompkins Middle School.  SDS asked RO about how he felt given that he had previously said that he did not want to go back to Thompkins.  RO said that he felt like things would just be the same at Thompkins if he went there.  RO said that he still did not feel good about not being able to go. (EVSC Ex. page 0534).

F 0.48 On 12/04/2023 SDS Cody Flores met with RO and RO said that he is getting all F's at school.  RO said that he was not doing his work at school and the school would not let him take his work home.  RO said that he did not see the point in doing his work at school since his mom told him that she was going to keep him at that school instead of letting him go to his old school. (EVSC Ex. page 0591).

F 0.49   On or around 12/7/2023  student's mother stopped all of his medications and student felt like his anger was ten times worse since his meds stopped.(EVSC Ex. page 0597).

F 0.50   RO conveyed to Donald Chambliss, LSW at Southwestern Behavioral Healthcare, frustration with teacher at school as well as mom and concern over having meds discontinued.  He also conveyed that his mom was trying to send him off to a boarding school in Missouri. (EVSC Ex. page 0601).

F 0.51 The student received a 3 day suspension from The Learning Center (TLC) on December 13, 2023. (P. Ex. 59, page1).  RO was repeating "what is dick short for? I want to be called Dick".

F 0.52   On 12/18/2023 SDS reported that RO "said that his parents were talking about sending him to a camp that was out in the woods where he would not have any bed.  RO said that this made him feel bad.  Ro said that he heard his parents talking about this after they sent him to his room and he listened in on them". (EVSC Ex. page 0611).

F 0.53  Parents did not return the student to TLC after Christmas Break. (Tr. Oct 2 page 175:8-10).

F 0.54  Mother was unable to attend the CCC of January 2024 due to a "recent diagnosis of Stage 2 breast cancer. I do not know yet when my chemo will start. ..I had my port put in Friday".   (P. Ex. 54, page 647) (Tr. Nov 30 page 138:20-23).

F 0.55  During the  January 9, 2024 IEP meeting the committee discussed, at Mom's request, whether homebound could be an option, but it would have to be a medical homebound placement instead of an IEP homebound placement since RO's needs could be met in the separate day school setting.

F 0.56 Dr. Tina Evans-Robinson stated that the student was not eligible for medical homebound.[13]

F 0.57 Parent advised the IEP team that she wanted RO on homebound services while they were waiting on residential placement.

F 0.58 Student remained with little to no instruction until his transfer to Whetstone Boys Ranch. (Tr. Oct 2 page 175:18-23)

F 0.59 In an email dated January 23, 2024 parent stated "Ashton …approved his admittance and gave his name on fast track for Evansville Childrens Psychiatric Center.

F 0.60 On 2/15/2024 the wrap facilitator discussed youth and family with SOF gatekeeper, SDS and Wrap Coordinator. Discussion was regarding residential treatment at EPCC is no longer what family wants but instead wants Wheatfield Academy, RO being upset at mothers comment and family staying in Wraparound. (EVSC Ex. page 0718).

F 0.61 Wrap facilitator, Lisa Lantaff and team at Southwestern Behavioral Healthcare, Inc., discussed the family's desire to admit RO to EPCC and then remove him in May when a bed at Wheatfield Academy becomes available. "I do not feel that it is appropriate to admit RO to EPCC if family plans to have him discharge in May to transfer to a less restrictive environment. Lisa and Cody discussed current behaviors w/RO being safe and more compliant recently but concerned that this due to him not attending school and having little to no responsibilities or expectations. The team reviewed that family has openly discussed that they do not feel that Wraparound is helpful and only continue to participate to receive skills. Cody expressed feeling that sessions have little direction dt lack of symptomology at this time and family's lack of communication w/any concerns". (EVSC Ex. page 0719).

F 0.62 In a lengthy email dated March 3, 2024 to Jessica Foster, Admissions Manager at Whetstone Boys Ranch, Mom stated:

> *"I just wanted to reach out to you and give you an update on our son RO, I don't know if you ever reconsidered admittance, but I thought it was worth a shot as your school is still our favorite.*

---

[13] "Mom shared that the family decided to request that RO be placed on homebound from The Learning Center because he was not successful in the classroom setting. School would like for parents to have a form filled out that this is medically necessary".

.. Well, I remembered that RO's mother had called and spoken to our nurse LaDonna to let her know that there was a form that she wanted me to complete, and LaDonna told her to bring it with her at RO's upcoming appointment and that I would take a look at it.

Did you ever agree that, medically homebound services were necessary?

No. And at the appointment that mother brought it in, I told her I didn't feel comfortable completing the form because he did not have a medical diagnosis for which I felt it needed to be completed...But I told her that if school feels he needs to be put on homebound, that it doesn't require me filling out a medically necessary form". (Tr Oct 3 page 170:12-25; page 171:1-25) (EVSC Ex. page 0667).

16

*Throughout November and December of last year, we weaned RO off of all his medications. He was on four medications for mood, anxiety, depression, and ADHD. At first, there were some side effects of headaches and tummy aches, but overall he came off them fairly easily.*

*We have seen a big difference since he has come completely off of medication. He has been less depressed, much less irritable, aggressive, defiant, and unmotivated. He has had more energy and more compliance. His ADHD is still there, but it is actually welcome compared to the lethargic RO we had before. He has shown more interest in social activities, such as car racing, cooking, and just hanging out with friends. During his last WRAP meeting, everyone was very impressed at his attitude and the way he handled himself.[14] …Maybe the leadership team could pray about the possibility of working with our family? I'm praying also". ( P. Ex. 39, page 2-3).*

F 0.63   On March 13, 2024, after reconsideration, RO was accepted to Whetstone Boys Ranch. "*Thanks for your patience with our reconsideration. After talking it over with our team, we have decided to approve RO for enrollment. If you want to move forward with enrollment, we can either enroll on Tuesday, march 19 or you can choose to wait until the second or third week of April. The reason for the gap is our Adventure Week. If RO comes next week, he will go on Adventure Week (Hiking, camping, canoeing type trip) the week of March 25. We need students to be with us 2 weeks before going on Adventure Week.*" (See, email from Jessica Foster, Admissions Manager). (P. Ex. 39, page 1).

F 0.64    On March 26, 2024 parents were advised that they could enroll RO on April 15 at 10 am. (P. Ex. 40, page 1).

F 0.65    On April 4, 2024 parents issued at check to Whetstone in the amount of $22,500.00 Dollars[15].

F 0.61   On April 5, 2024 Parents forwarded their Written Notice of Intent to Place in Nonpublic Facility and Seek Reimbursement from School District Pursuant. (P. Ex. 20) (EVSC Ex. page 0790).

F 0.62 On  April 15, 2024 RO was placed by his parents at Whetstone Boys Ranch in Missouri.

---

[14]*Mother states: "We have also pulled him from his school as it was not a good environment for him the school (before meds were weaned) was letting him sleep and not giving him appropriate work. It was not a healthy environment for him as the teacher would make comments about him going to residential in a negative way. Since January, we have been keeping him at home. He does homeschool work, spends time with his grandparents and helps around the house. We have filed a claim, hoping that the EVSC, our school corporation will be required to pay for part of residential as they have not met his needs in public school". (P. Ex. 39, page 2-3)*

[15] "Mother made it clear that the family is seeking long term IP treatment at this time, stating that they have been in contact w/a private facility in Missouri (Whetstone) and that despite it's cost paternal grandfather is willing to fund this treatment. The family has been informed that there will be an open bed available in January. We reviewed pros/cons of IP treatment and discussed IP opinions that are more local do to (dt) the need for family therapy".  (P. Ex. 100 page 278).

17

**EXHIBIT B, Page 17 of 56**

F 0.63  Whetstone Boys Ranch is a therapeutic boarding school.  (Tr. Oct 1 page 235:l-6).

F 0.64   Whetstone boys school is a therapeutic boarding school for boys that are struggling with things like apathy, or screen addiction, or pornography, or mild drug use or other types of rebellion. (Tr Oct 1 page 220:12-15).

F 0.65   Whetstone's Lifepac print curriculum is designed for grades 9-12. (Tr. Oct 1, page 3-8).

F 0.66   Whetstone is a six (6) month program. RO is scheduled to graduate from the program in January of 2025 over nine (9) months since his enrollment.

F 0.67   RO behaviors continued at Whetstone[16].  See also (P. Ex. 25, page 5-9) Report of various selected Incidents involving significant or general misbehavior on the part of

---

[16] **On August 19** to End of Shift (EOS) individual report RO not his worst night, but not his best either. He worked off 1.5 hours of time tonight, and got three of his labs done. With what he has coming into the shift that would have left him with 30 minutes of work, and three laps out of a 3 hour work time low. He ended the night with one hour of work time, and six laps on the board. He received some exercises from Mr. Sarto for inappropriate comments, but that did not stop him because he got an hour from Sarto RO immediately after that for saying the "N" word. It was not directed at anyone luckily, so it doesn't cause a trigger of any kind, but for obvious reasons, he got more than just 30 minutes for saying it. Mr. Sarto gave it to him with a breakdown of 30 minutes of work time, and three more laps. He helped with dinner prep and stuff tonight and I did not see any issues from him until he got the time from Sarto during shower times at bed prep. He received fails for boundaries and language/manners tonight on his grading.
**On August 20** to EOS Jeremy and I discussed RO's behavior from last night saying the "N" word and then this morning, jokingly saying he would kill Mr. Harvey, and then pretending to punch or actually punching Mr. Harvey. As a result of everything, RO has an additional two hours of work time and a 300 word essay on why he will never say the "N" word again.
**On August 21s**t to EOS .. these boys were talking about their wieners and their sizes. RO showed Braxton his and tried to convince Braxton to show him his back. They were complementing each other and trying to decide whose was bigger. I do not believe Braxton showed RO his penis, but I know for sure RO did. I am recommending RO at (Discipline Meeting) DC meeting. I do not believe Braxton was involved in the showing off, but I do know he played some part in the conversation.
**On August 27** to EOS right off the bat this morning I had to get after RO not showing proper respect towards Mr. Harvey (right after a chapel concerning residence respecting staff), after I let into him, he was much more respectful for the remainder of the morning, not really even needing anything in the way of redirection.  He went to therapy with Ms. Johnson RO always easily the most disrespectful of the bunch this afternoon, constantly trying to be the clown and constantly trying to push buttons, especially Sean's. He lost a lot of merits today and got some laps and time as well.
**On August 31, 2024** ** I am recommending RO for a DC meeting. See individual**
RO when he saw Joe came back he was the most excited out of everyone, but it was all a façade. When Joel went upstairs, and he went to feed the pigs, he was talking about "how much of a bitch Mr. Reynolds was" and "he's going to make his life hell until he quit ". He also got into Mr. Kazimir's face after I said they didn't have to shower because of the lightning outside. Was quiet the rest of the night after Mr. Ingram talk to him about his behavior.
**September 1, 2024** to Andrew, EOS I am adding onto RO DC referral from the EOS since I was brought into it. Mr. Ingram and two residents confirm the phrases Alcorn listed below almost verbatim. I did not tell anyone what was said, but they shared the story below close enough. I did not catch any deception from it. Neither resident was very happy about what was said, because they disagree with what was said. Where I was brought into this was when I

**EXHIBIT B, Page 18 of 56**

RO, pulled from various EOS (End-Of-Shift) reports written by Whetstone Boys Ranch Shift-Supervisors.[17]

---

received a call from Mr. Reynolds last night. RO told him I was very upset with him for not responding to some text while he was home visiting. That I was so upset, I had talked about killing myself. Of course, none of this is true. I called RO out on all of his behavior this morning, and he did not deny any of it. He shut down and was nonverbal when I called him out and told him about his DC meeting (he was unaware he had one). Mr. Brown talk with him for a bit after lunch, and RO was at least responsive with him. He did not take responsibility saying it was a joke or trying to justify why he said those things about Mr. Reynolds. Neither Mr. Brown nor myself can gauge if he is remorseful. I am still waiting for an apology that may never come, but is usually the first step to showing remorse. I'll share if I get one.

**September 6**, to staffless team, Dyllan and I met RO for another DC meeting. We discussed his possessing Ryan's Amazon card, disrespectfully, addressing employees, snail, pace progress through the program and failed to complete his essays due. To his credit he was respectful during our meeting. His consequences are: finish the essay, including the one assigned today, work off his time on the board. (3.5 hours.) and work on the four hours assigned to him for the gift card incident today. He will have a workday on Monday to complete anytime still remaining on the board. I also told him that he will not be returning to school next week until the essays and work time is worked off.

**September 6** to EOS I'm referring RO to a DC meeting for stealing my Amazon gift card. I've realized that it's been lost for a couple of weeks. Lyric found it in the d dry/washer today. Knew it was mine, and said that RO had it. I asked about it and didn't deny it. Honestly, I don't care what consequences he gets. (if any). I'm honestly disappointment that, at the least RO and Lyric both knew that they had stolen $25 from me and didn't see a need to tell me or return it. He also received .5 hours. That's 30 minutes if anyone was wondering, from me for being disrespectful during chores this morning.

**September 8** to EOS individual report RO actually a pretty good day for him. He still needed some redirection and got some exercises for inappropriate comments, though. After lights out, Reynolds approached me to tell me RO got an hour from him for not heeding his warnings today about boundaries and disrespect. I'm going to speak with RO tomorrow, but I advised Reynolds to give him the time automatically from now on after RO is told that this will be the case we will all help Reynolds hold him accountable to quit this STAFF picking that seems to become a thing. ROr worked off his consequence time and tapped into his four hour work tomorrow a little bit he had one essay done, and 200 words of the second one done before going up for bed prep. This leaves him with three hours and 25 minutes on the board and his essays (which he knows the consequence of if not turned in tomorrow). The one he did complete was an apology letter to me. He gave it to me and finally looked me in the eye to apologize for what he said... he was upset with me before going to sleep because I told him no for extra time with a lie. He tried to start into Reynolds saying he was getting picked on, but I went and spoke with him to tell him that was his fault for waiting all week to write his essays. He did not respond and just rolled away from me.

---

[17] *7/24/2024*
*EOS/Mr. Brown*
*At about 45 minutes into the music lecture program, Isaiah angrily informed me that he was tired of RO, making deep throat sexual sounds and gestures. I had already asked him to settle down once, parentheses he was being loud, laughing, making noise, noises, etc.) so I had him move away from the others and sit within 3 feet of me for the remainder of the program. At first, he did not sit still and engaged in various disruptive attention, seeking misbehaviors, including putting his chair up and down, turning Mr. Newell's desk lamp off and on, getting out of his seat when I told him he needed to remain in it the rest of the evening, and he attempted to split STAFF by asking Mr. Harvey the question he had already asked me, to which I told him "no," and so on and so on.*
*When the film was over, several of the boys angrily told me and Mr. Harvey in front of RO, that he had been messing with, and trying to disrupt their viewing, and at some point, was rubbing Bakers' thigh, which really frustrated Baker. Neither Mr. Harvey or myself actually saw this, but RO did not deny this either. I am recommending a D. C. Meeting for his overall negative behavior during the program.*
*ACTION TAKEN: D. C. Meeting.*

_7/9/2024_

_Mr. Newell_

_RO: worked on his packs today, and did it with a little redirection needed. After second break, when heading back to his desk, he did get push-ups from Miss Johnston, for being overly sexual-since he wasn't doing his push-up very quickly, Miss Johnston changed it to two extra laps after school (the board was updated to reflect this consequence). Music lecture in film discussion went pretty well right up to the end of the ladder, when he made a sexually explicit gesture, trying to be funny-I tacked on one more lap to his consequence from Miss Johnston earlier today, so he now has three extra laps to run today._

_6/9/2024_

_EOS/Mr. Brown_

_Tough day overall. Mildly, antagonistic and physically over-bearing with many of the residents and staff today. He was told that if he could turn the last half of the evening around, he would not get a DC meeting for the totality of the day. Unfortunately, his behavior during the movie did not warrant a second chance, so as a result, he has another DC meeting tomorrow. RO did not meet the program requirements today._

_ACTION TAKEN: D. C meeting._

_6/5 2024_

_Mr. Harvey_

_Overall, a pretty terrible day._

_The specific issue for this add-on was about a few of the boys playing with a condom rapper and RO getting close to/actually touching a used condom. RO would not listen to me and went to touch it, I screamed at him and decided that everyone had to go back to the river and we couldn't be there anymore. Everyone started to begrudgingly leave but RO went back to the condom rapper and picked it up again. RO was given consequences ( 2.75 hours/DC meeting.(.75 minutes for talking about his erection in the van). He refused to go to the river and try to talk to me about it. I asked him not to touch me (due to the condoms) he proceeded to touch my arms._

_Complained during the field trip and got frustrated several times when his fishing pole got tangled up. He tried to pick up a condom wrapper and a used condom mirror where we were fishing. He wasn't listening to staff or following directives. He punched L--. Once back to the ranch he worked all his time off by cool down time, but then earned 30 minutes during bed prep for being disrespectful towards staff. He is being recommended for a DC meeting._

_ACTION TAKEN: DC meeting_

_6/1/2024_

_Mr. Page_

_Bad day for RO. He struggled with every minute of his work time. He got exercises, more work time, and I think had one on one talks with every member of STAFF today. He finally got back into program after speaking with me before dinner. He finished up the last of his work time with at least a little bit of the free time we had before coming in for cool down. He got additional time while trying to work off his original time for several things: humping the floor, instead of doing push-ups, sexual gestures, and comments, disrespecting the interns, and not following directions_

_ACTION TAKEN: Various physical exercise; mountain, climbing, laps, etc._

_5/12/2024_

_Mr. Gleason_

_RO had an exceptionally poor night with constant innuendo both words and actions, listing various porn, stars, and did not take direction well in changing the subject or in doing his mountain climbers in a timely fashion._

_ACTION TAKEN: 1 Hour of Work_

_5/8/2024_

_Mr. Gleason_

_RO: the struggle is real for RO he can't make it half an hour without saying or doing something inappropriate. He worked off about an hour and a half of his time and after today he's sitting a 7 hours of work time. He received more work time through the day for throwing things in the car and putting a bat between his legs acting like it was his genitals. He sang a 4 "big guys song. Put 69:69 on the microwave and then made a penis comment while going up for bed prep. During evening chores RO was doing dishes for some of his time Shawn brought over a piece of paper that_

20

---

*had some of the boys names on it. Shawn said it what are the check and X marks by some of the names a RO reply that was if he'd kill them or not. So with that, I think it's time he has another DC meeting.*

*5/3/2024*
*Mr. Tucker*
*RO: workday in the morning. Joined us in the afternoon. He asked politely if he could not do qualifiers. I told him he didn't have to. He did well until we went back into the school room. He interrupted my lecture to ask what he was supposed to be writing down. I told him anything interesting and noteworthy. He crumpled his paper and threw it on the ground. During merit store I had them watching a documentary on the pyramids. (not a crazy alien one., Thomas) and he was told by staff a dozen times to stop talking, but he continued to both talk and make jokes. He received 500 demerit and an hour of work for his behavior.*

*4/30/2024*
*Mr. Page*
*RO is being referred for a DC meeting. He racked up two hours, but we could have given him 10 and it would not have made a difference. Constantly not following instructions from any of the four staff on, making inappropriate comments/cursing about other residence, but Saying "Got" to them (slang for got a big butt.), and other disruptive behavior. (like screaming/moaning/etc..) he did numerous exercise such as mountain, climbers, sit-ups, and squats as re-directional tools as well.*

*4/28/2024*
*Mr. Tucker*
*RO: woke up in a bad mood. He woke up and immediately started yelling that Shawn woke him up on purpose (which Shawn hadn't, I was the one who woke him up, it was time to get up anyway). He took a super long time to get ready, but he made his bed really well. He worked off sometime before church. He was his typical self: asking all sorts of questions, nonstop, bothering other residents trying to be funny. I talk to him one on one and try to encourage him to not make comments on every little thing the other residents say and do. In one ear and out the other. Please keep encouraging him.*

*4/28/2024*
*Mr. Brown*
*Music lecture: the programs went pretty well, and the only behavior challenge was RO, who from the get-go started making unnecessary comments to the other boys. I gave him a firm warning, but just a few minutes later, Luke asked what a year did the Altamont concert take place, and I answer 1969, RO interrupted with "69' is my favorite number Mr. Brown" to which I stopped lecture and sent him back upstairs with one hour of work*

*4/27/2024*
*Mr. Page*
*RO: not a good day for RO. He got multiple bits of work time today. He accumulated two hours before lunch for very inappropriate comments, not listening to staff after multiple redirection consequences were given, and constant complaining/tattling. He behaved decently well at fun city, but receive time while at dinner for making comments about his "horse cock" while walking through the parking lot. He received some more time once we got back to the ranch by Mr. West because RO constantly did exactly what he was asked not to do. Then after lights out, Shawn approached Mr. Ingram for a relevant question and RO just started in on him telling Sean to "shut the fuck up" multiple times. He received another hour from me for this in total. He received four hours of work today, and still has two hours to work out before coming off of PR.*

*4/26/2024*
*Mr. Newell*
*RO: started off pretty well getting more done on his diagnostics first. Then he's done for the previous two or three days combine, but then began slacking off, making noises, being disruptive. And eventually had to be called to Account for his behavior multiple times by myself and Mr. Harvey. He's really pushing boundaries and driving the other residence away, at times even being pretty mean and cutting towards them.*

21

On April 24, 2024 the Executive Director Jeremy Thompson reported in a letter address to the parents that "He has only had one emotional blow up after supposedly being lied to by a peer". (P. Ex. 42 page 1).

> *June 7, 2024 - the client shared some of the emotions and thoughts that he has when he is being defiant -devious, happy, I am getting away with it", and anger (when he gets caught/consequence).*

> *June 13, 2024 - the client came into session without having done his homework. Discuss the importance of homework and have the client take time to work on it in session.*

> *June 20, 2024 - the client shared about the areas he got in trouble for and what he wanted to work on, he noticed a pattern of not controlling what comes out of his mouth occurred that week. He mentioned knowing that when he is asked to stop saying inappropriate things or calling people names. It is difficult to stop until he is able to say everything he wants to say.*

> *June 27, 2024 - the client discussed recent inappropriate behavior of flashing another resident. He shared what was going on before and after his behavior and the consequences he received from his behavior as well as continuing the conversation of the different things he could do help himself stop when he catches himself in the midst of making them decisions The discussion led to the client, history of watching porn and masturbation. Discuss what porn does to our brains and thinking about sex in our bodies the client was open about his struggle with watching porn and masturbation. He shared that he is constantly thinking about the images he saw on the porn sites*

> *July 11, 2024 - the counselor states on July 9, I was in the school room and witnessed the client making sexual gestures and sounds while talking with another boy. He received consequences for this. The client shared about his time on adventure week. He shared different moments of "flipping his lid", One where he broke his glasses and cursed out the staff. He reported that he was frustrated, anxious, and overwhelmed being put at the back of the canoe, and everyone telling him to steer the canoe. He shared that when everyone was talking to him at once, correcting him, splashing him, and being called names by one of the boys he lost it, crushing his glasses and cursing at everyone.*

> *On July 15, 2024 the client discussed the influence the client is letting the new resident have on him and his inappropriate comments and gestures occurring more often than before. The client thinks his ADHD meds should be upped.*

22

**EXHIBIT B, Page 22 of 56**

*On August 2, 2024, speaking with counselor Katie Johnston RO states his recent behaviors of kicking a hole in the wall, not respecting boundaries of staff, and being defiant. The client shared that he wanted to prove a point about being mad so he planned to kick a hole in the wall. He shared that when he is set on doing something like this, that he doesn't back down he stated it's not worth it "I don't want to go back to doing so much work time over something stupid.*

*On August 6, 2024 the client shared about his time with his family over the weekend. He was very thankful for his time with family and was sad to return. He shared that his negative behavior yesterday was due to his desire to be with his family.*

*On August 13, 2024 the client continued the conversation about what he believes causes him to do some of the things he does. Client shared that he knows he needs to learn how to use his humor appropriately and that not all of his behaviors are impulsive. Some are premeditated... He also reported that he and his siblings complain a lot and always seem to be wanting to get each other in trouble. He reported that he believes that anger is "passed around" the family.*

*On August 27, 2024 the client came into session talking about a staff member not accepting his apology. Discuss the difference between a sincere apology and a "drive-by" apology... explain to the client that I have gotten great reports of his behavior with some staff, but with other staff, his behavior is worse. He shared that with staff he believes are more strict, he is making sure he thinks before doing and with the staff that are less strict, he feels a little looser with his mouth and behavior. I asked the client the list out all the things that he gets in trouble for.*

*On August 30, 2024 I checked in with the client about some of his friends graduating. The client shared that he is sad they are leaving but is very happy for them to be able to go home. He shared that he looks forward to the day that he gets to be with his family again... he shared that it is difficult to be kind when he is mad. He wants to be better at owning his behaviors, improving his focus, and pushing through difficult situations. He shared that unknown and a lot of schoolwork stress him out which leads to some of these behaviors.*

*On September 3, 2024, discuss which behavior the client would like to self monitor for a month. The client chose "calling staff and residence by the appropriate name. Being kind when addressing others."*

*On September 12, 2024, I asked him to pick out his best day in his worst day of the week. He shared about the night before when he thought a staff member wasn't trying to understand him and assumed he was not doing*

*what he was asked of him. He shared that he got really mad and shut down after cursing at the staff member. He shared that when he feels like someone isn't taking time to understand the whole situation, his anger is triggered. He talked about ruminating on the how "dumb" or "idiotic" the staff member is and it usually makes him more mad discuss what happens in his mind and body when he does this. He shared that it is like putting more gas on the fire". He later shared that it is like "I am a pot of boiling soup and I am just adding logs to keep the boiling going."*

F 0.68  The parents are considering three (3) placements post Whetstone.[18]


## THE STUDENT's IEPs

Petitioners provided a considerable amount of testimony reviewing each provision of the students' IEPs. The IHO thought there should be an analysis of the differences in the IEPs beginning with his initial IEP for historical reference.

1.01 IEP Fourth Grade 02/24/2021 -02/24/2022 – Historical Reference.

1.02   The initial case conference for the student was held during his fourth grade year. The student qualified for and Individualized Education Plan (IEP) under the category of Other Health Impairment (OHI).

1.03   The effective dates were 02/24/2021 through 02/24/2022.   This IEP was adequately designed to provide the student with a Free Appropriate Public Education (FAPE).  (P. Ex. 2)**.**

1.04   The Case Conference Committee (CCC) determined that the student's strengths were described as being trusting of others, works independently, and learns easily.  The student is very inquisitive about topics that interest him… (P. Ex. 2, page 1).

 1.05   The student[19] was doing well in all areas of study.  His NWEA Data:
> Math – Boy – 211 – 80% MOY -212- 69% Low Growth High Achievement
> Reading – Boy -206 – 72% MOY -218 -85% High Growth High Achievement

---

[18] In a letter dated September 12, 2024 to whom it may concern Janice Sanders, MSW,LCSW,LMSW, states: "I have been retained by the parent of RO to assist in securing a residential placement. It is my understanding that he has already been accepted at Evansville Children's Psychiatric Center (EPCC). RO is currently placed at Whetstone Ranch in Indiana by the parent, as this was the only residential placement that was within her financial means to provide. I am currently actively working with discovery Ranch and Eagle Ranch Academy on his admission review. Please feel free to contact me if you require any further information or clarification on the recommendations provided". (P. Ex. 104 page 1)

[19] RO and student will be used interchangeably throughout the document.

**EXHIBIT B, Page 24 of 56**

1.06   The RO's Supportive Information included ADHD, anxiety, disruptive behavior disorder with the medications to include Concerta 78mg, Zoloft 75 mg, Clonodine .1mg, Lamotrigine 25 mg.  (P.Ex.3, page 2).

1.07   The CCC determined that RO was functioning in the upper limits of the Average range, overall.  An academic assessment indicated that RO was performing the High Average range, overall.  Importantly, the student's behavioral rating scales in both the school and home settings indicated that the student struggled with conduct problems and depression, in both home and school setting.  (P. Ex. 2, page 2).

1.08   His Behavioral rating scales in the school setting indicated clinically significant items in hyperactivity, conduct problems, depression, and atypicality.  In the home, the student exhibited clinically significant behaviors as aggression, conduct problems  and depression.

1.09   His measures of adaptive functioning skills were rated in the Below Average range in overall General Adaptive Composite (GAD) and social adaptive domain (leisure, social skills).

1.10   RO had strength in the practical domain (community use, school/home living, health and safety, self-care) across both environments.

1.11   The parents concern in 2021-2022 IEP included low self-esteem, is disruptive, gets into trouble at school, dislikes school, has poor social relationships, complains often and is angry.

1.12   According to RO's teacher and mother, behavioral and adaptive functioning in the school and home settings indicate significant impairments that adversely affected the student's ability to participate in a classroom setting, and there are seven (7) behavioral incidents on file for the 2020-2021 school year ranging from defiance, disruption, disrespect, and verbal harassment... (P. Ex. 2, page 2).

1.13   RO's Behavior concerns indicated that he had 7 behavioral incidents during the current school year, ranging from defiance, disruption, disrespect, and verbal harassment. The student can become escalated in the classroom, and during transitional periods, which looks like blurting out, being aggressive verbally and physically, throwing objects, and being defiant. (P. Ex. 2, page 3).

1.14   The concerns also included that he is often off task, is distracting to others, and that he can become emotional when he is stressed.  It is reported that he is able to express himself after a cool down time as long as its used before he escalates.  He has done better at handling being told "no".

1.15   A Functional Behavior Assessment was not recommended at that time.

**EXHIBIT B, Page 25 of 56**

1.16  His Environmental Supports included 15 minutes of support in the special education setting daily to work on IEP goals and self-regulation.

1.17  The CCC determined that the behavior should be monitored weekly using Tally Sheets during specific class or period, by the Teacher of service.

1.18  The student was also provided accommodations as follows:
1. Preferential seating and line placement
2. Reteaching procedures
3. Offered a cool-down
4. Allow for choices when possible
5. Role-play and positive reinforcement
6. Advanced warning to changes in the schedule
7. Visual cues

1.19  The CCC determined that the pattern of the student's behavior interferes with his ability to participate in or focus on learning or the learning of others.

1.16  The point of contention and much discussion is the Goal for this student.  This IEP is  being discussed for historical reference. The Goals were outlined as follows:

1.17   RO's Goal Title was Verbal Disruption

1.18  The CCC noted that His Present Level: includes struggles with staying attentive to the assigned task.  He will often disrupt instruction by shouting out inappropriate comments that are off topic.  He was disruptive an average of two times per period based on data collection by his teachers.

1.19  The Standard(s) / Element (s) Aligned to Goal: were to Demonstrate skills necessary to properly interact with peers, school personnel, and community members.

1.20   The CCC concluded that RO's Specifically Designed Instruction would include direct instruction on maintaining a calm learning environment.  He will be given the opportunity to practice these skills across all setting through the use of visual reminders, modeling, verbal an on verbal cues, corrective feedback and frequent reinforcement of appropriate behaviors.

1.21   The student Goal Statement: included the use self-regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on interval data collection.

1.22   The student's Special Education Services included 15 minutes of behavioral support in the special education setting to focus on behavior goals and self-regulation. (P. Ex. 2, page 5).

**EXHIBIT B, Page 26 of 56**

1.23    It was determined that the following Related Services were not necessary: Accessible Materials, Assistive Technology, Extended School Year, Technical Assistance and Program Modification. Further that Periodic reports will be provided to parent/guardian at the end of each grading period/quarter.

1.24   The Reasons for provisions and reasons for rejecting other options: The committee discussed the need for the recommended services to improve student's behavioral needs within the classroom setting and agreed that this would best meet his needs at this time and a more restrictive placement is not indicated. (P. Ex. 2, page 6).

1.25   The case conference committee determined that re-evaluation was not required for the purpose of considering eligibility or providing additional information regarding the student's special education and related services…

The above was a capsule of the initial case conference for RO in the District.


THE REVISED IEP OF APRIL 15, 2021
2.01 The Revised IEP of April 15, 2021.

2.02   The IEP was revised in order to change the Special Education Services from 15 minutes of behavioral support in special education setting… to  3 30 minute periods (per day)  of support in the special education setting to support his behavior. (P. Ex. 3, page 5).


THE FIFTH GRADE IEP OF 04/07/2022
3.01    IEP Fifth Grade 04/27/2022 -04/07/2023

3.02    The CCC conducted the student's 5th grade move-in IEP of 04/07/2022.

3.03    The Student moved from the Lutheran School to Highland Elementary School.  His move-in IEP, although substantial the same as the above-mentioned IEP's, the 2023-2024 move-in IEP included the following additional information:

3.04    His Present level of academic and functional performance is based on Evansville Lutheran and it includes his current medications of Lexapro and Adderall.
His Non-District Supports included a therapist, Jamie Below,  and a psychiatrist, Dr. Kaplan.

3.05    The student also had a B+ in Math and a B- in Science.
His NWEA Data remained the same. Math at the beginning of the year 211 or 80% at the middle of the year 212 or 69%; Reading at the beginning of the year 206 or 72% and at the middle of the year 218 or 85%.  It was reported that RO would do better in math, if he did not make careless errors on the easier items.

3.06   The concerns of the Parent included his returning to Highland and that the student was able to do virtual through Evansville Lutheran while they adjusted medication. Behavior Concerns- There are behaviors of concern for the Case Conference Committee.

3.07   The behaviors of concern include:   Information from Evansville Lutheran on 8/25/2021: In the twelve days since school began, student is in the office at least every other day, sometimes just to cool off.  In class, he is argumentative, blurting out, calling other names, and asking why constantly.  He has issues getting his homework completed, does not use his time and procrastinates.

3.08    The CCC included behavioral Information from Highland IEP of  04/15/2021.(P. Ex. 4, page 3).

3.09   The concerns include that he often is off task, is distracting to others, and that he can become emotional when he is stressed, in the school setting.  RO is able to express himself after a cool down time, and has done better at handling being told 'no'.  It is also reported that RO is caring and enjoys playing with younger children.  RO does respond well to using cool down techniques as long as they are used before he escalates. Concerns in the home setting include RO's level of anxiety, and that he expresses a lot of depression.  It is reported that RO has been very negative lately, and finds fault in almost everything.  Additionally, RO's inability to tell the truth is a concern, and his over-exaggeration of everyday stressors and level of anxiety involved with said stressors.

3.10   His Environmental Supports remained 3 30 minute periods of support in the special education setting daily to work on IEP goals and self regulation (P. Ex. 4, page 3).
The Teacher of Service will monitor using a Tally sheet

3.11   His Accommodations included extra time and working in a small group. (P. Ex. 4, page 4).

3.12   His Goal Title remained <u>Verbal Disruption</u>.

3.13   The CCC did not change his Present Levels and determined that RO continues to struggle with staying attentive to the assigned task and the Goal Statement: … will use self-regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on data collection (P. Ex. 4, page 5).

3.14    The IEP's Method/Instrumentation for Measuring Progress: data collection.

3.15   The student's Least Restrictive Environment was the Resource room (In a general education classroom for 40% to 79% of the day). (P. Ex. 4, page 6).

3.16   The CCC discussed and considered the following harmful effects of the suggested service on the student.-  He may miss instruction with his general education peers and

**EXHIBIT B, Page 28 of 56**

general education teacher.  However, the CCC feels the benefits of the services outweigh the potential harmful effect. (P. Ex. 4, page 7).

**REVISED IEP OF 05/23/2022**
4.01 REVISED IEP 04/07/2022 – 04/07/2023

4.02 The IEP was revised on 05/23/2022 due to RO's behaviors.

4.03  His Present level of academic and functional performance: - Student has been at Highland since early April.  During this time we have seen ups and downs with his behavior.  In the general education setting, student struggles with staying focused and using social appropriate behaviors.  He often disrupts class with comments and noise. He can become argumentative. He has had several low level referrals (31) and has spent one day at our CARES program.  (P. Ex. 5, page 1).

4.04  His Medication Updated included Adderrall, Lexapro, Abilify, & Clonodine.

4.05  His Outside Supports were Dr. Metzger (weekly), Dr. Below, Dr. Esan, & Dr. Patel.

4.06 The Environmental Supports were changed to include six (6) 40 minute periods of instruction in the special education setting at the start of the 2022-2023 school year.

4.07  The Assessment Accommodations included small group testing and extra time.

4.08   His Goal Title remained Verbal Disruption- and the goal remained the same.

4.09 His Specially Designed Instruction – Student will receive direct instruction on maintaining a calm learning environment.  He will be given the opportunity to practice these skills across all settings through the use of visual reminders, modeling, verbal and non verbal cues, corrective feedback and frequent reinforcement of appropriate behaviors.

4.10 The Goal Statement remained the same.


**Revaluation, Review, Manifestation IEP of  04/13/2023**
5.01  Reevaluation, Review, Manifestation IEP 04/13/23 – 10/28/2023

5.02  On April 13, 2023 the student was a sixth grader at Thompkins Middle School the CCC  convened for reevaluation review and Manifestation Determination.

5.03 The Goal Statement included self-regulation strategies to maintain socially appropriate language/action 8 out of 20 attempts by the end of the 4th IEP grading period based on data collection.

5.04  The student had 45 behavior incidents documented on RDS during the 3rd quarter. All of these incidents have involved defiance, disruption, or harassment.

5.05  His Present Level Information includes Reading: 91% A; Math: 33% F; Science: 93% A; Social Studies: 36% F; PE: F; Resource: No grade – Student hasn't been in resource very much.  The times he was in resource he would normally be sent to the office due to not listening or disruptive behavior. (P. Ex. 6, page 2).

5.06  Student was making academic progress, His ILEARN scores: ELA at 5608 Pass Plus, Math at 6387 was below proficiency and Social Studies at 8502 was Passing.

5.07  His health problems now included a diagnosis of ADHD, anxiety, depression, Disruptive Mood Dysregulation Disorder (DMDD)  and Oppositional Defiant Disorder (ODD).

5.08  His medications included an increased dosage of Adderall, Lexapro, Trileptal and intuniv (switched to this in December) all of which he takes at night instead of the morning. (P. Ex. 6, page 2).

5.09  The Concerns of the Parent included a timeline of the student's medical and educational history from age 3 until present day, including his current medical diagnosis.

5.10  The parents stated that the student struggles with transitions and change. Also, that the student will be evaluated for autism in July through a community provider. They believed that his behavior was a manifestation of his disability.  (P. Ex. 6, page 3).
.
5.11  The manifestation determination was based on behaviors by the student on March 22, 2023, while at breakfast.  It was alleged that the student continue to call another student  'Peter' and "Peter Griffin". The complaint stated that the student was separated from all other students at breakfast, and at his own table, but he turned around and continued to be a problem.  He also turned around and started yelling to the other student, 'Why did you ask that boy to the dance?'.  He was told to stop, eat his food, and go to homeroom. He continued.  He was told to stop again and he continued to call the student 'Peter'.  He was told that he is bullying people by calling them names.  He then started yelling the other student's name, did you ask that boy out, and aid it's not bullying since he used the student's real name.  .., The  witness felt that this had gone past bullying and harassment because it was a daily issue.  (P. Ex.6, page 3).

*"This was the fourth incident of verbal harassment and bullying of this same student since mid-February.  The student first reported this behavior to Mrs. Walker back on February 16th.  The victim reported that the student continued to call him "Peter" and "Peter Griffin."  He stated that this has been happening for a while and he had finally decided to report it to someone.  Mrs. Walker then shared this information with me, and I followed up with the student and we had a conversation about positive language and did reteaching of expectations. On February 28th , the student once again called the victim :Peter Griffin" at breakfast.  The student was assigned a lunch detention and was assigned a table by*

*himself at breakfast.  Mrs. Hartz once again retaught expectations to the student ad discussed avoiding and ignoring this student.  On March 2nd, the student once again targeted this same victim in the breakfast line, calling him "Peter Griffin."  I spoke with the student and assigned him an after-school detention.  I once again retaught expectations and reinforced what we had talked about previously regarding not speaking to this student and avoiding him here at school.  I followed up with an email to his mother and father to express my concern regarding the ongoing verbal harassment and bullying of this student.  The fourth incident, reference above, took place on March 22nd".*  (P. Ex. 6, page 4).

5.12  It was determined that "The conduct in question was not caused by, or directly and substantially related to the student's disability[20]."

5.13  The CCC placed the student on homebound instruction and scheduled to reconvene in 60 instructional days.  The student's parents requested an expulsion hearing.

5.14  Behavior Concerns remained the same as the previous IEP.

5.15  This IEP was created after the Functional Behavior Assessment was completed… Based on data collected from observations and school referrals, the student's disruption in the classroom is due to attention seeking.  He will often become defiant and disruptive with adults to escape a particular setting, which leads to him going into the office where his attention seeking behaviors continue with adults and peers.

5.16  In regards to unsafe physical actions, it appears that many of these instances are due to impulse control and when the student is unable to control extreme emotions.  The symptoms are related to his diagnoses of both ADHD and DMDD.

5.17  The Conditions that Contribute to the Behavior of Concern include attention gained from peers and staff contribute to the behaviors of concern.  When a staff indicates student needs to go to the office, student has responded with "finally" indicating he may be trying to escape.  Right before the behavior occurs there is an absence of attention.

5.18 The Conditions that Maintain the Behavior of Concern include when the student is disruptive in the classroom, he is often given attention from peers and adults.  When the student is defiant with teachers, he is often sent to the office and receives attention from the office staff and other peers.

5.19  A review of the data around his Related Deficits shows he needs to develop skills related to attention to task, maintaining appropriate level of activity for a task, interacting with others in a manner that respects differences, and develop self-regulation skills.

---

[20] "The conduct in question was not the direct result of the public agency's failure to implement the student's individualized education program. The conduct has been determined not be a manifestation of the student's disability and therefore disciplinary procedures apply to the student.  The student will continue to receive appropriate services."  (P. Ex. 6, page 4).

**EXHIBIT B, Page 31 of 56**

5.20  The Behavior Intervention Plan included the following:
Replacement Behaviors:  Student will use self regulation strategies to maintain socially appropriate language/action.
Evidence-based Instructional Strategies: Maintain clear expectations and hold student accountable.  Behavior modification plan.
Maximizing Reinforcement  of Replacement Behaviors: 4:1 specific positive praise.  2x10 strategy -for 10 days in a row staff member will engage for 2 minute discussion with the student.  The discussions will exclude academic and behavior topics.
Minimizing Reinforcement of Interfering Behaviors:  Avoid power struggles with  the student when he is seeking attention. Avoid sending him to locations with opportunities for increased attention, unless safety is a concern.
Behavior Goal(s)/Skills to be Taught and Learned: Social Skills without the use of verbal aggression towards others and accepting direction from staff without demonstrating defiance.

5.21  The Accommodations and Participation in Testing Programs remained basically the same as the previous IEP.

5.22  The Goal was changed to Replacement Behavior.

5.23  His Present Levels indicated that the Student struggles with staying attentive to the assigned task.  He will often disrupt instruction by shouting out inappropriate comments that are off topic.  Student was disruptive on average two times per period based on data collection by his teachers.

5.24  The Standard(s) Element (s) Aligned to Goal remained the same.  Demonstrate skills necessary to properly interact with peers, school personnel, and community members.

5.25  The students Specially Designed Instruction remained the same.

5.26  His Goal Statement included: Student will use self regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on data collection.

5.27   The Progress Monitoring Design remained  Descriptive Documentation

5.28  It was the schools testimony that the Assessment was incorrectly recorded as Student will use self regulation strategies to maintain socially appropriate language/action during 6 out of 10 attempts by the end of the 4th IEP grading period based on data collection. (P. Ex. 6, page 7).  The same should have remained 8 out of 10 attempts.

5.29  The student was placed on homebound services upon the manifestation determination.  The Special Education Services Narrative: The student was to receive one hour of instruction a day for each day school is in session. The services may be

**EXHIBIT B, Page 32 of 56**

delivered virtually or in person as agreed upon by the family and teacher of service. The CCC was scheduled to reconvene in 60 school days on/before 9/21/23. (P. Ex. 6, page 8).

5.30    The parents, Teacher of Record, Instructional Strategist, Assistant Principal, Special Education Coordinator, School Psychologist, General Education Teacher and Public Agency Representative participated in the case conference committee meeting.

5.31    The stated purpose of this meeting was re-evaluation review to address and discuss the functional behavioral assessment.

5.32    The addition of the BIP into the IEP substantially cured the deficiency in this IEP.

Parents filed a request for Mediation with the IDOE as a result of RO's placement.

"An important feature of the IDEA is that is contains a statutory 30-day resolution period once a "due process complaint" is filed. 20 USC.§ 1415(F)(1)(B). That complaint must list all of the alleged deficiencies in the IEP. The Department then has thirty days to remedy these deficiencies without penalty. If, at the end of the resolution period, the parents feel their concerns have not been adequately addressed and the amended IEP still fails to provide a FAPE, they can continue with the due process proceeding and seek reimbursement. The adequacy of the IEP will then be judged by its content at the close of the resolution period.

The failure to change the name of the goal did not make the 2022-2023 IEP defective. The failure to review and add additional services and support, prior to the behavioral intervention plan, made the IEPs defective. It appears that the staff at Thompkins constantly reported his behaviors to his parents but failed to seek additional interventions to address the escalating behaviors.

…A school district that inadvertently or in good faith omits a required service from the IEP can cure that deficiency during the resolution period once it receives a due process complaint. *R.E. Individually, on behalf of Individually, on behalf of J.E. v. New York City Department of Education, 694 F.3d 167 at 16.* This analysis is appropriate in the case at bar. The School, as a part of the Mediation process, engaged Mom and her representative in settlement talks. The parties agreed to place the student in The Learning Center and Mom dismissed her complaint. The placement at TLC essentially cured any deficiency regarding measurement of behaviors and related services in the IEP. TLC's program was designed to monitor and measure progress while implementing the BIP.

In determining whether an IEP complies with the Individuals with Disability Education Act (IDEA), courts make a two-part inquiry that is, first, procedural, and second, substantive. At the first step, courts examine whether there were procedural violations of the IDEA, namely, "whether the state has complied with the procedures set forth in the IDEA." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186,... Courts then examine whether the IEP was substantively adequate, namely, whether it was "reasonably calculated to enable the child

33

**EXHIBIT B, Page 33 of 56**

to receive education benefits[s]."Id. (quoting Rowley, 458 U.S. at 206-07). Substantive inadequacy automatically entitles the parents to reimbursement. Procedural violations, however, only do so if they "impede the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decision making process," or "caused a deprivation of educational benefits." The IDEA requires that every IEP include "a statement of the child's present levels of academic achievement and functional performance", describe how the child's disability affects the child's involvement and progress in the general education curriculum," and set out "measurable goals, including academic and functional goals," along with a "description of how the child's progress toward meeting" those goals will be gauges.§§ 1414(d)(1)(A)(i)(I)-(III). *Endrew F. v Douglas County School District RE-1*, 580 US 386, (2017). The April 13, IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

## ANNUAL IEP October 27, 2023
6.01 The Annual IEP from 10/30/23 – 10/29/24

6.02 The Annual IEP was similar to the previous IEP.

6.03 Progress Monitoring Goals included:
        1.Replacement Behavior – Student will use self regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on data collection.

6.04  The data showed that RO had poor communication 35/320 30 minute time intervals in the first grading period.  RO had appropriate communication approximate 89% of the time.  He had an unsafe body 16/320 30 minute time intervals in the fourth grading period. RO had appropriate communications 95% of the time.

6.05  The data showed that his Present level of academic and functional performance included information that the student is working through the EL Curriculum and Envision Math Curriculum.
        In ELA, the student was able to read the book A Long Walk to Water and the current book One Last Work independently.  He has demonstrated he can read at 1100L with no support.  He is able to answer comprehension questions from the texts well, and he is able to write full paragraphs with little support.  He does well making inferences and only occasionally needs help understanding the theme of the text.  He is on grade level.

        In Math, he is working on finding the whole given a part and the percent.  He does well setting-up equations and has mastered finding the percent of a number.   He sometimes needs assistance breaking down multi-step word problems and struggles with mathematical fact fluency.  He is on grade level with minimal support. (P. Ex. 7, Page 1).

6.06  His NWEA scores were Math 198 in Fall 23; Language 223 in Fall 23; and Reading 216 in Fall 23.  His Grades for the first grading period ELA and Reading = 91.2% for the first grading period and Math =  91.0% for the first grading period.

34

**EXHIBIT B, Page 34 of 56**

6.07  The listed Concerns of the Parent include – Mom's concern about the battle she has with the student to get him to school.  She expressed concerns about him being safe at home and expressed that they were exploring long term residential options. His Eligibility remained the same with no Special Considerations.

6.08  The CCC Behavior Concerns included: The student tends to blurt out, curse, and call other student names.  His teachers have observed that this behavior usually occurs when he is bored or when he does not want to complete a task.  The pattern of the student's behavior does interfere with their ability to participate in or focus on learning or the learning of others.

6.09  The CCC Analysis of Functional Behavior Assessment Results showed Behavior(s) of Concern: The sources of existing and new data reviewed for the FBA (systemic observations, ABC data, frequency data, discipline history) confirmed the following behavior of concerns for the student: disruption, unsafe physical actions and defiance. (P. Ex. 7, Page 3).

6.10  The Goal Title remained Replacement Behavior and the Objectives, Methods and Progress Monitoring remained the same as the previous IEP. (P. Ex. 7, Page 5).

6.11  This IEP included Special Education Services, in a self contained behavior based program within the School District and receive transportation. The program was outside of the student's home school area.

6.12  Progress reports will be provided +/- one week of the report card.

6.13  The CCC's stated reasons for provisions and reasons for rejecting other options were the student "will attend a behavior based self contained program within the EVSC. The supports of the program will be beneficial for his socialization. He needs more support (behaviorally) than the traditional school setting could provide at this time. The goal of attending the behavior based program is to learn the skills needed to be successful in traditional school setting". (P. Ex. 7, page 7).

6.14  The participant included Mother, Student, Teacher of Record, Instructional Strategist, SEL specialist, Public Agency Rep, Social Worker and Wrap Facilitator from Southwestern attended this IEP. (P. Ex. 7, page 8). `

6.15  This IEP was sufficiently designed to meet the needs of the student.  The implementation of the BIP effectively eliminated any previously perceived deficiency within the  IEPs.

6.16  The Goal Title of Replacement Behavior remained the same as the previous IEP. This Goal Title did not prohibit the student from receiving FAPE.  TLC was effectively implementing the student's IEP.

**REVISED IEP JANUARY 9, 2024**
7.01  The revised IEP from 10/30/2023 – 10/29/2024

7.02  The student's Progress Monitoring Goals remained as follows:
1.  Replacement Behavior – Student will use self regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on data collection.

7.03  The CCC determine that R.O. had poor communication 109/342 30 minute time intervals in the second grading period.  R.O. had appropriate communication approximately 68% of the time.  R.O. had an unsafe body 34/342 30 minute time intervals in the second grading period. R.O. had appropriate safe body approximately 90% of the time.

7.04   After the Annual CCC meeting R.O. had poor communication 35/320 30 minute time intervals in the first grading period.   R.O. had appropriate communication approximately 89% of the time.  R.O. had an unsafe body 16/320 30 minute time intervals in the first grading period.  R.O. had appropriate safe body approximately 95% of the time.

7.05   His NWEA scores in Math 198 in Fall of 2023 and 211 in Winter 2023; Language 224  in Fall 2023; Reading 216 in Fall of 2023 and 220 in Winter of 2023.  RO's ELA and Reading  were 91.2% for the first grading period along with Math at 91.9% for the first grading period.  The Second Grading period ELA and Reading were 32.3% and Math 31.3% for the second grading period.  The significant drop in grades is due to R.O.'s poor task attention.  R.O. had poor task attention 247 out of 342 30 minute time intervals in the second grading period.  He was on task approximately 28% of the time.  (P. Ex. 8, page 2).

7.06   Mom did not attend the meeting, but expressed to the Exceptional Learning Specialist via the phone call, that R.O. is emotionally hurting the family at home and that the outside therapies he has had in the past have not been effective on him.  She stated he seems to be getting worse at home.  Parent state that R.O. is on a waitlist at 3 differential residential facilities, Star Guides in Utah, EPCC and one in Northern Indiana.  She stated that she is worried that if she sent him to school he would disrupt the learning environment and get into trouble.

7.07   The IEP remained essentially the same.  The Written Notes and Other Relevant Factors included the Meeting Purpose:  Mom discussed with the Public Agency Representative about her desire for him to go to a residential facility due to instances that were occurring outside of school.  Homebound services were brought up as an option during the conversation  and could be discussed at the conference as he was on the waiting list for residential through the outside placement agency.  Mom gave permission to hold the meeting without her in attendance.

**EXHIBIT B, Page 36 of 56**

7.08   The CCC discussed the placement of RO.   Parents gave permission to hold the conference without being present.   Prior to the meeting, a discussion was held that the parent wanted RO to go on homebound services while they were waiting on a residential placement for RO from an outside placement, due to issues occurring outside of school.

7.09   At the meeting the committee discussed that homebound could be an option, but it would have to be a medical homebound placement instead of an IEP homebound placement since RO's needs could be met in the separate day school setting.  The options the committee discussed to assist with the mom's request for homebound services were to provide the parents with the medical homebound form, to allow RO to continue services at The Learning Center, but if the parent did not feel like he could attend on certain days, R.O. could attend virtually or with the use of Google Classroom.

7.10   The medical homebound form was given to the parent if she would like to pursue homebound services as she requested prior to the meeting.  The committee felt keeping him at school would continue to be his least restrictive environment with options to support his academics while parents pursue outside agency placement in a residential facility for non-academic concerns. (P. Ex. 8, page 9).

7.11   This IEP was substantially the same as his previous ones. The student was suspended in December.  His mother made the decision to Home School the student. Ellyn Hulsey testified that *"at this time after the October conference is exactly what I was talking about with the baseline changes data. So we were seeing an uptick in his behavior from the October conference to December, which did result in similar repeated conversations, sexual comments to his peers, which resulted in the suspension, but at no means would I, from the suspension say, oh, we can't handle you. Instead we said, let's go to conference and discuss what we need to do different.* (Tr. Nov 30 page 219:1-25; page 220:1)


## III. CONCLUSIONS OF LAW

Based upon the above findings of fact, and argument and legal memorandums from counsel, the conclusions of law are as follows:

C. 01  All Conclusions of Law that can be deemed Findings of Fact are hereby deemed Findings of Fact.  All Findings of Fact that can be deemed Conclusions of Law are hereby deemed Conclusions of Law.

C. 02  The Petitioners bear the burden of proof in this hearing.  *Schaffer v. Weast*, 546 U.S. (205).  To prevail, the Petitioner must establish their position by a preponderance of the evidence.

C. 03  Student is eligible for special education and related services for Other Health Impairment.

C. 04  Whetstone Boys Ranch is not an appropriate placement for the Student because it does not provide all of the behavioral supports the student needs.  Whetstone operates with a Headmaster his Assistant and one license professional counselor, for up to nine students.  Whetstones response to maladaptive behaviors include  kinesthetic kind of activities and interventions like pushups or running extra laps around the campus. Whetstone does not have a board certified behavioral analyst, teacher certified in special education, a behavior interventionist, or  behavior technician.

**ISSUE 1.** **Whether during the 2022-2023 and 2023-2024 statutory period the IEP was appropriate and was reasonably calculated to provide meaningful educational benefit, including behavioral assessments, behavior intervention plans, accommodations and the development of appropriate goals and services, the required elements, including:**

   a. Whether the IEP included updated Present Levels of Academic Achievement and Functional Performance, and if not, did this violate 511 IAC 7-32-42 and 511 IAC 7-42-6.
   b. Whether the IEP included necessary accommodations, and if not, did this violate 511 IAC 7-42-6(f)(6)(A); 511 IAC 7-32-9.
   c. Whether the IEP included special education and related services, and if not did this violate 511 IAC 7-32-79.
   d. Whether the IEP included supplementary aids and services, and if not, not did this violate 511 IAC 7-42-6(e)(2).
   e. Whether the IEP included specific and measurable goals drafted to meet all his needs, and if not, did this violate 511 IAC 7-42-6(f)(2)(A)(i)(ii); 511 IAC 7-42-6(f)(3).

   Whether any of the foregoing issues resulted in a procedural violation or multiple procedural violations, and if so, did that/those procedural violation(s):
   iii. Impeded the Student's right to a free and appropriate public education.
   iv. Caused a deprivation of educational benefit, that resulted in a denial of a free appropriate education pursuant to 511 IAC 7-32-40; 511 IAC 7-32-12; 511 IAC 7-32-14(a); and 511 IAC 7-33-2.

**ISSUE 1a. Whether the IEP included updated Present Levels of Academic Achievement and Functional Performance, and if not, did this violate 511 IAC 7-32-42 and 11 IAC 7-42-6.**

   No. The Petitioners have met the burden of proof to show that at some point during the 2022-2023 statutory period (after the move- in IEP) the Present Levels of Academic Achievement and Functional Performance (PLAAFP) should have been updated. This update should have occurred with the revised IEP.

   Yes. The April 2023-2024 IEPs included updated Present Level of Academic Achievement.  The School conducted a complete Functional Behavioral Analysis that

38

**EXHIBIT B, Page 38 of 56**

included the required components of 511 IAC 7-42-6(c). The FBA included the required positive behavioral interventions and supports, to address any of the student's behaviors that impede the student's learning or the learning of others. The Petitioners have failed to show by the preponderance of the evidence that the Respondents did not complete an updated PLAAFP.  There is no denial of FAPE.


**ISSUE 1b.  Whether the IEP included necessary accommodations, and if not, did this violate 511 IAC 7-42-6(f)(6)(A); 511 IAC 7-32-9.**

Yes.  The Petitioners failed to show by the preponderance of the evidence that Respondents failed to include the students Statewide testing scores and achievement assessments. Further, no evidence was presented to show a need for this student needed to participate in an alternate statewide assessment program. There is no denial of FAPE.


**ISSUE 1c.  Whether the IEP included special education and related services, and if not did this violate 511 IAC 7-32-79.**

Under **511 IAC 7-32-79 (a) "Related services"** means transportation and such developmental, corrective, and other supportive services as are required to assist a student with a disability to benefit from special education. Examples of related services are described in 511 IAC 7-43-1.

Under the accompanying article **511 IAC 7-43-1 Related services** means transportation and developmental, corrective, and other supportive services that are required for a student to benefit from special education. The public agency must provide related services to a student if the student's CCC determines that related services are necessary for the student to benefit from special education.
(b) Related services may be provided as:
    (1) direct services by qualified professionals; or
    (2) integrated services by teachers or paraprofessionals acting in accordance with the instructions of qualified professionals.
(c) Related services include the following and may include other developmental, corrective, or supportive services if the services are required for a student to benefit from special education:
    (2)  Counseling services.
    (5)  Medical services for the purpose of diagnosis and evaluation.
    (8)  Parent counseling and training.
    (9)  Physical therapy.
    (10) Psychological services.
    (15) School social work services.
    (16) Transportation.
    (17) Other supportive services.

**EXHIBIT B, Page 39 of 56**

(m) Parent counseling and training may:
   (1) include:
      (A) assisting the parents in understanding the special needs of their child;
      (B) providing parents with information on child development; and
      (C) assisting parents in understanding the student's educational program and helping them to acquire the necessary skills that will allow them to support the implementation of their child's IEP;
   (2) be provided:
      (A) as part of the CCC process; or
      (B) in the form of special meetings or conferences; and
   (3) be provided by any of the persons listed in subsection (g)(3). The nature of the parent counseling and training needs must guide the selection of the appropriate individual and manner in which the counseling and training are provided.

(o) Psychological services must be provided by school, clinical, and child psychologists or psychiatrists who are appropriately licensed and trained to provide the following services:
   (1) Administering psychological and educational assessments as a member of the multidisciplinary team.
   (2) Interpreting assessment results.
   (3) Obtaining, integrating, and interpreting information regarding student behavior and conditions related to learning.
   (4) Consulting and working with school personnel and parents in planning and developing a student's IEP to meet the special needs of a student as indicated by the following:
      (A) Psychological assessments.
      (B) Interviews.
      (C) Direct observation.
      (D) Behavioral assessments.
   (5) Planning and managing a program of psychological services, including psychological counseling for students and parents.
   (6) Assisting in developing positive behavioral intervention strategies.

(t) School social work services:
   (1) may include:
      (A) serving as a member of the educational evaluation multidisciplinary team with responsibilities that may include the preparation of a social and developmental history on a student;
      (B) group and individual counseling with the student and family;
      (C) working, in partnership with parents and others, on those problems in a student's home, school, and community life that affect the student's adjustment in the educational setting;
      (D) mobilizing school and community resources to enable the student to learn as effectively as possible in the student's educational program; or
      (E) assisting in developing positive behavioral intervention strategies; and
   (2) must be provided by a licensed school social worker.

**Yes.** Petitioners have met the burden of proof to show that the Respondents failed to provide the student with related services during the statutory period. This family was in crisis as they met with Lifestance and Southwestern Behavioral Healthcare for counseling and wraparound services. The family received services at Lifestance and Mother continued to stress that she was going to place RO in a residential facility. During the 2022-2023 statutory period, the school, did not offer the services of a license social worker, parental counseling or a psychologist. The school allowed the family to continue receiving services from outside sources. RO began counseling at 4 years of age. His behaviors carried on into each school setting. This procedural violation denied FAPE to this student. His maladaptive behaviors throughout the day may have benefited from access to the one or more of the above-in school services. It must be noted that the student received many services from an outside source, and Mom admitted that they did not work. Yet, he may have benefitted from these services being provided at Thompkins.

**No.** In the 2023-2024 school year this procedural error was corrected by his referral to TLC. The Petitioners failed to show by the preponderance of the evidence that the IEP's formulated at the time of the manifestation was not appropriate and that appropriate services were available for the student.

The April 13, 2023 IEP and the subsequent IEPs met the required components of 511 7-42-6. It has been held that an IEP need not directly address every possible need of the student. *See J.D. v. Crown Point School Corp.*, 2012 WL 639922 21 (N.D. Ind. 2012). The question is whether the IEP addresses the student's individual needs. Id. The April 13, 2023 and subsequent IEP did just that. The IEP included the BIP which was being successfully implemented by TLC. The student decided not to participate in his education, due to a couple of factors; 1) denial of the request to attend ½ day school and 2) being increasingly aware that his parents were planning to send him away to a boys ranch. The parents did not participate in the January 7, 2024 case conference (due to Mom's illness) but she communicated to the CCC that she wanted to place the student on homebound. The CCC informed mother that she must obtain a physician's consent for medical homebound. The CCC would not recommend home school for the student. The CCC forwarded a medically necessary form to Mom for completion by the student's physician. Yet his psychiatrist, Dr. Evans-Robinson determined that RO did not have a medical condition that would necessitate a homebound placement. Mom did not return the form and the student did not return to school. Mom testified that she had decided to home school the student until his placement into a residential therapeutic facility.

To determine whether an IEP is appropriate, it is critical to remember that an IEP is a can only be determined as of the time it is offered to the student, and not at some later date .... Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement.") The adequacy of an IEP must be judged considering the available information upon which it was based. See *M.B. v. Hamilton Southeastern Sch.*, 2010 U.S. Dist. LEXIS 80719, 20 (S.D. Ind. Aug. 10, 2010) (stating "…the Court should not engage in a reexamination with hindsight that is enlightened by additional evidence or information not provided or available to the CCC at the time of either case conference.")

41

**ISSUE 1d.  Whether the IEP included supplementary aids and services, and if not, not did this violate 511 IAC 7-42-6(e)(2).**

No. The Petitioners have met their burden of proof.  The Respondents 2022-2023 revised IEPs failed to supplementary aids and services necessary to allow this student to advance appropriately towards attaining the annual goals.

Yes. The Petitioners failed to show by the preponderance of the evidence that the 2023-2024 IEPs failed to include supplementary aids and services necessary to allow this student to advance appropriately towards attaining the annual goals.

**ISSUE 1e.  Whether the IEP included specific and measurable goals drafted to meet all his needs, and if not, did this violate 511 IAC 7-42-f)(2)(A)(i)(ii); 511 IAC 7- 42-6(f)(3).**

No.  The Petitioners have met their burden of proof. The Respondents 2022-2023 revised IEPs failed to include specific measurable goals drafted to meet all the needs of the student. Although the IEP was revised after the move-in IEP the School failed to include specific measurable goals drafted to meet all his needs.

Yes.  The Petitioners failed to show by the preponderance of the evidence that the 2023-2024 IEPs post manifestation, failed to include specific and measurable goals drafted to meet all the needs of the student.

**Whether any of the foregoing issues resulted in a procedural violation or multiple procedural violations, and if so, did that/those procedural violation(s):**
**v.  Impeded the Student's right to a free and appropriate public education.**
**vi.  Caused a deprivation of educational benefit, that resulted in a denial of a free appropriate education pursuant to 511 IAC 7-32-40; 511 IAC 7-32-12; 511 IAC 7-32-14(a); and 511 IAC 7-33-2.**

Yes.  The Petitioners met their burden of proof to show that the procedural violations regarding the evaluations impeded the students right to a free appropriate public education.

No.  The Petitioners failed to show by the preponderance of the evidence that the 2023-2024 IEPs post manifestation resulted in a procedural violation or multiple procedural violation to impede the student's right to FAPE or cause a deprivation of educational benefit, that resulted in the denial of FAPE.

"Under [the] IDEA and its implementing regulations, students with disabilities ... are entitled to receive [a] FAPE through an Individualized Education Program (or

42

**EXHIBIT B, Page 42 of 56**

IEP)." *Charles H.,* 2021 WL 2946127 (quoting 20 U.S.C. § 1401(9)(D)). An IEP is a written document that lays out how the student will obtain measurable annual goals and that mandates specific special education and related services that the student must receive. 20 U.S.C. § 1414(d)(1)(A)(i). It is created for each student by a special "IEP Team," consisting of the child's parents, at least one regular-education teacher, at least one special-education teacher, and other specified educational experts. *Id.* § 1414(d)(1)(B). An IEP is the main tool for ensuring that a student is provided a FAPE. *See Charles H.,* 2021 WL 2946127 (*quoting Lofton v. District of Columbia,* 7 F. Supp. 3d 117, 123 (D.D.C. 2013)). " (*Robles v. District of Columbia* 81 IDELR 183 D.D.C. August 26, 2022)

The United States Supreme Court addressed this issue and held that, based on the information a school has available to it, the IDEA requires the school to develop an IEP "reasonably calculated to enable a student to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). The "reasonably calculated" qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials, informed by their own expertise and the views of a student's parents or guardians; any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal.

An IEP must aim to enable the student to make progress. The essential function of an IEP is to set out a plan for pursuing academic and functional advancement. And the degree of progress contemplated by the IEP must be appropriate in light of the student's circumstances. A student's IEP need not aim for grade-level advancement if that is not a reasonable prospect. But that student's educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives. The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. At the same time, deference is based on the application of expertise and the exercise of judgment by school authorities.

The April 7, 2023, IEP recognized the Student's behavioral issues and set out behavioral interventions to address these issues including, emotional behaviors, functional and executive functioning and set out special education services specifically designed to address the student's needs.

The IEP can only be a "snapshot in time" not a retrospective and can only be based on information available to the CCC when the IEP is devised. *Mandy S ex rel. Sandy F. v. Fulton County Sch. Dist.*, 205 F.Supp.2d 1358, 1367 (N.D. Ga. 2000)(quoting *Roland M. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) ("actions of school system cannot…be judged exclusively in hindsight).

The data provided during the CCC on October 27, 2023 indicated that RO met exit criteria from TLC. The RO was successful in the program and was scheduled to transition to Thompkins Middle School. His attendance and subsequent behavior at the CCC changed

**EXHIBIT B, Page 43 of 56**

the minds of the CCC and RO was returned to TLC. RO became extremely angry and noncompliant because he was not allowed to attend school ½ day. His behaviors escalated to a point where he was suspended from TLC. He shared with a wraparound facilitator that he was not going to do his school work because he wanted to return to Thompkins. Mom decided to home school RO until his placement in April of 2024 at Whetstone Boys Ranch in Missouri.

The pre-mediation agreement allowed RO to receive FAPE at The Learning Center. The Functional Behavioral Analysis and the subsequent implementation of the BIP at TLC cured any deficiency (failure) by the school to adequately address his behavioral needs.

The evidence established that the Petitioner did not meet the Petitioner's burden of proof to show that the Respondents failed to develop an IEP that met the standard set out in *Endrew F.*, 137 S. Ct. at 1001. The IEP was reasonably calculated to enable the student to make progress appropriate in light of the child's circumstances. "The 'reasonably calculated' qualification reflects recognition that crafting an appropriate program of education requires a prospective judgment by school officials". Endrew F., 137 S. Ct. at 999.

Pursuant to 511 IAC 7-45-7(k), an Independent Hearing Officer may find that a student did not receive a free appropriate public education only if the procedural inadequacies:
(1) impeded the child's right to a free appropriate public education.
(2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parent's child; or,
(3) caused a deprivation of educational benefit.

The Petitioners failed to prove by the preponderance of the evidence that the 2023-2024 IEP caused a deprivation of educational benefits thus a denial of FAPE..

The evidence established that the Petitioner did not meet the Petitioner's burden of proof to show that the Respondents failed to develop an IEP that met the standard set out in *Endrew F.*, 137 S. Ct. at 1001. The IEP was reasonably calculated to enable the student to make progress appropriate in light of the child's circumstances. "The 'reasonably calculated' qualification reflects recognition that crafting an appropriate program of education requires a prospective judgment by school officials". Endrew F., 137 S. Ct. at 999.

Pursuant to 511 IAC 7-45-7(k), an Independent Hearing Officer may find that a student did not receive a free appropriate public education only if the procedural inadequacies:
(1) impeded the child's right to a free appropriate public education.
(2) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parent's child; or,
(3) caused a deprivation of educational benefit.

The Petitioners failed to prove by the preponderance of the evidence that the 2023-2024 IEP caused a denial of FAPE on that basis.

**ISSUE 2. Whether during the 2022-2023 and 2023-2024 statutory period Respondents conducted an appropriate evaluation and/or a reevaluation sufficiently comprehensive to identify all of the students' special education and related services' needs [including speech therapy, occupational therapy and assistive technology], and if not, did this violate 511 IAC 7-32-30; 511 IAC 7-40-3; and 511 IAC 7-40-8; 511 IAC 7-32-79; 511 IAC 7-43-1.**

**Pursuant to 511 IAC 7-32-30 an "Educational evaluation"** defined

Sec. 30. (a) "Educational evaluation" means procedures used in accordance with 511 IAC 7-40 and 511 IAC 7-41 to provide information about a student's disability or suspected disability for the student's CCC to determine the following:

> (1) Whether a student is eligible for special education and related services.
> (2) If eligible, the nature and extent of the special education and related services that the student needs.

(b) Based on the suspected disability or disabilities, the educational evaluation may address the following:

> (1) Development.
> (2) Cognition.
> (3) Academic achievement.
> (4) Functional performance or adaptive behavior.
> (5) Communication skills.
> (6) Motor skills and sensory responses.
> (7) Available medical and mental health information that is educationally relevant.
> (8) Social and developmental history.
> (9) Analysis of other factors.
> (10) Other assessments or information necessary to determine eligibility and inform the student's CCC.

**Pursuant to 511 IAC 7-40-3 Educational evaluations** states that (a) This rule applies to educational evaluation procedures that enable a student's CCC to determine:

> (1) whether the student is eligible for special education and related services; and
> (2) if eligible, the special education and related services necessary to meet the educational needs of the student.

(e) The public agency must establish, maintain, and implement procedures to ensure the following:

> (4) The student is assessed or information is collected in all areas related to the suspected disability, including, if appropriate, the following:
>> (A) Development.
>> (B) Cognition.
>> (C) Academic achievement.
>> (D) Functional performance or adaptive behavior.
>> (E) Communication skills.
>> (F) Motor and sensory abilities, including vision or hearing.
>> (G) Available educationally relevant medical or mental health information.
>> (H) Social and developmental history

45

**Pursuant to 511 IAC 7-40-8 Reevaluation Sec. 8.** (a) Once a student is eligible for special education and related services, any subsequent evaluation of the student is reevaluation, even if the student is being evaluated because a different or additional eligibility category is suspected.
(b) A public agency must consider reevaluation for each student receiving special education and related services: 65

> (1) at least once every three (3) years; however, reevaluation need not occur if the parent and the public agency agree that it is unnecessary;
> (2) if the public agency determines, at any time during the three (3) year cycle, that additional information is needed to address the special education or related services needs of the student; and
> (3) if the student's parent or teacher requests reevaluation.

**Yes.** During the 2022-2023 school year, Petitioners met their burden of proof to show that the Respondents failed to provide the student with an appropriate evaluation and/or reevaluation during the 2022-2023 statutory period. The students' initial case conference of February 24, 2021 concluded that the student met eligibility criteria for Other Health Impairments (OHI). He had 7 behavioral incidents on file for the 2020-2021 school year ranging from defiance, disruption, disrespect, and verbal harassment.[21] His IEP was revised on or about April 15, 2021. His move-in IEP was dated April 7, 2022 at Highland Elementary. He had a revised IEP dated May 23, 2022 due to (31) low level referrals and had spent one day at the CARES program. (P. Ex. 5, page 1). The re-evaluation would have benefited the student.

**No**. During the 2023-2024, the Petitioner's failed to meet their burden of proof to show that the Respondents failed to provide the student with an appropriate evaluation and/or reevaluation during the 2023-2024 statutory period. The students' behavior began to escalate throughout the 2022-2023 statutory period. He was receiving constant intervention from the assistant principal. The assistant principal treated many of these incidents as "boys will be boys". The Respondents believed that an FBA was necessary to assist the student with his behaviors. The FBA was appropriate at this time to address his behaviors. On April 13, 2023, while at Thompkins Middle School, there was an IEP titled Reevaluation Review and Manifestation Determination. The Goal Statement included "RO has had 45 behavior incidents documented on RDS during the 3rd quarter".[22] The student was eventually expelled and suspended for his behaviors. The student was removed from Thompkins and placed on homebound. Mom requested Mediation through the Indiana Department of Education. After pre-mediation conversations, the parties agreed that the student should be placed at The Learning Center. Once the parties agreed to transfer the student to The Learning Center, the school implemented the appropriate BIP to assist the student with his emotional needs. TLC begin to assess his behaviors and implement his intervention strategies. There was not a need for a reevaluation at this time. The School conducted and implemented a behavioral plan which cured and failures regarding re-evaluation.

---

[21] See, IEP of 02/24/2023 (P. Ex. 2, page:1-9).
[22] See, IEP of 04/13/2023 (P. Ex. 6, page 1)

46

**ISSUE 3. Whether during the 2022-2023 and 2023-2024 statutory period the series of removals of the student including multiple classroom removals, time-outs, and seclusions constitute a pattern that amounted to a disciplinary change of placement in violation of 511 IAC 7-44-4.**

Petitioners allege that the series of removals of the student including multiple classroom removals and placement in the seclusion room constituted a pattern that amounted to a disciplinary change of placement.

Pursuant to 511 IAC 7-44-4 a disciplinary change of placement is defined as removals of more than 10 consecutive days or 10 cumulative days that result in a change of placement Sec. 4. (a) When a decision is made to make a removal that constitutes a change of placement, the public agency must notify the student's parent and provide the parent with the notice of procedural safeguards described in 511 IAC 7-37-1. A change of placement occurs when a student has been removed for more than ten (10):
    (1) consecutive instructional days in the same school year; or
    (2) cumulative instructional days in the same school year if the removals
        constitute a pattern that results in a change of placement under section
        2(b)(2) of this rule.

**No**. Petitioner has not met the burden of proof to show that the referrals to the assistant principal's office "to cool down" or his placement in the seclusion room/de-escalation area of TLC resulted in a change of placement.

The removals that should be counted towards 10 days includes but is not limited to:
    1) school changes child's placement without IEP meeting;( If an administrator unilaterally changes a student's placement because of his behavior, the days he spends in that placement should be counted toward the 10 days of removal. See, e.g., Mesa County Valley Sch. Dist. No. 1, 124 LRP 6361 (SEA CO 01/06/24) (A district denied the student FAPE by not conducting an MDR after moving him from an autism classroom to homebound instruction due to behavioral concerns without an IEP meeting).
    2) school imposes in-school suspension;( An ISS needn't be counted under the 10-day rule if the student is afforded the opportunity to continue to appropriately participate in the general curriculum, to receive the services specified on the IEP, and to participate with nondisabled children to the same extent. See Dear Colleague Letter, 68 IDELR 76 (OSERS/OSEP 2016).
    3) School shortens student's school day without IEP meeting; (The informal imposition of shortened school days, if imposed repeatedly as a disciplinary measure, can create a pattern of removals requiring an MDR. See *Letter to Mason*, 72 IDELR 192 (OSEP 2018).
    4) School imposes out-of-school suspension; (A district must count out-of-school suspensions when determining whether an MDR is required. See *Dear Colleague Letter*, 68 IDELR 76 (OSERS/OSEP 2016).
    5) School suspends student from bus; (A bus suspension counts as a day of suspension for purposes of the IDEA's disciplinary protections if the child receives transportation as a related service and the district does not provide the student with alternative transportation to school. See *Letter to Sarzynski*, 59 IDELR 141 (OSEP 2012); and

47

6) Teacher asks mom to pick up student early. (See *Questions and Answers: Addressing the Needs of Children with Disabilities and IDEA's Discipline Provisions*, 81 IDELR 138).

Suspensions for 10 consecutive school days or less do not constitute a change in placement under the IDEA. *Dear Colleague Letter,* 68 IDELR 76 (OSERS/OSEP 2016). The Office of Special Education and Rehabilitative Services and Office of Special Education Programs advised that districts' authority to implement short-term disciplinary removals doesn't negate their obligation to address, even during a suspension, whether the student needs new or different behavioral assessments.

A removal that constitutes a change in placement not only triggers the requirement to conduct a manifestation determination review, but also invokes other procedural rights. On the date on which the decision is made by administrators to make such removal because of a violation of a code of student conduct, the district must notify the parents of that decision and provide them with the procedural safeguards notice described in 34 CFR 300.504. 34 CFR 530 (h).

In this case the removals were designed to calm the student. Caroline Paleski, BCBA  stated "*the Seclusion Room refers to the de-escalation, what we would call a de-escalation.  TLC does have a space that has four rooms that are, they don't have anything in them. So, if a student is in danger to themselves or others, we can remove them from the classroom, really work on that de-escalation piece, bring them down. There are no doors. There's an adult with them at all times in that section, and they do have the ability to exit. Should they need to, you know, something arise that they have to leave that area. So they are not secluded alone or behind the door. There are no doors in the rooms ... a reset I would call it.* (Tr Oct 2 page 232:10-21).  These removals were as a part of TLC response to his specific behaviors.  The Petitioners failed to show that these removals triggered a change of placement.

**ISSUE 4. Whether during the 2022-2023 and 2023-2024 statutory period the Respondent provided or designed an appropriate Functional Behavioral Assessment and/or an appropriate Behavior Intervention Plan, and if not, did this violate 511 IAC 7-40-3(e) and (f); 511 IAC 7-32-4; 511 IAC 7-32-41; 511 IAC 7-32-54; 511 IAC 7-32-96; 511 IAC 7-44-5; 511 7-44-5(e)(1)(A); 511 IAC 7-42-6(c)(1); 511 IAC 7-32-10; 511 IAC 7-43-1(g) and (o).**

**Yes.**  School designed an appropriate Functional Behavioral Assessment and/or an appropriate Behavior Intervention Plan.  The Petitioner has not met the burden of proof to show that the Respondents failed to provide an appropriate Functional Behavioral Assessment and/or an appropriate Behavior Intervention Plan. The evidence established that the Respondents provided the student with modified instruction in his special education classes at the therapeutic day treatment facility on or after April, 2023.

Neither the IDEA nor its implementing regulations describe the steps required to complete an FBA. State law or local policy may articulate a specific process. With regard to conducting behavioral assessments, the U.S. Education Department notes that 34

48

CFR 300.304 (c)(4) "requires the public agency to ensure that the child is assessed in all areas related to the suspected disability. This could include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. This is not an exhaustive list of areas that must be assessed. Decisions regarding the areas to be assessed are determined by the suspected needs of the child. If a child's behavior or physical status is of concern, evaluations addressing these areas must be conducted." 71 Fed. Reg. 46,643 (2006).

An FBA is generally understood to include these steps: 1) defining the problem behavior; 2) collecting data about the antecedents and consequences of the behavior; and 3) developing a hypothesis about the function of the behavior. In *H.D. v. Central Bucks School District*, 59 IDELR 275 (E.D. Pa. 2012), the court held that the FBA was appropriate because it was conducted by a qualified, board certified associate behavioral analyst, used various methods of collecting relevant data, identified the child's most significant concerning behaviors, identified the triggers and consequences of those behaviors, and provided instruction on how to create an educational program and behavior plan to address the behaviors. *See also C.P. v. Krum Indep. Sch. Dist.*, 114 LRP 41006 (E.D. Tex. 09/17/14, *unpublished*) (holding that the FBA was appropriate because it identified the problem behaviors, noted past interventions, identified antecedents of the behavior, and suggested strategies to assist the child in controlling the behavior).

The FBA in this case was appropriately conducted by a Board Certified Analyst. Petitioners' experts discussed the inadequacies within the IEPs. The April 2024 IEP included goals, specially designed instruction, and related services that targeted the deficits of RO.

ISSUE 5. Whether during the 2022-2023 and 2023-2024 statutory period Respondents provided accurate educational records in a timely manner, including IEP progress reports, daily sheets, and disciplinary action, and if not, did this violate. 511 IAC 7-38-1.

   **Yes.** The Petitioner has not met the burden of proof to show that the Respondents failed to provide the student with accurate educational records in a timely manner, including IEP progress reports, daily sheet, and disciplinary action.

Pursuant to 511 IAC 7- 38-1, Sec. 1. (a) The public agency must annually notify, in writing, parents of students currently in attendance, or students of legal age currently in attendance, of their rights regarding confidentiality of personally identifiable information. The notice must inform parents or students of legal age that they have the right to the following:
   (1)   Inspect and review the student's educational record with respect to the:
         (A) identification, evaluation, and educational placement of the student; and
         (B) provision of a free appropriate public education to the student.
   (2)   Seek amendment of the student's educational record that the parent or student of legal age believes to be:
         (A) inaccurate;
         (B) misleading; or
         (C) otherwise in violation of the student's privacy rights.
   (3)   Consent to disclosures of personally identifiable information contained in the student's educational record, except to the extent that this rule authorizes disclosure without

consent.
(4) File a complaint concerning the public agency's alleged failure to comply with the requirements of this rule.

The Petitioners failed to provide relevant testimony as to the schools failure to provide access to and disclosure of educational records.

**ISSUE 6. Whether during the 2022-2023 and 2023-2024 statutory period Respondents educated the parent on the continuum of placements, and if not, did this violate. 511 IAC 7-42-10(b)(4).**

Pursuant to 511 IAC 7-42-10(b)(4) The public agency must do the following:

(4) Ensure the availability of a continuum of placement options for students in kindergarten through the school year in which students become twenty-two (22) years of age that includes the following:
(A) General education classroom with special education and related services provided during the instructional day.
(B) Resource room with special education and related services provided outside the general education classroom during the instructional day.
(C) Separate classroom in a general education school building with special education and related services provided outside the general education classroom during the instructional day.
(D) Separate public or nonpublic nonresidential school or facility with special education and related services provided.
(E) Public or nonpublic residential school or facility with special education and related services provided to students living at the school or facility.
(F) Homebound or hospital setting with special education and related services provided at the student's home, a hospital, or other noneducational site selected by the public agency.

**Yes.** Petitioners fail to show by the preponderance of the evidence that during the statutory period Respondents failed to educate the parent on the continuum of placements.

Each local educational agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. 34 CFR 300.115.

The Continuum of Alternative Placements must: 1) include the alternative placements listed in the definition of special education under 34 CFR 300.39 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions); and 2) make provisions for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement. 34 CFR 300.115 (b).

50

**EXHIBIT B, Page 50 of 56**

A district can place a child in a particular classroom or school based on the availability of special education services; however, it cannot allow such concerns to dictate the child's placement on the least restrictive environment continuum. *Letter to Trigg*, 50 IDELR 48 (OSEP 2007).

The obligation to make a continuum of placements available means that an IEP team must consider a range of such placements for a particular child. *See, e.g., Avaras v. Clarkstown Cent. Sch. Dist.*, 70 IDELR 129 (S.D.N.Y. 2017) (Testimony that a fifth-grader's IEP team focused on a 15:1 special education class when discussing the student's need for reading and writing instruction convinced a District Court that the team failed to consider a continuum of alternative placements.); *South Montgomery Cmty. Sch. Corp.*, 76 IDELR 198 (SEA IN 2020) (A district considered the continuum of placement options for a student with OHI before determining that a general education setting with the student's peers for 80 percent or more of the day, and in the special education skills building class in a self-contained classroom for the remainder of the school day, was the LRE.); and *Switzerland of Ohio Local Schs.*, 123 LRP 14133 (SEA OH 03/27/23)

Mom is a teacher with EVSC. She maintains a license to teach special education.  Mom attended every CCC except in January, 2024. Mom testified that "when it came to finding in all the research for years, we decided that it was in his best interest for a residential placement with academic focus. (Tr. Oct 2 page 137:5-7).   The IEP records show that Mom is seeking residential placement, due to problems at home. Mom testified that the school did not educate her about systems like Devereux, Meridell and Eagle Ranch. (Tr. Oct 2, page 138:1-4).  She hired Ashton O'Keefe to assist the family with placement. Mom advised CCC that she had three placements including Star Guides in Utah, EPCC and one in Northern Indiana.   The student was accepted at Wheatfield Academy and Whetstone Ranch.  The record reflects that the school offered the therapeutic day school and medical homebound placements on the continuum. The school offered residential placement. They believed they could service the student at the therapeutic day school.  Mom was determined to place the student in residential therapeutic school.   The Petitioners failed to show by a preponderance of the evidence that the School did not offer a continuum of  placement.

## UNILATERAL PLACEMENT AT THE WHETSTONE

This IHO has concluded that the IEPs created after the move-in IEP of April 7, 2022  and prior to the April 13, 2023 IEP were found not to confer FAPE to the student.  The School completed a Functional Behavioral Analysis and created a Behavioral Intervention Plan. This IHO believes after examining the evidence and reviewing the testimony that the IEP of April 13, 2023 cured any defects in the previous IEPs.  While it is true the title of the Goal, verbal disruption was changed to replacement behavior this change was not detrimental to the services provided under the goals. It is quite evident that the services anticipated in the BIP were design to address RO's behavioral needs. The BIP was being implemented at The Learning Center, a therapeutic day school.

51

During the Oct 27, 2023 Annual CCC, the student attended the CCC and disrupted the meeting. He wanted to attend school for ½ day like another student in his program. The CCC and Mom determined that RO should remain in the TLC program. RO began to spiral at TLC and advised his licensed clinical social worker, that "he would stop doing all of his work and start acting out in order to try an be placed on a reduced day". (P. Ex. 65, page 1). RO maladaptive behaviors continued and on Dec 13, 2023, he was suspended from TLC for three days. Mom did not attend the Jan 9, 2024 CCC and advised that she would homeschool RO pending his placement into a therapeutic boarding school. Mom wanted the school to place him on medical homebound but her psychiatrist did not believe RO's condition required medical homebound placement. Although Mom advised the CCC that she was seeking placement, the record does not reflect a request for assistance from the CCC. The CCC stated the students' behavioral needs could be supported at the therapeutic day school. Mom enlisted the help of Ashton O'Keefe to assist with securing a therapeutic boarding school. Mom refused two placements within the Evansville area and settled on The Whetstone Ranch, a therapeutic boarding school for boys located in Missouri. The evidence shows that parents were seeking residential placement since 2022. Ashton O'Keefe continues to assist the family with placements.

Whetstone is not an appropriate placement for RO. According to the Executive Director, Jeremy Thompson, Whetstone Ranch is a nonprofit Christian therapeutic boarding school. Mr. Thompson states that Whetstone is "accredited up to the accreditation standard required by the State of Missouri though the Joint Commission Accreditation Agency". Although he does not have a degree, Mr. Thompson trains all employees in therapeutic crisis intervention, a program developed by Cornell University. A questionable requirement for admission was to remove RO from his meds. Mr. Thompson denies cessation of meds as a requirement for admission. Yet, Mom removed RO from his meds as his behaviors escalated at TLC. TLC was unaware that RO was being weaned off of his meds. During his wraparound counseling service, RO expressed anger about being removed from his meds. RO's application for admission was denied. Mom expressed in an email to Whetstone how well RO was doing and requested that they reconsider their admission decision.

On April 15, 2024 RO was unilaterally placed by his parents at Whetstone Boys Ranch in Missouri. Whetstone Boys Ranch is a therapeutic boarding school for boys that are struggling with things like apathy, or screen addiction, or pornography, or mild drug use or other types of rebellion. (Tr Oct 1, page 220:12-15). Whetstone has a six (6) month program. RO is scheduled to graduate from the program in January of 2025 over nine (9) months since his enrollment. RO behaviors continued at Whetstone. (See footnote 17). The records reflect RO was at one point suspended from Whetstone. Mr. Thompson stated that RO is experiencing success. He is on track to graduate in January.

Petitioners presented no evidence of the academic progress, progress monitoring, grades, behavior plans outside of kinesthetics, although, the weekly social work sessions were entitled Progress Monitoring. Mom suggested that EVSC implement the modalities of Whetstone. This IHO believe it would be impossible for a school district to require

52

**EXHIBIT B, Page 52 of 56**

push-ups, laps and extra chores  as appropriate response to maladaptive behaviors. While it is true that RO meet with the social worker one hour each week that service does not meet the robust interventions Petitioners expert believes RO should receive.  In fact many of them agreed that if he was not receiving these services the placement is inappropriate.

According to IDEA the parents of a child with a disability who place their child in a private school may receive reimbursement for tuition if a court finds that the public agency did not make FAPE available prior to the placement and that the private school placement is appropriate. 34 CFR 300.148 (c).

The implementing regulation at 34 CFR 300.148 (c) does not require a district to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school or facility. 34 CFR 300.148 (a).

The Learning Center is the appropriate place to provide services for RO.  The records show that TLC had all of the services the Petitioners' experts stated RO needed.  TLC's team was working with RO and making progress until RO attended the CCC meeting and demanded a ½ day school schedule.   TLC understood that there would be a regression in RO's behavior.  They did not know RO was being removed from his meds.  His behaviors at Whetstone mirrored the behaviors at Thompkins and TLC.  The parents did not give TLC an opportunity to adjust behavioral strategies. They decided to remove RO from TLC.  Whetstone has been given approximately nine (9) months and the record shows as late as September 2024 RO engages in behaviors such as stealing Amazon gift cards and making false suicide allegations about the staff.

Parents who believe that a public school is not providing an appropriate education may unilaterally remove the child from that school, place him/her in another school, and seek tuition reimbursement for the cost of the alternate placement. 20 U.S.C. § 1412(a)(10)(C); *Burlington Sch. Comm. v. Dep't of Educ.,* 471 U.S. 359, 374, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985). A court may grant tuition reimbursement if two elements are met: (1) the student's IEP must be inappropriate; and (2) the private placement must be proper. *Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 248 (3d Cir.1999). The plaintiffs have the burden of demonstrating both elements. *Andrew M. v. Del. County Office of Mental Health and Mental Retardation,* 490 F.3d 337, 345 (3d Cir. 2007); *Ridgewood Bd. of Educ.,* 172 F.3d at 248.  Although, Courts have found that programs like Whetstone was an appropriate placement, (*Steckelberg v. Chamberlain School District*, 123 LRP 24587, 77 F4th 1167, (August 15, 2023)(*The Academy partnered with an online school that worked with the Academy to let students focus on therapy and social skills outside of class. While there, AMS completed different classes and, importantly, did well enough to graduate and move on to college*).

Plaintiffs must also show a proper private placement—one that "provides significant learning and confers meaningful benefit (*Lauren W. v. DeFlaminis,* 480 F.3d 259, 276 (f3d Cir. 2007).  It need not be "perfect,"  but it must provide services allowing the student

53

to "make progress in reaching [his or] her academic, social and behavioral goals, *Lauren W.*, 480 F.3d at 277. See also *Anthony B., v. Colonial School District*, 123 LRP 24591, July 26, 2023 (unpublished).

While a private placement does not necessarily have to meet all of the student's needs to be "appropriate" for reimbursement purpose, it does have to offer instruction and services specifically designed to meet the student's unique needs.   Evidence of the student's struggles in the private school may show that her services are inadequate. *Ward v. Board of Education of the Enlarged City School District of Middletown, New York*, 63 IDELR 121, May 30, 2014, (Here, the school's decision to place the student in a lower-level math class rather than provide specialized instruction showed that it could not meet the student's disability-related needs.)

Where the parent highlighted the general benefits of the private college preparatory school where she unilaterally placed her son with ADHD, behavioral issues, and reading deficits, didn't help a parent establish her right to receive tuition reimbursement from a New York district. Noting that the parent provided no evidence that the school addressed the student's unique needs, the court held she didn't establish it was an appropriate placement. *Fragnito v. Board of Education of the Suffern Central School District, f/k/a Ramapo Central School District*, 77 IDELR 9 (July 21, 2020).

The evidence in indicates that RO continues to struggle at Whetstone.  He may have experienced minor improvements but Petitioners failed to provide adequate progress records to show how he is being monitored and whether RO is gaining any grounds towards exiting the Whetstone therapeutic program.

The Petitioners failed to prove by the preponderance of the evidence that placement at Whetstone Boys Ranch was appropriate.

## ORDER

Based upon these findings of fact and conclusions of law, IT IS ORDERED THAT:

1. The parties shall within thirty (30) days convene a case conference committee meeting.  The parties shall agree on a case conference facilitator.

2. This case conference committee shall include, at a minimum, the student's current special education teacher, the mother, the special education district director, the therapeutic day treatment facility principal, the psychologist, who recently evaluated the student, and any other person the parties deem necessary.

3. The student is currently admitted to The Whetstone Boys Ranch. He shall transition back to the therapeutic day treatment facility The Learning Center with the following additional support a 1 to 1 aide.  This placement is in an effort to transition RO to Thompkins Middle school or his local high school. His present levels of performance can be evaluated and his IEP reviewed/updated if warranted.

4. The student shall be administered an educational reevaluation by the Respondents' school psychologist and look at the student's areas of eligibility for special education, including an emotional Disability.

5.  A functional behavioral assessment shall be completed to determine if a new Behavior Intervention Plan should be created.
.
6. The school shall provide the family with wrap around services with a local provider.

7.  If the student is unsuccessful at The Learning Center the CCC shall discuss the placement of the student in a residential facility, within the State of Indiana, at the school's expense.

8.  The Petitioners shall not be reimbursed for their expenses associated with The Whetstone Boys Ranch.

**NOTICE OF RIGHT TO APPEAL**

      The decision of the independent hearing officer is a final order unless a party seeks judicial review.  Any party aggrieved by the hearing officer's decision has the right to seek judicial review in a civil court with jurisdiction within thirty (30) calendar days from receipt of this written decision, as provided by IC 4-21.5-5 AND 511 IAC 7-45-9.

**ATTORNEY'S FEES**

An action for attorney's fees must be filed in a civil court with jurisdiction within thirty (30) calendar days from receipt of the hearing officer's final decision if no request for judicial review is filed in federal or state civil court as provided in 511 IAC 7-45-11.

Date: December 15, 2024

                          /s/Sonya Morris_____
                          Sonya Morris
                          Independent Hearing Officer

/s/Sonya Morris, Independent Hearing Officer
CC: via I-CHAMP

56

**EXHIBIT B, Page 56 of 56**