**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | | |
|---|---|---|
| L.O. and B.O on behalf of R.O., | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) | Case No. 3:25-cv-00007-MPB-CSW |
| | ) | |
| Evansville Vanderburgh School Corporation | ) ) | |
| Defendant | ) | |

**PLAINTIFFS'-APPELLANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR JUDGMENT ON THE ADMINISTRATION RECORD**

/s/Catherine M. Michael
Catherine M. Michael, #22474-49
Connell Michael, LLP
550 Congressional Blvd., Ste 350-11
Carmel, Indiana 46032
Main Line: 317-343-4482
Direct Dial: 317-696-4159
catherine@connellmichaellaw.com

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ ii

Table of Authorities ........................................................................................................ iii

Issues for Review ............................................................................................................. x

I.     Standard of Review ........................................................................................... 3

II.    Who is R.O.? ..................................................................................................... 4

III.   Statutory Framework for this Action ............................................................... 6

    a.   The IDEA's historical development and remedial purpose: Ensuring that children
         with disabilities are educated with typical peers, and that parents of children with
         disabilities have legal means to enforce their rights ...................................... 6

    b.   The requirement and importance of writing effective, individualized IEPs for
         children, like R.O., with social-emotional-behavioral disabilities................. 8

        i.    Evaluations.......................................................................................... 8

        ii.   Individualized behavioral goals and programming.............................. 9

        iii.  Related services for children with social-emotional-behavioral disabilities ........ 10

IV.    Factual Background: EVSC's System Failure of R.O. Since 2021. ............... 11

    a.   Events leading to the 2022-23 school year: EVSC's Lack of Re-Evaluation of R.O
         Within the Required Statutory Period ........................................................... 11

    b.   EVSC recycled R.O.'s inadequate IEP from 2021 through 2024................... 13

    c.   2022-2023 School Year. ................................................................................ 15

        i.    R.O.'s expulsion was based on a predetermined, unlawful Manifestation
              Determination Review ...................................................................... 16

    ii.    R.O. was placed at EVSC's segregated Learning Center, where he was removed from class almost daily and isolated for hours without receiving instruction .......18

    iii.    R.O. deteriorated emotionally in 2022 and 2023, but EVSC failed to reevaluate him or change his IEP ...................................................................................21

  V.    Procedural Background................................................................................23

Argument ........................................................................................................24

  a.  The IHO erred in holding R.O.'s 2023-2024 IEP was appropriate because it had the same critical failures as the 2022-2023 IEP, which she had held denied R.O. a FAPE ............24

    i.    EVSC's 2023-2024 IEPs did not provide necessary accommodations ......................27

    ii.    EVSC's 2023-2024 IEPs did not include appropriate special education and related services..............................................................................................28

    iii.    The 2023-2024 IEPs failed to included supplmentary aids and services....................29

    iv.    The 2023-2024 IEPs did not include specific and measureable goals drafted to meet all of R.O.'s needs.........................................................................................30

    v.    EVSC failed to consider the full continuum of educational placements, and failed to offer R.O. a residential placement ...............................................................32

    vi.    The IHO misapplied the legal standards regarding change of placement and seclusion.................................................................................................34

  b.  EVSC failed to reevaluate R.O. in 2023-2024. The FBA it administered and BIP it wrote were not evaluations or revaluations under IDEA and Article 7 ......................................37

  VI.    Under the *"Burlington/Carter"* test, the IHO improperly denied reimbursement for R.O.'s placement at Whetstone Boys Ranch .............................................................39

    a.  Prong 1: EVSC denied R.O. a FAPE for the 2023-2024 school year.........................40

     b.   Prong 2: Whetstone Boys Ranch was an appropriate placement for R.O. .................40

VII.   Remedies: The IHO erroneously failed to provide compensatory education despite finding that EVSC denied R.O. and his Parents related services................................43

VIII.  The IHO had no legal authority to order that R.O.'s Residential Treatment Facility options be limited to those in the state of Indiana .......................................................48

IX.   The IHO erred by failing to order EVSC to provide Plaintiffs with R.O.'s complete educational records ..........................................................................................................48

X.    EVSC violated the ADA and Section 504 by failing to offer R.O. a FAPE and by systematically segregating him and isolating him from his peers ...............................50

Conclusion .....................................................................................................................................53

Certificate of Service ....................................................................................................................57

# TABLE OF AUTHORITIES

## CASES

*Anchorage Sch. Dist. v. M.P.*,
689 F.3d 1047, 1055–56 (9th Cir. 2012)……………………………..…………..…………. 46, 47

*Bd. of Educ. v Rowley,*
*458 U.S. 176, 191-97 (1982)* …………………………..………………………..……… 6, 7, 8

*Bd. of Educ. of Evanston-Skokie Cmty. Consol. Sch. Dist. 65 v. Risen*, No. 12 C 5073,
2013 U.S. Dist. LEXIS 88575, at *63 (N.D. Ill. June 25, 2013) (quoting *Frank G. v. Bd. of
Educ. of Hyde Park*, 459 F.3d 356, 364-65 (2d Cir. 2006)) …………………….………… 41

*Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross,*
*486 F.3d 267, 270 (7th Cir. 2007)* …………………..………...……………………………… 3

*Carlisle Area Sch. v. Scott P. By & Through Bess P.*,
62 F.3d 520, 534 (3d Cir. 1995)…… ……………………………………………… 25, 31, 34

*Carter v. Florence Cnty Sch. Dist. Four*,
950 F.2d 156, 164 (1991)………………………………..………….………...………… 41

*D.S. v. Trumbull Bd. of Educ.,*
120 LRP 28133 (2d Cir. 09/17/20) ……………………….………………...………… 40

*D.S. v. Trumbull Bd. of Educ.*,
975 F.3d 152, 157 (2d Cir. 2020) …………………………………...……………………… 7

*Dale M. v. Bd. of Educ.*,
237 F.3d 813, 817 (7th Cir. 2001) (*citing Butler v. Evans*, 225 F.3d 887,
894 (7th Cir. 2000)). …………………………………………………………...…..…… 33

*Endrew F v. Douglas Cnty. Sch. Dist. RE-1,*
*580 U.S. 386, 390-91 (2017)……………………………………………………………… passim*

*Florence County Sch. Dist. Four v. Carter*,
510 U.S. 7 (1993) ………………………………….……………………..……… *passim*

*G.L. v. Ligonier Valley Sch. Dist. Auth.*,
802 F.3d 601, 625 (3d Cir. 2015) …………………………………………………… 46

*Hilliard v. Mariscal*,
No. 23-cv-00562, 2025 U.S. Dist. LEXIS 32400, at *6 (N.D. Ill. Feb. 24, 2025) ..………… 51

*J.T. v. Dep't of Educ.*,
  695 F. App'x 227, 228 (9th Cir. 2017) ……………………………………….………… 41

*Jaros v. Ill. Dep't of Corr.*,
  684 F.3d 667, 671-72 (7th Cir. 2012)) ……………………………………..……… 51

*Klein Indep. Sch. Dist. v. Hovem*,
  690 F.3d 390, 397 (5th Cir. 2012) ………………………..……………..……………… 46

*M.B. v. Hamilton SE. Schs*,
  668 F.3d 851, 859–60 (7th Cir. 2011) ……………………………………………....… 3

*M.G. v. D.C.*,
  246 F. Supp. 3d 1, 9 (D.D.C. 2017) (quoting *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 521
  (D.C. Cir. 2005)) ………………………………………..……………...………………… 3

*M.H. v. N.Y.C. Dep't of Educ.*,
  685 F.3d 217, 256 (2d Cir. 2012) (emphasis added)
  (quoting 20 U.S.C. §1414(d)(1)(A)(i)(VIII)……………..……………………………… 25

*M.W. v. Bd. of Educ. of the Enlarged City Sch. Dist. of Middletown*,
  2013 U.S. Dist. LEXIS 82808, at *68 (S.D.N.Y. June 12, 2013)……..………………… 41

*Mahomet-Seymour Cmty. Sch. Dist. No. 3 v. S.W.*,
  2020 U.S. Dist. LEXIS 142963, at *65 (C.D. Ill. May 1, 2020) ……………………… 6

*Mesa County Valley Sch. Dist. No. 1*,
  124 LRP 6361 (SEA CO 2024) ………………………………..……....…………………… 36

*Metropolitan Sch. Dist. of Washington Twp.*,
  120 LRP 14383 (SEA IN 2020) …………………………..………………..………… 36

*Queen Creek (AZ) Unified Sch. Dist.*,
  123 LRP 32247 (OCR 2023) ………………………………..……………...………… 35, 36

*Puyallup Sch. Dist. v. Student W.*,
  31 F.3d 1489, 1497 (9th Cir. 1994) ………………………………………………… 46

*Reid ex rel. Reid v. D.C.*,
  401 F.3d 516, 521 (D.C. Cir. 2005) ……………………………..………………………… 3

*School Comm. of Burlington v. Dep't of Educ.*,
  471 U.S. 359 (1985) …………………………………………………………….. 40, 54, 55

*Schroll v. Bd. of Educ. Champaign Cmty. Unit. Sch. Dist. #4*,
  No. 06-2200-DGB, 2007 U.S. Dist. LEXIS 62478, at *12 (C.D. Ill. Aug. 10, 2007)). ……… 25

*T.Z. v. Tippecanoe Sch. Corp.*,
No. 4:22-CV-016-PPS-JEM, 2023 U.S. Dist. LEXIS 12581, at *18 (N.D. Ind. Jan. 25, 2023)
(*citing Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 171 (2017)) ……………………....…… 51

## FEDERAL STATUTES, REGULATIONS, AND RULES

20 U.S.C. § 1400…………………………………..…..…..………………………..…… 1
20 U.S.C. § 1400(c)(2) …………………………………………………..…………..…… 8
20 U.S.C. § 1401(3) …………………………………………………………………..…… 8
20 U.S.C. § 1401(19)………………………………………………………………….…… 6
20 U.S.C. § § 1414(a)(1)-(2) …………………………………………………………..…… 7
20 U.S.C. § 1414(b)(2)(A)(ii)…………………………………………………………..…… 7
20 U.S.C. § 1414 (b)(3)(B) …………………………………………………………….…… 7
20. U.S.C. § 1414(c)(1)-(2) …………………………………………………………….…… 7
20 U.S.C. § 1414(d) …………………………………………………………………..…… 27
20 U.S.S. §1414(d)(1)(A) …………………………………………………………… 7, 25
20. U.S.C. § 1414(d)(3)(A) …………………………………………………………….…… 7
20. U.S.C. §1414(d)(4)(A) …………………………………………………………….…… 7
20 U.S.C. § 1414(d)(A)((i)(II) ……………………………………………………...…… 9
20 U.S.C. § 1415(f)(3)(E)(i) …………………………………………………………….…… 4
20 U.S.C. § 1415(i)(3) ………………………………………………………………… 55
29 U.S.C. § 794…………………………………………………………………………… 51
29 U.S.C. § 794(a) …………………………………………………………………….…… 51
42 U.S.C. § 12102(1)(A) …………………………………………………………………… 51
29 C.F.R. § 1630.2…………………………………………………………………….…… 52
34 C.F.R. § 104.1…………………………………………………………………….…… 51
34 C.F.R. § 104.33………………………………………………………………………… 52
34 C.F.R. § 104.34…………………………………………………………………….…… 52
34 C.F.R. § 104.35………………………………………………………………………… 53
34 C.F.R. § 104.36………………………………………………………………………… 53
34 C.F.R. § 104.43………………………………………………………………………… 52
34 CFR 300.34 (a) ………………………………………………………………...…… 10
34 C.F.R. 300.303…………………………………………………………………….…… 38
34 CFR 300.303 (b) …………………………………………………………………… 40
34 C.F.R. 300.303(b)(2) …………………………………………………………….…… 38
34 CFR 300.304 through 34 CFR 300.311……………………………………...……6, 38
34 C.F.R. § 300.304(a) …………………………………………………………………… 39
34 C.F.R. § 300.304(b)(1) ………………………………………………………………… 39
34 C.F.R. § 300.304(b)(2) ………………………………………………………………… 39
34 C.F.R. § 300.304(b)(3) ………………………………………………………………… 39
34 C.F.R. § 300.304(c)(1 – 7) …………………………………………………………… 39
34 C.F.R. § 300.305(a)(1) ………………………………………………………………… 39
34 CFR 300.111 (a)(1)(i) …………………………………………………………….…… 6
34 CFR 300.114 (a) ……………………………………………………………………… 7
34 CFR 300.15…………………………………………………………………………… 6
34 CFR § 300.320 (a)(3)(ii) ……………………………………………………………… 49

34 CFR 300.321 (a)(1) …………………………………………………..…... 7
34 CFR 300.322 ……………………………………………………………… 7
34 C.F.R. §§ 300.320-300.324……………………………………..………….. 7
34 CFR § 300.324(a) ……………………………………………………… 27
34 C.F.R. § 300.513(a)(1) ………………………………………………….4
34 C.F.R. § 300.530(h) …………………………………………………… 36
34 C.F.R. § 300.536…………………………………………..……………… 35

## **STATE STATUTES, REGULATIONS, AND RULES**

511 IAC 7……………………………………………………………..…. 1
511 IAC 7-32-9………………………………………………………… 28
511 IAC 7-32-10(a)(2)-(4) ……………………………………...………….. 15
511 IAC 7-32-17…………………………………………………………… 39
511 IAC 7-32-30(a)……………………………………………………… 8
511 IAC 5-32-30(b) …………………………………………………… 8
511 IAC 7- 38-1………………………………………………………… 51
511 IAC 7-40-3……………………………………………………………… 40
511 IAC 7-40-5(a)……………………………………………………… 11
511 IAC 7-40-8(g), (j) …………………………………………………… 39
511 IAC 7-40-8(m)(1)(A) ……………………………………………… 39
511 IAC 7-41-7……………………………………………………………… 11
511 IAC 7-41-10………………………………………………...………… 11
511 IAC 7-42-6……………………………………………………………… 29
511 IAC 7-42-6(f)(2)(A) ………………………………………………… 9
511 IAC 7-42-6(f)(3) …………………………………………………… 9
511 IAC 7-42-6(f)(4) …………………………………………………… 9, 29
511 IAC 7-42-6(f)(6)(A) ………………………………………………… 28
511 IAC 7-42-10(b)(4) ………………………………………………… 32
511 IAC 7-43-1……………………………………………………………… 11
511 IAC 7-43-1(a) …………………………………………...………… 10
511 IAC 7-43-1(c) ……………………………………………………… 10
511 IAC 7-43-1(g)(1)(E) ………………………………………………… 10
511 IAC 7-43-1(g)(2), (3) ……………………………………………… 10
511 IAC 7-44-4……………………………………………………………… 35
511 IAC 7-44-4(a) ……………………………………………………… 36
511 IAC 7-44-5(a) ……………………………………………………… 17
511 IAC 7-44-5(b) ……………………………………………………… 17
511 IAC 7-44-5(c), (e) ………………………………………………… 18
511 IAC 7-44-5(d)…………………………………………...…………… 18

## **OTHER AUTHORITIES**

*August 2016 OSERS Letter*, at 5–6. …………………………………..…………… 37
*Dear Colleague Letter*, 68 IDELR 76 (OSERS/OSEP 2016) ………………….…………… 37
*Letter to Sarzynski*, 59 IDELR 141 (OSEP 2012) ……...……………………………… 35

OSEP Memorandum 95-9, 21 IDELR 1152 (OSEP 1994) …………………………………… 7

References to IDELR are to the Individuals with Disabilities Education Law Reporter, a specialized reporter for this area of law. It may be found within Westlaw or online at www.specialedconnection.com.

### ISSUES FOR REVIEW

1. Where an IEP fails to offer a child a FAPE for an academic year, that IEP, left unchanged, cannot reasonably be found to offer the child a FAPE for the following year. Here, the IHO held that R.O.'s IEP for 2022-2023 did not offer him FAPE, but also that a substantially identical IEP did offer FAPE for 2023-2024. Did the IHO err by holding that the IEP deemed inappropriate for 2022-2023 offered R.O. a FAPE for 2023-2024?

2. The IDEA requires an LEA to following rigorous procedures and timelines while reevaluating a child in all areas of suspected disability, academic and behavioral. Here, EVSC failed to follow the IDEA's procedures and timelines in evaluating and reevaluating R.O., and did not ascertain his needs. Did the IHO err by finding that the District did not violate the IDEA's reevaluation provisions?

3. Under the *Burlington/Carter* test for unilateral private placements, a private school is appropriate where it allows the child to make meaningful academic progress. The standard for appropriateness of private schools is lower than that for public schools. Here, R.O made progress at the Whetstone Boys Ranch. Did the IHO err by holding Whetstone to a higher standard and denying Parent reimbursement for R.O.'s tuition there?

4. Whether the IHO erred in failing to find that EVSC's use of near-daily seclusions and repeated removals constituted a change of placement requiring procedural protections?

5. Whether the IHO failed to order necessary related services, including counseling, psychological services, and parent training, and corresponding compensatory services, despite clear evidence of their necessity?

6. Whether the IHO erred in failing to order appropriate compensatory education to remedy the 2022–2023 denial of FAPE?

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Plaintiffs appeal the errors in an Indiana independent hearing officer's (IHO's) decision under the Individuals with Disabilities Education Act (IDEA).[1] After a four-day hearing, the IHO *correctly* held that Evansville Vanderburgh School Corporation (EVSC) committed procedural and substantive violations of the IDEA, and denied R.O. a free appropriate public education (FAPE) for the 2022-23 school year.  (DKT. 38-5 at 142)  However, she erred by failing to award adequate remedies for EVSC's violations and then, inexplicably, by holding that EVSC complied with the IDEA procedurally and substantively for 2023-24, despite offering a near identical IEP (Individualized Education Plan) with the same sole goal, no related services, and the same present level of performance aligned to the same sole goal she had found inadequate from 2022-23, now more than a year later.[2]

As explained throughout this brief, R.O.'s IEPs went largely unchanged for more than three years, despite their failure to meet the basic requirements of the law or his profound behavioral, academic, and emotional needs. EVSC failed to offer legally viable IEPs reasonably calculated for R.O. to make progress, failed to properly evaluate or reevaluate him, denied him and his parents necessary related services, and then left him without any services for months.

Children like R.O. who have social-emotional-behavioral disabilities often get less natural sympathy than do children with more traditional academic disabilities. Worse, as happened here, LEAs sometimes reject the very notion that a "bad kid," one whose behaviors bother teachers,

---

[1] 20 U.S.C. § 1400, *et seq*. Plaintiffs also allege violations of Indiana's IDEA implementing regulations. Article 7, 511 IAC § 7, *et seq*.
[2] EVSC also violated the Americans with Disabilities Act (ADA) and section 504 of the Rehabilitation Act of 1973 (§ 504).  As explained below, the same evidence that demonstrates clear violations of the IDEA proves EVSC's culpability under the ADA and § 504.

administrators and other students, has a "real" disability that they must address with individualized, informed instruction. Instead, they blame the child for his behaviors and blame the parents for having to deal with the child. EVSC revealed this callous, dismissive position in its opening argument:

> The fact is that R.O. is a highly intelligent young man with severe social, behavioral and emotional problems. His problems are not, Your Honor, in the school. His problems are at home where he cannot get along with his siblings, where he makes life hell for his parents to the point where these parents began to foreshadow their ultimate intention here, and that was to place him in a residential setting outside the home so that their family life could proceed with his two siblings.

(Dkt. 38-5 (Tr. (9/30/2024) at 17:21-18:5). Concluding, EVSC insulted R.O.'s parents in a stunning "us versus them" accusation:

> We believe at the end of all of the evidence you'll be convinced that these people have a problem in their home, not in their school, and they're asking you to make us pay for it. Thank you.

Id. at 22:12-15. This insult, accusing Parents of running a long con, betrayed EVSC's underlying belief that "us" was a school community that did not include "these people" R.O. and his parents.[3] It was not his R.O.'s parents who gave up on him, but EVSC. Throughout the entire statutory period, the District persistently failed to provide him with the special education and related services he needed. Instead, EVSC repeatedly called the parents for early pickups, removed him from class, sent him to the office nearly every day, suspended him, expelled him, and placed him in time-out and seclusion, sending him on near daily basis to the office, all for behavior occurring at School. These disciplinary actions were taken in response to behaviors that occurred at school; behaviors

---

[3] EVSC also disingenuously accused R.O.'s mother of failing to attend a January 2024 CCC meeting, alleging that she had "lost interest in the IEP process… and elected not to come," (Dkt. 38-5 at Tr. (9/30/24)at 22:5-11, omitting that she was unable to attend because she was undergoing chemotherapy treatments for Stage 2 breast cancer, and already had notified EVSC of her condition in September 2023. P. Ex. 54 at 647 (Email dated 9/4/23 from L.O. to EVSC employees E. Farmer and C. Paleski); P. Ex. 92 (EVSC Notice of Case Conference states: "Mom gave permission to hold the meeting without her.").

happening in school at EVSC were directly linked to his disabilities and exacerbated by the school's refusal to provide appropriate program. At no point did these behaviors originate from or manifest at home, they manifested from this child's mental illness which occurred across all environments. The District's actions reflect a systemic abandonment of its legal responsibility to educate and support R.O.

The IHO disregarded overwhelming evidence of EVSC's procedural and substantive IDEA violations for the 2023-2024 school year. Plaintiffs respectfully ask this Court to reverse the IHO's decision, in part, find that EVSC denied R.O. FAPE throughout 2023-24 school year as well, and award appropriate remedies, including tuition reimbursement and compensatory education.

## I.       Standard of Review

Courts in the Seventh Circuit apply a "modified *de novo*" standard of review when reviewing IHO decisions under IDEA and Indiana's Article 7 of the Indiana Code.  The court makes an independent determination based on a preponderance of the evidence, giving "due weight" to the IHO's administrative findings. This means that the IHO's factual determinations are considered *prima facie* correct when supported by the record, but the court must ultimately exercise independent judgment regarding the legal conclusions.[4]

A district court gives less deference to an IHO's determinations than in a conventional administrative proceeding. It cannot simply "rely on the Hearing Officer's exercise of discretion," as case law has made clear that an IHO decision "without reasoned and specific findings deserves little deference."[5] Consequently, while courts give some measure of deference to the IHO's specialized knowledge and expertise, they do so only when the IHO's decision is thorough,

---

[4] *M.B. v. Hamilton SE. Schs*, 668 F.3d 851, 859–60 (7th Cir. 2011); *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 270 (7th Cir. 2007).
[5] *M.G. v. D.C.*, 246 F. Supp. 3d 1, 9 (D.D.C. 2017) (quoting *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 521 (D.C. Cir. 2005)).

reasoned, and detailed. Absent such specific and reasoned findings, the IHO's decision is entitled to little or no deference.

Regarding the standard IHOs must apply when presiding over an IDEA/Article 7Due Process hearing, the IDEA states that "a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education."[6]

## II.    Who is R.O.?

R.O. is a fourteen-year-old boy diagnosed with Disruptive Mood Dysregulation Disorder (DMDD), Attention Deficit Hyperactivity Disorder (ADHD) and related emotional and behavioral mental health challenges. P. Ex. 21, P. Ex. 22, (Dkt. 38-5 at Tr. (10/2/24)195:14-196:14).  R.O. also has traits that are typical of persons with autism, including heightened sensory sensitivity, "scripting," trouble identifying and responding to the perspectives of others, misinterpreting social cues, and difficulty in forming peer connections. P. Ex. 22, at 1

In his first IEP created on February 24, 2021, this child was described as "being trusting of others, works independency, and learns easily" as well as being "very inquisitive" and a "leader in the classroom." P. Ex. 3 at 1. In his April 13, 2023, IEP he is also described as a very "intelligent student" who "likes to help." P. Ex. 6 at 1.

However, during the 2022-2023 and 2023-2024 school years, R.O. experienced further profound emotional dysregulation, self-injurious behavior, aggression toward others, academic failure, and significant social impairment.[7]

---

[6] 20 U.S.C. § 1415(f)(3)(E)(i); *see also* 34 C.F.R. § 300.513(a)(1) ("[A] hearing officer's determination of whether a child received a FAPE must be based on substantive grounds.").

[7] *See generally* P. Ex. 56; P. Ex. 54 at 152; P. Ex. 6 at 1-2 of 11; (Dkt. 38-5 at Tr. (9/30/24)at 237:21-239:6, 239:24-240:3, 247:1-248:15, 266:19-267:5; P. Ex .10; P. Ex. 54 at 76, 78, 152, 202;  P. Ex. 32 at 9 of 76; *See* Metzger Testimony (Dkt. 38-5 at Tr. (10/2/24)at 199:4-5, (Dkt. 38-5 at Tr. (10/2/24)at 200:2-4; (Dkt. 38-5 at Tr. (10/2/24)at

Since R.O. was young his parents have repeatedly sought services for him as a result of his mental health issues, including private evaluations and services from Easter Seals; counseling with Stanley Metzger, at Lifestance Health, counseling and psychiatry through Southwestern Behavioral Healthcare, and Deaconess Hospital, and counseling with lay counselor Beth Boling. P. Ex. 21, P. Ex. 22, P. Ex. 32, P. Ex. 33, P. Ex. 100.

Boling, who began working with R.O. in early 2023, testified that from their first meeting she had immediate concerns for his safety and wellbeing. "Those kind of thoughts and reactions and lack of healthy coping mechanisms sometimes move people to get violent, self-hurtful," she explained. When asked if she believed R.O. could hurt himself or others, she answered unequivocally, "Yes." (Dkt. 38-5 at Tr. (10/1/24)at 123:13-124:7).

Stanley Metzger saw R.O. as a patient beginning on September 27, 2021, thru August 28, 2023.  P. Ex. 21.  He reported significant concerns about the student's progress and behavior. Metzger testified that "he really was not showing progress, and these episodes that he was having at school just made me concerned that he was going to eventually end up doing something, seriously hurt somebody" (Dkt. 38-5 at Tr. (10/2/24)at 199:4-5). Metzger further noted that "his taking a knife with him to school certainly represented potential danger," (Dkt. 38-5 at Tr. (10/2/24)at 200:2-4), and expressed ongoing concerns, stating: "I had concerns that he could potentially be a danger to himself or other people." (Dkt. 38-5 at Tr. (10/2/24)at 200:17-19). Metzger also testified that during his time working with R.O.: "His behavior has become increasingly volatile and dangerous..." (Dkt. 38-5 at Tr. (10/2/24)at 202:9-12).

---

200:17-19; (Dkt. 38-5 at Tr. (10/2/24)at 202:9-12,  Easter Seals Rehabilitation Center Record, P.Ex.22, at 1;  See Counselor Boling Testimony (Tr.10/1/24, at 123:13-124:7);

### III.     Statutory Framework for this Action.

**a.  The IDEA's historical development and remedial purpose: Ensuring that children with disabilities are educated with typical peers, and that parents of children with disabilities have legal means to enforce their rights.**

The IDEA codified the achievements of a decades-long effort to ensure that children with disabilities are integrated into classrooms with non-disabled children, receive evidence-based instruction, and have a system of "due process" hearings to enforce these hard-won rights.[8]  The act creates *procedural and substantive rights* for children with disabilities and their parents, spells out how states and school districts must educate children with disabilities and include their parents, and establishes its own system of hearings and appeals.[9] These procedural and substantive rights are mutually reinforcing and carry equal importance, as the Supreme Court explained:

> [W]e think that the importance Congress attached to [IDEA's] procedural safeguards cannot be gainsaid. ***It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process as it did upon the measurement of the resulting IEP against a substantive standard****.*[10]

School districts like EVSC are "local educational agencies" (LEAs) the entities that must offer a FAPE to all children with disabilities in their jurisdictions.[11]  LEAs must follow rigorous procedures to, among other things:

(i)     locate or "find" children with disabilities in their jurisdictions, [12]

(ii)    evaluate and reevaluate such children to understand their disabilities;[13]

(iii)   form teams, teachers, administrators, psychologists and other school professionals to decide, *with parents' meaningful participation*, what special education programs,

---

[8] *See Bd. of Educ. v Rowley*, 458 U.S. 176, 191-97 (1982) (summarizing legislative/litigation backdrop for IDEA).
[9] *See Endrew F v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390-91 (2017).
[10] *Rowley*, 458 U.S. at 205 (emphasis added); *Mahomet-Seymour Cmty. Sch. Dist. No. 3 v. S.W.*, 2020 U.S. Dist. LEXIS 142963, at *65 (C.D. Ill. May 1, 2020) ("Following the procedures of the IDEA is an important, perhaps paramount, responsibility of school districts.") (Citing *Rowley, id.*)
[11] 20 U.S.C. § 1401(19).
[12] 34 CFR 300.111 (a)(1)(i).
[13] 34 CFR 300.304 through 34 CFR 300.311. 34 CFR 300.15.

services and accommodations a student requires;[14]

(iv)    Draft individualized educational programs (IEPs), which are highly structured road-map documents that lay out the special education programs, along with clearly defined and measurable annual goals, and a detailed outline of the special education and related services the public agency will provide and accommodations to which the student will be entitled;[15]

(v)    Ensure that every child with a disability is educated in the "least restrictive environment" where they can make meaningful progress.[16]

The IEP is "the centerpiece of the statute's education delivery system for disabled children."[17]  The crux of the *Endrew F.* Court's decision was that an IEP must be tailored to the child's individual circumstances and unique needs.[18] It explained that an IEP requires fulsome, accurate information about the disabled child, and must articulate a detailed plan that, if followed properly, allows the child to make meaningful progress. It emphasized the "individualized" nature of IEPs: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth."[19]

The IDEA requires LEAs to do fulsome and regular evaluations and reevaluations, *following very specific procedures*, and then revise a child's IEP annually or more frequently, as the Second Circuit recently held:

The IDEA requires that a child's initial evaluation and triennial reevaluations be comprehensive. In conducting these evaluations, a school must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," and the school must assess the child in "all areas of suspected disability." The child's IEP Team [then]… collaborates to develop, maintain, and update the child's IEP over the course of their education. [A] child's IEP Team must review their IEP "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved."[20]

---

[14] *See generally* 34 CFR 300.321 (a)(1); and 34 CFR 300.322.
[15] 34 C.F.R. §§ 300.320-300.324.
[16] 34 CFR 300.114 (a); and OSEP Memorandum 95-9, 21 IDELR 1152 (OSEP 1994).
[17] *Endrew F.*, 280 U.S. at 391.
[18] *Id.* at 391 (citing §1414(d)(1)(A), (B); *Rowley*, 458 U.S. at 181).
[19] *Id.* at 400.
[20] *D.S. v. Trumbull Bd. of Edu*c., 975 F.3d 152, 157 (2d Cir. 2020) (*quoting* 20 U.S.C. § § 1414(a)(1)-(2); 1414(b)(2)(A)(ii), (b)(3)(B); 1414(c)(1)-(2), 1414(d)(3)(A), (d)(4)(A)). These IDEA procedural protections which include requiring regular evaluations, imposing rigid timeframes, detailing mandatory components of evaluations,

**b. The requirement and importance of writing effective, individualized IEPs for children, like R.O., with social-emotional-behavioral disabilities.**

The IDEA establishes legal categories that encompass not only children's physical and intellectual disabilities, but also social-emotional-behavioral disabilities.[21]

### i. Evaluations

One core obligation of a school district is to devise an appropriate Individualized Education Program (IEP), based on a comprehensive evaluation of the child. After this initial evaluation, re-evaluations consist of testing and/or data from a variety of sources including classroom observations, forms from teachers, staff and parents and in some cases input from outside providers and/or consultants. The purpose of these evaluations is to determine the nature and extent of the specific special educational and related services that the student needs.[22]

An evaluation is to measure not only cognition, but academic achievement, functional performance, adaptive behavior, communication skills, motor skills and sensory responses, medical and mental health information, social and developmental needs as well as other factors to ensure the case conference committee has the necessary information to develop an IEP.[23]

---

reevaluations and IEPs, and establishing a novel system of due process hearings and appeals, arose in response to decades of opacity and unaccountability for schools and institutions educating children with disabilities. Parents had little insight or input into how their children were being treated and taught (if they were taught at all). The IDEA codified parents' litigation victories to level the playing field with schools and gain the power to insist on meaningful participation in their children's education. *See Rowley*, 458 U.S. at 191-94 (discussing landmark litigation that led to passage of IDEA).

[21] *See* 20 U.S.C. § 1401(3) (defining "child with a disability" to include children with "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities.").

[22] 511 IAC 7-32-30(a).

[23] 511 IAC 5-32-30(b).

### ii. Individualized behavioral goals and programing.

Both the IDEA and Article 7's procedures require that an IEP for a child with serious behaviors include appropriate, *individualized* goals, including goals to address behavior. Specifically, both the IDEA and Article 7 require that IEPs include:

> [A] statement of "measurable annual goals, including academic and functional goals designed to meet (i) the student's needs that result from the student's disability to enable the student to be involved in and make progress in the general education curriculum; and
>   (ii) each of the student's other educational needs that result from the student's disability.[24] It must also include a description of:
>     (A) How the student's progress toward meeting the annual goals …will be measured.[25]
>     (B) When periodic reports on the progress the student is making toward meeting the annual goals, such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards, will be provided.[26]

Finally, the IEP must explain what programming, related services and other supports the school will provide so that the child can attain the goals while being included with peers. Article 7 states that the IEP must include:

> (4) A statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the student, or on behalf of the student, and a statement of the program modifications or supports for school personnel that will be provided to enable the student to do the following:
>     (A) Advance appropriately toward attaining the annual goals.
>     (B) Be involved in and make progress in the general education curriculum … and to participate in extracurricular and other nonacademic activities.
>     (C) Be educated and participate with other students with disabilities and nondisabled students in the activities described in this article.[27]

---

[24] 511 IAC 7-42-6(f)(2)(A). The IDEA has substantially identical language. *See* 20 U.S.C. § 1414(d)(A)((i)(II).
[25] 511 IAC 7-42-6(f)(3).
[26] 511 IAC 7-42-6(f)(3).
[27] 511 IAC 7-42-6(f)(4).

### iii. Related services for children with social-emotional-behavioral disabilities.

"Related Services" are central to IEPs, including IEPs for children with social-emotional-behavioral disabilities. Related services include psychological services; physical and occupational therapy; recreation; and counseling services. Related services also include school health services and school nurse services, social work services in schools, and parent counseling and training.[28] The public agency must provide related services if the CCC determines they are necessary for the student to benefit from special education."[29]  Related services that R.O. critically needed included counseling, occupational therapy, parent counseling and training, psychological services (including referrals to a speech language pathologist), physical therapy, and school social work services.[30] However, all of these were absent from his IEPs across the statutory period.

Article 7 explains that counseling includes: "assisting the student to: (i) understand and cope with a disability; (ii) cope with a personal problem or crisis; and (iii) develop and implement a behavioral intervention plan."[31] It can be provided "in the instructional setting or another setting" and can be provided by "(A) school social workers or school counselors; (B) school, clinical, or child psychologists; (C) administrators or teachers; (D) related services personnel; (E) vocational rehabilitation counselors; or (F) other qualified professionals."[32]

Parent counseling and training may:

(1) include: assisting the parents in understanding the special needs of their child; providing parents with information on child development; and assisting parents in understanding the student's educational program and helping them to acquire the

---

[28] 34 CFR 300.34 (a); 511 IAC 7-43-1
[29] 511 IAC 7-43-1(a).
[30] 511 IAC 7-43-1(c).
[31] 511 IAC 7-43-1(g)(1)(E).
[32] 511 IAC 7-43-1(g)(2), (3).

necessary skills that will allow them to support the implementation of their child's IEP;

    (2) be provided: as part of the CCC process; or in the form of special meetings or conferences; and

    (3) be provided by any of the persons listed in subsection (g)(3). The nature of the parent counseling and training needs must guide the selection of the appropriate individual and manner in which the counseling and training are provided.[33]

As explained below, the IHO erred by overlooking EVSC's failure to evaluate and reevaluate R.O. properly, its failure to create BIPs (let alone BIPs based on data from valid FBAs), and its failure to offer R.O. or his parents any related services for either the 2022-2023 or the 2023-2024 school years.

## IV. FACTUAL BACKGROUND: EVSC's Systemic Failure of R.O. Since 2021

### c. Events leading to the 2022-23 school year: EVSC's Lack of Re-Evaluation of R.O. Within the Required Statutory Period

EVSC administered R.O.'s initial and only evaluation in January 2021 when he was in 4th grade at Highland Elementary School. *See* P. Ex. 75.  But it was not comprehensive, not sufficiently individualized, and did not assess R.O. in all suspected areas of disability.[34] EVSC miscategorized R.O. It identified him as solely as Other Health Impaired (OHI)[35] a category that requires "having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli" which is often assigned to children with "chronic or acute health problems" rather than as a child with Emotional Disability (ED),[36] the category that far better describes R.O.'s persistent and severe mental health struggles.

---

[33] 511 IAC 7-43-1(m).
[34] 511 IAC 7-40-5(a).
[35] 511 IAC 7-41-10 lists the following conditions under OHI: (A) asthma; (B) attention deficit disorder or attention deficit hyperactivity disorder; (C) diabetes; (D) epilepsy; (E) a heart condition; (F) hemophilia; (G) lead poisoning; (H) leukemia; (I) nephritis; (J) rheumatic fever; (K) sickle cell anemia; and (L) Tourette syndrome.
[36] 511 IAC 7-41-7.

Although the adequacy of the 2021 evaluation is not directly at issue due to the statute of limitations, it is tied to the LEA's mandatory duty to conduct timely reevaluations, and the deficiencies in the original evaluation are also critical to understanding how EVSC systematically avoided its obligations in the years that followed. As EVSC acknowledged in its opening statement, R.O. had a very long history of behavioral problems, beginning "virtually from the time he was born." (Dkt. 38-5 at Tr. (9/30/24)at 5-6). Nevertheless, EVSC's initial evaluation did not identify R.O. as having a behavioral or emotional disability at all, despite the reason for referral being that "[R.O.] currently has a 504 learning plan, due to his ADHD, anxiety, and disruptive behavior disorders. [R.O.'s] teachers are concerned with his behavior, in the school setting." P. Ex. 75 at 2. Contrary to the stunningly wrong claim in EVSC's opening statement that "R.O. is a highly intelligent young man with severe social, behavioral and emotional problems. His problems are not, Your Honor, in the school" (Dkt. 38-5 (Tr. (9/30/2024) at T17:21-18:5), EVSC's 2021 evaluation recorded his teacher's responses on the Behavior Assessment System for Children - Third Edition (BASC-3) questionnaire, which expressly and repeatedly cites his problems *in school*:

> Clinically significant items in the school setting include Hyperactivity, conduct problems, depression, and atypicality…. Concerns include *he often is off task, is distracting to others, and that he can become emotional when he is stressed*…. Comparatively, the results of the BASC-3 behavioral rating scale indicate that *[R.O.] struggles significantly with conduct problems and depression, in both the home and school settings*."

P. Ex. 75 at 5-6, 11, 12 (emphases added). The January 2021 evaluation concludes:

> According to [R.O.'s] teacher and mother, behavioral and adaptive functioning in the school and home settings indicated significant impairments that adversely affect [R.O.'s] ability to participate in the classroom setting, and there are 7 behavioral incidents on file for the 2020-2021 school year ranging from defiance, disruption, disrespect, and verbal harassment. Data suggests that 504 accommodations are not sufficient in meeting [R.O.'s] educational needs. The [CCC] should determine the least restrictive environment for [R.O.]. P. Ex. 75 at 12.

EVSC failed to assess him for all areas of suspected disability, including an emotional disability, autism, and speech-language needs.[37] The resulting IEPs over the subsequent years, relied on this inadequate, incomplete evaluation, and failed to address R.O.'s core disability. Despite R.O.'s changing needs, all IEPs continued to report from his first IEP through his last one of January 22, 2024: "[T]he case conference committee has determined there is sufficient data to plan appropriately for the Student."[38]

**d. EVSC recycled R.O.'s inadequate IEP from 2021 through 2024.**

R.O.'s initial IEP was created on March 10, 2021, following a February 24, 2021, CCC meeting. P. Ex. 2 at 1.[39] It was inadequate to meet R.O.'s identified (and unidentified) needs, and was essentially recycled through the 2023-2024 school year.  Here is his March 10, 2021 (Grade 4) present level and IEP Goal (P. Ex. 2 at 5):

---

[37] Article 7 defines ED as follows: "(a) [A]n inability to learn or progress that cannot be explained by cognitive, sensory, or health factors. The student exhibits one (1) or more of the following characteristics over a long period of time and to a marked degree that adversely affects educational performance: (1) A tendency to develop physical symptoms or fears associated with personal or school problems. (2) A general pervasive mood of unhappiness or depression. (3) An inability to build or maintain satisfactory interpersonal relationships. (4) Inappropriate behaviors or feelings under normal circumstances. (5) Episodes of psychosis." 511 IAC 7-41-7.

[38] P. Ex. 3 at 7; P. Ex. 5 at 8; P. Ex. 6 at 10, P. Ex 7 at 8, P Ex. at 8.

[39] The IEP's "Date of Report," located on the top right corner of page one, is 3/10/2024.

---

**Goals**

**Goal Title:** Verbal Disruption
**Present Level:** Reed struggles with staying attentive to the assigned task. He will often disruptive instruction by shouting out inappropriate comments that are off topic. Reed was disruptive an average of two times per period based on data collection by his teachers.
**Standard(s) / Element(s) Aligned to Goal:**
· Demonstrate skills necessary to properly interact with peers, school personnel, and community members.
**Specially Designed Instruction:** Reed will receive direct instruction on maintaining a calm learning environment. He will be given the opportunity to practice these skills across all settings through the use of visual reminders, modeling, verbal and non verbal cues, corrective feedback and frequent reinforcement of appropriate behaviors.
**Goal Statement:** Reed will use self regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on interval data collection.
**Method / Instrumentation for Measuring Progress:** interval data collection
**Progress Monitoring Design:** Descriptive Documentation
**Objectives/Benchmarks are only required for students participating in Alternate Assessment:**
· Reed will use self regulation strategies to maintain socially appropriate language/action during 6 out of 10 attempts by the end of the 2nd IEP grading period based on interval data collection.

**Progress Monitoring Assessment:** Progress Monitoring Assessment
**Subject Area:**
**Metric:** Description

---

Here is his substantively identical Nov. 1, 2023, IEP (Grade 7) Present Level and Goal

(P. Ex. 7 at 5):

---

**Goals**

**Goal Title:** Replacement Behavior
**Present Level:** Reed struggles with staying attentive to the assigned task. He will often disrupt instruction by shouting out in-appropriate comments that are off topic. Reed was disruptive on average two times per period based on data collection by his teachers.
**Standard(s) / Element(s) Aligned to Goal:**
· Demonstrate skills necessary to properly interact with peers, school personnel, and community members.
**Specially Designed Instruction:** Reed will receive direct instruction on maintaining a calm learning environment. He will be given the opportunity to practice these skills across all settings through the use of visual reminders, modeling, verbal and non verbal cues, corrective feedback and frequent reinforcement of appropriate behaviors.
**Goal Statement:** Reed will use self regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on data collection.
**The goal has been written to support:** Behavioral Need
**Method / Instrumentation for Measuring Progress:** data collection, observation
**Progress Monitoring Design:** Descriptive Documentation
**Objectives/Benchmarks are only required for students participating in Alternate Assessment:**
· Reed will use self regulation strategies to maintain socially appropriate language/action during 6 out of 10 attempts by the end of the 2nd IEP grading period based on data data collection.

**Progress Monitoring Assessment:** Progress Monitoring Assessment
**Subject Area:** Subject Area
**Metric:** Description

---

This was the sole and only goal for all of R.O.'s education for both the 2022-2023 and

2023-2024 school years. His present level for that goal also remained unchanged.

None of R.O.'s IEPs listed any *individualized* "positive interventions and supports, and

other strategies, to address the behavior, maximize the consistency of implementation across

14

people and settings," and each failed to identify "the skills that will be taught and monitored in an effort to change a specific pattern of behavior."[40] And none included "related services," other than transportation added for the 2023-2024 school year, instead stating: "No Related Services required at this time."[41] None explain how or why this decision was made.

### e. 2022-2023 School Year

At school, R.O.'s behavioral challenges were severe and unrelenting. During the 2022-2023 school year at Thompkins Middle School, he was removed from class on a near daily basis. Thompkins Assistant Principal, Matt Jaques, testified that R.O. was sent to the office more than any other student at the school. Initially seen once or twice a week, R.O.'s removals increased to 3-4 times per week. (Dkt. 38-5 at Tr. (9/30/24) at 237:21-240:3). By March of 2023, R.O. had at least 79 disciplinary incidents, and was frequently out of class, unable to remain on task, and failing multiple subjects. P. Ex. 6 at 1-2; P. Ex. 54 at 152.

On Wednesday, March 22, 2023, Assistant Principal Jaques wrote to another staff member at Middle School indicating with respect to R.O. during the 2022-2023 school year: "He hasn't shown any progress this year behavior-wise and is now up to 79 discipline incidents this school year. We can rarely keep him in his classes for an entire day. I wanted to talk through this option with you and find out next steps about possibly pursuing this." P. Ex. 54 at 152.

As to any complaints about the parents, on the contrary, Jaques testified that he had a good relationship with the parents, and that he would have to call both parents at work repeatedly, and that he contacted them so much that "I'm sure they got tired of hearing from me…." (Dkt. 38-5 at Tr. (9/30/24) at 266:19 - 267:5).

---

[40] 511 IAC 7-32-10(a)(2)-(4).
[41] Subsequent IEPs through April 21, 2023 also provided no related services. *See* P. Ex. 3 at 5, P. Ex. 4 at 6, P. Ex. 5 at 6, P. Ex. 6 at 8. The October 27, 2023 and January 22, 2024 IEPs added transportation as a related service.

Despite these facts, EVSC did not reevaluate R.O. and, as noted above, made no substantive revisions to his IEP, including no updates to his present level aligned to his one goal, no change to his goal, and did not add any of the necessary related services between 2021 and January 2024. He continued to have only one goal related to "Verbal Disruption," based on incomplete and outdated data from his January 2021 evaluation which classified him as Other Health Impaired. Assistant Principal Jaques testified that despite the worsening behavior, he could not recall any CCC convened to adjust R.O.'s programming. (Dkt. 38-5 at Tr. (9/30/24)at 263:16-264:2).

### i. R.O.'s Expulsion Was Based on a Predetermined, Unlawful Manifestation Determination Review

In April 2023, R.O. was expelled from Thompkins Middle School following a Manifestation Determination Review (MDR). The behavior that was the subject of the MDR is provided in part as follows: ""[R.O.] continues to call the same student 'Peter' and 'Pete Griffin' at breakfast." P. Ex.6 at 3. The CCC held an MDR and an IEP Meeting (IEP) (MDR IEP) on April 13, 2023. *Id.*

The MDR IEP reported that "Mrs. [O] shared a summarized timeline of [R.O.]'s medical and educational history from age 3 until present day, including his current medical diagnoses: ADHD, Anxiety, Depression, Disruptive Mood Dysregulation Disorder, and Oppositional Defiant Disorder. Mr. and Mrs. [O] stated that [R.O.] struggles with transitions and change. Parents stated that [R.O.] will be evaluated for Autism in July through a community agency provider. Mr. and

Mrs. [O] believe that [R.O.]'s conduct was a manifestation of his disability." *Id*.; (Dkt. 38-5 at Tr. (10/2/24)at 124:19-126:4, 127:9-18).

The April 2023 MDR provided the following continuing behaviors of concern associated with the student's disability, "[R.O.] tends to blurt out, curse, and call other students names. His teachers have observed that this behavior usually occurs when he is bored or when he does not want to complete a task." P. Ex. 6 at 4. The April 2023 MDR IEP states: "It is hypothesized [R.O.'s] unsafe physical actions occur towards peers due to impulsive and extreme behaviors, which are sensory consequences of his diagnoses of ADHD and DMDD." *Id*. at 5.

Despite the data provided, the school personnel at this MDR concluded that his behavior was *not related* to his disability. *Id*. at 3-4. R.O. was then recommended for expulsion from the school system. The MDR IEP reported that "[R.O.] will receive homebound instruction due a disciplinary change of placement through the findings of a manifestation determination conference." P. Ex. 6 at 9.

The MDR is the formal process through which the CCC determines whether a child's conduct was or was not "a manifestation of the student's disability."[42] Specifically, the CCC must determine, based on "all relevant information in the student's file… including the student's IEP, any teacher observations, and any relevant information provided by the parent, to determine if the conduct in question was: (1) caused by or had a direct and substantial relationship to the student's disability; or (2) the direct result of the public agency's failure to implement the student's IEP."[43] If either condition is met, then the CCC must determine that the behavior is a "manifestation," and it must then conduct an FBA, implement a BIP, and return the student to the placement from which

---

[42] 511 IAC 7-44-5(a).
[43] 511 IAC 7-44-5(b).

he was removed.[44] Moreover, if, as was the case here, the conduct was "the direct result of the public agency's failure to implement the IEP," then the school "must take immediate steps to remedy those deficiencies."[45]

The conclusion of this meeting, along with the recommendation for expulsion, did not follow from the evidence in the record indicating that behaviors such as name calling, acting out in class, and other behaviors, were frequent and related to his disabilities including his diagnosis.

The MDR IEP then reported that "[R.O.] will receive homebound instruction due a disciplinary change of placement through the findings of a manifestation determination conference." P. Ex. 6 at 9.  Despite the fact that R.O. was being placed on homebound, EVSC continued R.O.'s sole goal (recycled since March 2021) to "use self-regulation strategies to maintain socially appropriate language/action during 8 out of 10 attempts by the end of the 4th IEP grading period based on data collection." *Id.* at 7.  No other services were added.

By the CCC's own descriptions, it was completely implausible to conclude that R.O.'s behaviors were not caused by and did not have a substantial relationship to his disability. Moreover, the CCC did not include any of R.O.'s outside providers or seek input from mental health professionals, all of whom would have confirmed the obvious: R.O.'s behaviors were due to his disability.

The parent testified that R.O. received no educational services for approximately eight to ten days before homebound instruction began. (Dkt. 38-5 at Tr. (10/2/24)at 128:5–12). After a meeting with Special Education Director Elyn Hulsey outside the CCC process, the parent testified that she agreed to try an alternative placement at The Learning Center, with the understanding that the parties could reconvene if needed. (Dkt. 38-5 at Tr. (10/2/24)at 127:19–128:11). The parent

---

[44] 511 IAC 7-44-5(c), (e).
[45] 511 IAC 7-44-5(d).

further testified that she never waived her child's IDEA or Article 7 rights, never signed a settlement agreement, and never agreed to dismiss her procedural complaint with prejudice; she understood she could still refile or seek counsel. (Dkt. 38-5 at Tr. (10/2/24) at 128:12–25).

### ii. R.O. was placed at EVSC's segregated Learning Center, where he was removed from class almost daily and isolated for hours without receiving instruction.

In May 2023, EVSC placed R.O. in its segregated school for children with disabilities, The Learning Center (TLC), where he remained until early 2024. (Dkt. 38-6 at 762). His time there was marked by daily seclusions in the "across the hall" or "danger to self or others" room, alternatively also termed "reflection," and frequent sleeping in class.[46] Emails from his Teacher of Record (TOR), Elijah Farmer, reveal that his days were largely unproductive, punctuated by his refusal to attend to lessons, resulting in time in seclusion. See P. Ex. 54 at 717-44; P. Ex. 57 at 1. For example, on October 4, 2023, Farmer emailed R.O.'s mother that R.O. had a "rough day," resulting him being placed "across the hallway" for the afternoon:

> Hi [L.O.],
>
> Just wanted to let you know that [R.O.] had a rough day. He had put "phantom games" on his bookmark tab when we had told the class that we could not play that app. We took his computer to remove the bookmarked tab and once we did [R.O.] got very upset.
>
> Once we had taken the computer we found that his settings were set to have him get out of go guardian so that we could not see what he was doing. We did not blame him for putting his settings to this, but we set him back up so that he was on go guardian. He continued getting upset and called me a "dumb ass".
>
> We then removed the chromebook, and I provided him paperwork to complete instead and he ripped it up. He then continued to break pencils we provided him and told us he would continue breaking the pencils given to him. We gave him

---

[46] See generally P.Ex.54, at 717; P.Ex.54, at 718; P.Ex.54, at 726; P.Ex.54, at 727; P.Ex.54; P.Ex.54, at 730; P.Ex.54, at 732; P.Ex.54, at 733; P.Ex.54,at 734; P.Ex.54, at 735; P.Ex.54, at 736; P.Ex.54, at 739; P.Ex.54, at 740; P.Ex.54, at 741; P.Ex.54, at 744; P.Ex.54, at 742; P.Ex.57, at 1.

a crayon instead and he did not do any work throughout the day. In the afternoon, he continued trying to distract the class by making random comments such as "Mr. Beast". He spent the afternoon across the hallway.

Just wanted to keep you informed with everything. Hoping he has a better day tomorrow! Thanks for all you do! P. Ex. 54 at 727.

On October 17, Farmer reported that R.O. "struggled," and was sent to "reflection":

Just wanted to let you know [R.O.] struggled today. He was asked to show his work on his long division review worksheet, and he refused. He began sobbing for over an hour because he did not want to complete it. He then pushed over his desk when students asked him to be quiet. He went over to reflection and ended up losing his tech time. He did come back to class and stopped crying. We let grandma know what happened, but we just wanted to keep you informed. Hoping he will have a better day tomorrow!

*Id*. at 730. On November 2, Farmer reported another "really bad day":

Just wanted to say that [R.O.] had a really bad day. He spent the majority of the day across the hallway and continues to make specific comments to other students bullying them, including saying "shhh" every time one student speaks. ***He got very bored across the hall as we did not give him any attention***, so he eventually completed some makeup worksheets and made it back to class. He continued being disruptive and refused his work for the rest of the day once in class. Hope his night is better! Thanks for everything!

*Id*. at 736 (emphasis added). On November 9, Farmer reported that R.O. "really struggled":

Just wanted to let you know [R.O.] really struggled again today. He came in ready to get his work caught up, but by the afternoon he began distracting the class by making fart noises and inappropriate moaning noises. Hopefully he decides to have a better day tomorrow! Thank you!

*Id*. at 737. On November 13, Farmer responded to L.O.'s report that R.O. had a good weekend:

Yes, he is here today. That sounds good about [C] picking him up. He slept all morning and just woke up a little before lunch. He ate but then began trying to disrupt the class. He is currently over in reflection across the hall. Hoping he is able to make it back!

*Id*. at 738. On November 17, Farmer reported "another rocky day":

Just wanted to let you know [R.O.] had another rocky day. He put his head down in the morning and did complete one worksheet. He again drew male genitals on his assignments. We removed his pencil and any extra paper, and he is now being

20

given a dry erase board and marker to complete some of his assignments. He continued disrupting students in class and tried to hide in a cubby under the window. He was taken across the hall where he still is. Across the hall he removed his shoes and threw them at a light over and over. Hoping he has a better week next week! Thanks for all you do! *Id.* at 740.

EVSC sent R.O. away to the TLC after improperly expelling him from Thompkins Middle School, ostensibly because its staff had more expertise in helping children overcome difficult behaviors, not merely to remove him from the typical classroom because he was causing distractions. Farmer's emails do not illustrate an evidence-based strategy to teach R.O., and that it was relying instead on isolation. While there is no clear documentation of the total hours R.O. spent in seclusion, these and other emails confirm a consistent and alarming pattern of near-daily removals, accounting for more than one hundred hours of removal in total. *Id.* at 717-18, 726-27, 730, 732-36, 739-42, 743; P. Ex. 57 at 1.

### iii. R.O. deteriorated emotionally in 2022 and 2023, but EVSC failed to reevaluate him or change his IEP.

As noted above, EVSC's January 2021 evaluation reported clinically significant concerns, including conduct problems, depression, hyperactivity, and aggression in both home and school environments. P. Ex. 75 at 12. Over the next two years, R.O.'s symptoms worsened; however, EVSC did not initiate or complete a required reevaluation.

Medical records from Deaconess Health System confirm that R.O. was psychiatrically hospitalized in August 2023 for suicidal ideation. He expressed that he did not want to live, had wrapped a seatbelt around his neck, and exhibited severe aggression. P. Ex. 32 at 1; P. Ex. 100 at 125. The hospital reported that R.O. engaged in inappropriate behaviors:

During this admission, the patient was monitored for suicidal ideation and depressive and anxiety symptoms. He was encouraged to attend and participate in groups, which he states he has enjoyed & plans to continue using the positive coping skills learned. Cooperative with staff at times, not active & engaged in his

treatment. [R.O.] required repeated redirection from staff & had difficulty in following basic rules & engaging in inappropriate conversations.

P. Ex. 32 at 50; *see also, e.g., id.* at 65 (noting that R.O. drew inappropriate pictures during group session, engaged in attention seeking behaviors, and was unwilling to follow directions).

Southwestern Behavioral Healthcare records from June through November 2023 consistently document R.O.'s explosive behaviors, head banging, emotional volatility, destruction of property, lying, bullying, and suicidal ideation. P. Ex. 100 at 12-307. Psychiatrist Tina Evans-Robinson testified that R.O. met criteria for serious emotional disturbance, exhibited daily behavioral outbursts, and required continuous psychiatric care. *Id*. at 162-275. R.O.'s maladaptive and dangerous behaviors were obviously not limited to the home setting.

As noted above, R.O.'s October 2023 IEP (P. Ex. 7) and January 2024 IEP (P. Ex. 8) were identical to prior IEPs in goals, services, and present levels to his 2022-2023 IEPs. And no related services were added, despite documentation of R.O.'s increasing psychiatric symptoms and his parents' new request for a residential placement. P. Ex. 7 at 8. No school psychologist or mental health professional attended these meetings. P. Ex. 8 at 9. The IEPs did not record how much time R.O. spent in seclusion or asleep. P. Ex. 8. Despite ongoing crises, hospitalizations, and the fact that more than three years had passed since his last evaluation, the IEP noted only that "there is sufficient data to plan appropriately for the student." *Id*. at 8. The parent's request for homebound placement and the family's continued search for residential treatment were noted, but EVSC did not document the data it relied on to deny those requests. *Id*. at 9.

By January 2024, R.O. stopped attending school due to deteriorating mental health. EVSC did not offer homebound services, initiate a reevaluation, or convene a meeting. Instead, it allowed R.O. to remain unserved for nearly three months. Special Education Director Hulsey and school

22

personnel admitted that during that time they did not reach out, offer services, or report R.O. truant. (Dkt. 38-5 at Tr. (10/2/24) at 278:11-22; (Dkt. 38-5 at Tr. (9/30/24)at 138:1-147:2).

Left to their own devices, the parents, desperate for appropriate services for their child, made the decision to attempt to get him appropriate programming on their own. On April 5, 2024, the Parents provided a written notice of intent to place R.O. in a nonpublic facility and seek reimbursement. P.Ex. 20. R.O. was placed at Whetstone Boys Ranch, a licensed therapeutic boarding school accredited under state standards and by the Joint Commission Accreditation Agency. (Dkt. 38-5 at Tr. (10/1/24)at 242:9–10, 224:16–17, 233:22–233:1). Jeremy Thompson, Whetstone's Executive Director, testified that R.O. received individualized instruction, licensed counseling, and had made meaningful academic and behavioral progress. (Dkt. 38-5 at Tr. (10/1/24)at 220:16-227:13).

### V. PROCEDURAL BACKGROUND

On February 21, 2024, R.O.'s parents, L.O. and B.O., filed a due process complaint with the Indiana Department of Education (IDOE) seeking relief under IDEA and Article 7 for systemic failures to evaluate, program for, and provide services to R.O. The administrative hearing was held from September 30 through October 3, 2024. On December 15, 2024, the IHO issued a final decision.

In her December 15, 2024, decision, the IHO agreed that R.O. had been denied FAPE during the 2022–2023 school year, ordered that EVSC convene a new CCC meeting, provide a one-to-one aide, conduct new evaluations including an FBA, and, if warranted, explore a residential placement. However, she did not award any compensatory education for R.O.'s missed educational time, denied reimbursement for a private residential placement at Whetstone, which had proven effective, and upheld the same inadequate IEP for the 2023–2024 school year without

justification, despite no material changes in the IEP's content and despite clear evidence as to R.O.'s growing needs and unrebutted expert testimony about the inadequacies of the 2023-2024 IEP.

The IHO further erred by failing to apply the correct legal standards to key issues, including EVSC's refusal to provide related services, its failure to supply required educational records and progress reports, and its use of repeated disciplinary removals and seclusion as a *de facto* change in placement. These omissions, misapplications of law and misstatements of fact leave R.O. and his parents without an adequate remedy for the significant deprivations they suffered, which the family is asking the Court to remedy.

## ARGUMENT

### f.  The IHO erred in holding R.O.'s 2023–2024 IEP was appropriate because it had the same critical failures as the 2022-2023 IEP, which she had held denied R.O. a FAPE.

The first issue before the IHO was whether R.O.'s 2022–2023 and 2023–2024 IEPs were appropriate substantively, *i.e.*, were reasonably calculated to provide him with a meaningful educational benefit,[47] and procedurally, *i.e.*, whether any procedural violations impeded R.O.'s right to a FAPE or amounted to a deprivation of educational benefit resulting in a denial of FAPE. IHO Op. 38. The IHO correctly held that the 2022-2023 IEP failed to provide updated Present Levels (*id*. at 38), failed to offer related services including a licensed social worker, parent counseling, or a psychologist, while he was struggling at Thompkins and subsequently in crisis (*id*. at 41); and failed to include specific measurable goals drafted to meet R.O's needs. *Id*. at 42.

Given that EVSC made no changes to the programming in its inadequate 2022-2023 or 2023-2024 IEPs, despite R.O. having regressed behaviorally under the 2022-2023 IEP, the IHO

---

[47]This issue was broken into sub-issues, including the adequacy of the IEP' present levels of performance, special education and related services, supplementary aids and services, and specific and measurable annual goals.

erred in finding that the 2023-2024 IEP was appropriate. As noted above, all of R.O.'s IEPs from 2021 to 2024 had the same present level of performance aligned to the same single goal with no related services and no new evaluation.[48]

Given the IHO's correct finding that EVSC's 2023-2024 IEPs were largely unchanged from its inappropriate 2022-2023 IEP, she should have concluded that the latter IEP was also inappropriate, especially as R.O. needs grew. The Supreme Court explained that an IEP must give the child an opportunity to make significant year to year progress:

> When all is said and done, a student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to sitting idly awaiting the time when they were old enough to drop out.[49]

The Third Circuit has similarly explained the importance of revising and changing an IEP where a child makes little progress: "Of course, if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate."[50] EVSC has no good-faith basis to argue that R.O made progress under his 2022-2023 IEP as his behaviors increased to the point that  EVSC (improperly) expelled him.

---

[48] The IHO acknowledged that these IEPs went unchanged. Regarding the October 27, 2023 IEP, she found: "The Annual IEP was similar to the previous IEP." IHO Op. at 34, ¶ 6.02.  So too for the January 9, 2024, which, she said, "remained essentially the same." *Id.* at 36-37, ¶¶ 7.07, 7.11.

[49] *Endrew F.*, 580 U.S. at 402-03.

[50] *Carlisle Area Sch. v. Scott P. By & Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995). The Second Circuit agreed: "The IDEA requires that an IEP be "updated annually," and revised "as appropriate." An IEP is not inappropriate simply because it does not change significantly on an annual basis, but ***if the student made no progress under a particular IEP in a particular year, the propriety of an identical IEP in the next year may be questionable***." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 256 (2d Cir. 2012) (emphasis added) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); *Schroll v. Bd. of Educ. Champaign Cmty. Unit. Sch. Dist. #4*, No. 06-2200-DGB, 2007 U.S. Dist. LEXIS 62478, at *12 (C.D. Ill. Aug. 10, 2007)).

Rather than focus on the content of the 2023-2024 IEPs (his program), however, the IHO instead emphasized solely EVSC's physical relocation of R.O. to TLC (his placement). IHO Op. at 41. This mere change in placement does not constitute a valid provision of FAPE. As discussed below, this conclusion is reinforced by extensive expert testimony and evidence provided at hearing, which unequivocally demonstrated that the 2023–2024 IEPs failed to provide appropriate present levels, failed to incorporate meaningful, measurable goals tailored to his unique circumstances, or adequately address R.O.'s growing behavioral and emotional needs through any type of related services.

The 2023-2024 IEP failed to include properly updated Present Levels. Initially, the IHO correctly found that EVSC failed to update R.O.'s Present Levels during the 2022–2023 statutory period: "[A]t some point during the 2022–2023 statutory period (after the move-in IEP) the Present Levels… should have been updated. This update should have occurred with the revised IEP." IHO Op. at 38.  The IHO then inexplicably reversed course by concluding that the April 2023–2024 IEPs were compliant because EVSC (finally) completed an FBA and drafted a BIP.  Id. at 38-39. Her conclusion shows a fundamental misunderstanding of the IDEA's/Article VII's distinct evaluative requirements. Specifically, they require Present Levels to document a student's current academic achievement and functional performance comprehensively and explicitly, thereby providing accurate, objective, and measurable baseline data from which goals and objectives must be developed. Present levels are needed in all areas, not just behavior.

   The section of the IEP that includes a child's present levels of academic achievement and functional performance (PLAAFP) must be comprehensive, providing a baseline that reflects the full scope of the child's needs, including both academic and nonacademic areas.

This statement must offer relevant background information on the child's areas of need, strengths, interests, and learning style. 20 U.S.C. § 1414(d); 34 CFR § 300.324(a).

The PLAAFP section in R.O.'s IEPs failed to include accurate, up-to-date information on his functional needs, behavioral challenges, and social skill deficits. They lacked any detailed information directly related to the disabilities with which R.O. struggled, leaving critical gaps in addressing his unique needs. P.Ex.4, P.Ex.5, P.Ex.6, P.Ex.7, P.Ex.8.

As shown above, the IEPs from March 10, 2021, onward copied and pasted *verbatim* the present level for R.O's sole goal: "Present Level: [R.O.] struggles with staying attentive to the assigned task. He will often disrupt instruction by shouting out inappropriate comments that are off topic. [R.O.] was disruptive on average two times per period based on data collection by his teachers."[51] The record shows that this present level was not at all accurate by early 2023.

Further, an FBA is a behavioral assessment tool intended solely to identify behavioral triggers, environmental factors, and patterns contributing to maladaptive behavior. It does not and cannot replace the comprehensive academic and functional baseline data mandated in a student's Present Levels. By design, it does not assess academic progress, classroom performance or social-emotional growth, or provide measurable baseline data required to revise goals meaningfully.

The record unequivocally demonstrates that R.O.'s present level related to his sole IEP goal was repeated verbatim across every subsequent IEP, despite documented evidence of his escalating emotional, behavioral, and academic needs. The IHO erred in concluding that EVSC met its obligation to update R.O.'s Present Levels.

---

[51] *Compare* P. Ex. 2 at 5 *with* P. Ex. 3 at 5; P. Ex. 4 at 5; P. Ex. 5 at 5; P. Ex. 6 at 7; P. Ex. 7 at 5; and P. Ex. 8 at 6.

**i. EVSC's 2023-2024 IEPs did not provide necessary accommodations.**

The IHO's decision also fails to address EVSC's failure to offer the accommodations R.O. needed to have access to his educational environment, instead reaching a finding only on *accommodations for statewide testing and assessments*, which are just one component of the larger issue of accommodations. IHO Op. at 39.   IDEA/Article 7 go well beyond testing accommodations, mandating that an IEP describe the accommodations, modifications, and supports for school personnel necessary for a child to advance toward annual goals, participate in the general curriculum, and engage in nonacademic activities.[52] R.O.'s extensive records, which document severe difficulties with attention, self-regulation, sensory sensitivities, and peer interactions (*e.g.,* P. Ex. 75 at 12; P. Ex. 100 at 12 of 546; P. Ex. 32 at 9 of 76) made clear that he needed specific, global classroom-based supports.

In concluding that EVSC did include testing accommodations and that no evidence showed a need for an alternate assessment program, the IHO did not analyze whether any of the IEPs in fact included the necessary accommodations for R.O.

**ii. EVSC's 2023-2024 IEPs did not include appropriate special education and related services.**

The IHO correctly held that EVSC denied R.O. related services and supplementary aids and services essential to his education for 2022-2023. IHO Op. at 41. She likewise concluded that EVSC "failed to [include] supplementary aids and services necessary to allow this student to advance appropriately towards attaining the annual goals." *Id*. at 42.   The failure to offer counseling, psychological services, social work, and other supports deprived R.O. a FAPE and were procedural violations of the IDEA/Article 7 that impeded his right to FAPE and deprived him of educational benefit. IHO Op. at 41–42.

---

[52]  511 IAC 7-42-6(f)(6)(A); 511 IAC 7-32-9.

However, the IHO's reversal on this issue for the 2023–2024 school year is indefensible in light of R.O.'s documented escalation of need. In addition to EVSC expelling R.O., his condition had clearly deteriorated: he was hospitalized, continued to head-bang and elope from classrooms, and was placed almost daily in TLC's "across the hall" / "danger to self and others" seclusion room. A sampling only of the correspondence during this year shows that the program at TLC was not only inappropriate for R.O. but that it wasn't meeting his needs.[9] These frequent removals effectively denied [R.O.] access to specialized instruction and support, and illustrate how the services that the Respondent put in place were not effective.

Nevertheless, without a cogent explanation, other than noting his change of placement to TLC, the IHO held that the 2023–2024 IEPs "met the required components of 511 7-42-6." IHO Op. at 41. That provision lists the required components of an IEP, including "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable."[53] But, as noted above, none of R.O.'s IEPs listed any classroom related services or what research his programming was based on. His April 12, 2023 IEP stated: "No Related Services required at this time," and the final IEPs included no related services other than transportation.[54]

The IHO did not find that R.O.'s needs had lessened. Nor did she conclude that for the 2023-2024 IEPs, the outside services R.O. received excused EVSC's failure to offer in-school supports. She did not cite any expert witness testimony or other evidence. Her about-face not only ignored the IDEA's mandate that an IEP address all of a student's disability-related needs through

---

[53] 511 IAC 7-42-6(f)(4).
[54] *See* P. Ex. 6 (4/21/23 IEP) at 8; P. Ex 7 (11/1/23 IEP) at 5 (adding daily Transportation, but no other related services); P. Ex. 8 (1/22/24 IEP) at 6 (same). The last two IEPs confirm the severity of R.O.'s behaviors: "Criteria to Determine a Health-Related Need for Special Education transportation: Behavioral Impairment – e.g., self-abusive, flees, problematic response to sensory input."

specially designed instruction and related services, but also contradicted her determination, a paragraph earlier, that those unmet needs denied R.O. a meaningful educational benefit for 2022-2023. This unexplained inconsistency fundamentally undermines her holding.

### iii.  The 2023-2024 IEPs failed to include supplementary aids and services.

This same internal inconsistency carries over to the IHO's analysis of the IEP's omission of supplementary aids and services.  For 2022–2023, she found that EVSC's revised IEPs "failed to [include] supplementary aids and services necessary to allow this student to advance appropriately towards attaining the annual goals." IHO Op. at 42.  For 2023-2024, however, she found that Plaintiffs did not prove that EVSC's IEPs "failed to include supplementary aids and services necessary to allow this student to advance appropriately towards attaining the annual goals." *Id*.  Again, she ignored uncontroverted expert testimony of multiple experts on this issue and offered no explanation how R.O.'s amplified needs in 2023-2024 (seen in hospitalizations and daily placement in seclusion), could have been met through the same inadequate aids and services offered in 2022-2023.

The IHO's decision is arbitrary, ignoring the record, the testimony of experts, and the IDEA mandate that an IEP include the necessary substance, including supplementary aids and services a student needs for access to and progress in the curriculum.

### iv.  The 2023-2024 IEPs did not include specific and measurable goals drafted to meet all of R.O.'s needs.

The IHO's analysis of EVSC's 2023-2024 IEP goals suffers from the same inconsistency and arbitrariness.  She correctly held that the 2022–2023 IEP "failed to include specific measurable goals drafted to meet all the needs of the student." IHO Op. at 42. Her conclusion was based on the fact that the IEP had only one goal copied and pasted into the previous four IEPs.  Yet she concluded, without explanation, that the same copied and pasted goal was now

appropriate in R.O.'s 2023–2024 IEPs. *Id.* As noted above, courts agree that "a copy of [an IEP] which failed to produce any gains in a prior year, could [not] be appropriate."[55] Her conclusion disregards the text of Article 7 and longstanding case law, as well as the testimony of experts.

For example, Dr. Dilk testified that, based on a comprehensive view of all of the documents, the 2022-2023 IEPs, and all other IEPs, should have had goals including social skill goals, multiple behavioral goals, functional goals, and related services. (Dkt, 38-5 Tr.10/2/24, at 23:14 – 24:4). Janice Sanders, a licensed clinical social worker, testified regarding R.O's educational needs based on her comprehensive review of his records. In her report she noted multiple areas that needed to be addressed in the student's IEPs in her expert opinion, including "improving inattention, task completion, adaptive skills, executive functioning, organizational skills, impulsivity, or social-emotional development. P.Ex.23, at 1-10. These are key areas where [R.O.] exhibits significant deficits, and their exclusion from his IEP reflects a lack of comprehensive planning and support." Dr. Hahn emphasized that special education is not limited to addressing only academic needs, stating: "We don't just teach the students with perfect behavior." She stressed that "behavior is part of him and a part of who he is," and that educators are "supposed to address all areas of disabilities" and "educate the entire child." Dr. Hahn reiterated that "we educate the entire child." (Dkt, 38-5 Tr.p.48:7- 16, 10/01/2024).

Dr. Hahn then explained that an IEPs' goals and objectives "are supposed to be in all areas of need. All areas of his individual needs. That's why the present levels is academic and functional performance." She emphasized that the district "should have written goals, functional behavior goals, [and] objective functioning goals." She further clarified that "you write goals in all areas of disability," and that "it's clear throughout his entire IEP, if you read them, disability is his

---

[55] *Scott P.*, 62 F.3d at 534.

behavior." Dr. Hahn concluded that providing goals in all areas of need "is required under IDEA, all areas of disability, and that includes behavior." (Dkt. 38-5 Tr.10/01/24, at 51:16-52:8).

Overall, going beyond the text of the one goal and reviewing the 2023-2024 IEPs in their entirety, the IHO still offered no basis for her holding that:

> [t]he April 7, 2023, IEP recognized the Student's behavioral issues and set out behavioral interventions to address these issues including, emotional behaviors, functional and executive functioning and set out special education services specifically designed to address the student's needs. IHO Op. at 43.

This holding lacks a coherent rationale and disregards the record. The IHO pointed to no new services, progress data, related services, or testimony of any lay or expert testimony that supported this conclusion, as there were no new goals, no new present level aligned to the goal, and no new related services. Multiple experts, including a licensed clinical psychologist and attorney, a former due process hearing officer, a licensed clinical social worker, and a board-certified behaviorist, confirmed that the IEPs failed to address R.O.'s behavioral, emotional, and academic needs. The IHO's decision fails to grapple with this unchallenged testimony and stands in contradiction with the record.

### v. EVSC failed to consider the full continuum of educational placements, and failed to offer R.O. a residential placement.

In the fall of 2023, Plaintiff Parents let EVSC know that they were considering placing R.O. in a full-time residential placement due to his significant needs. The CCC had an obligation to discuss the full continuum of placements with the parents, including residential placements.[56] The Seventh Circuit has held that a residential placement is appropriate where it offers "services primarily oriented toward enabling the child to obtain an education" as opposed to "services

---

[56] 511 IAC 7-42-10(b)(4) (listing placement options on continuum).

oriented more toward enabling the child to engage in noneducational activities. The former are 'related services' within the meaning of the statute, the latter not."[57]

There was ample support for Parents' request, in light of R.O.'s Summer 2023 hospitalization and his rapid decompensation at TLC in the fall. Testimony from several licensed professionals confirmed R.O.'s need for a therapeutic residential placement. Clinical social worker Janice Sanders, neuropsychologist Dr. Melody Dilk, and behavior consultant Carissa Harrington each testified that EVSC failed to meet R.O.'s intertwined educational and mental health needs. Sanders emphasized that R.O.'s severe needs necessitated a residential placement:

> It is this clinician's professional opinion that [R.O.'s] needs are best met in residential treatment. His psychiatric and educational needs are intertwined as the resulting emotional dysregulation, impulsivity, and aggression preclude [R.O.] from attending school and thereby making educational progress." P. Ex. 23 at 10.

Dilk explained that the family's exploration of residential options should have prompted the CCC to perform a comprehensive functional behavior assessment and discuss such placements as part of the continuum of services.  (Dkt. 38-5 at Tr. (10/2/24)at 55:3-57:13).

Ultimately, the IHO herself agreed that R.O. could benefit from a residential facility, ordering EVSC to consider one (improperly limiting consideration to Indiana schools) if TLC could not meet R.O.'s needs. IHO Op. at 55.

But the CCC never held a meaningful discussion about residential placement. The November 1, 2023, IEP and January 22, 2024, IEP mention Parents' private search for a residential placement, but they don't document that the CCC ever considered one or informed the Parent it could be responsible for the placement and the cost. *See* P. Ex. 7; Ex. 8. And while the IHO stated

---

[57] *Dale M. v. Bd. of Educ.*, 237 F.3d 813, 817 (7th Cir. 2001) (*citing Butler v. Evans*, 225 F.3d 887, 894 (7th Cir. 2000)).

without citation that "[t]he school offered residential placement," IHO Op. at 51, there is no support for this finding in the record or in the transcripts.

Instead, in its January 22, 2024, IEP, EVSC noted that R.O. could be admitted to the state hospital Evansville Psychiatric Children's Center (EPCC).[58] In its closing brief to the IHO, EVSC disingenuously argued that Parents' refusal to consider placement at EPCC was "unreasonable."[59] But EPCC is not a residential educational placement at all, it is a state mental health hospital. EPCC describes itself as "a state psychiatric hospital operated by the Family and Social Services Administration, Division of Mental Health and Addiction, an Indiana medical-based state psychiatric hospital." P. Ex. 46 at 2. Parents, not schools, are responsible for its costs through private insurance or Medicaid if eligible. *Id*. Dr. Dilk explained the difference between in-patient hospitalization and therapeutic residential placement. An in-patient facility focuses on acute stabilization, while a residential placement is a more holistic, supportive environment suited for transitioning the child to a less restrictive setting. (Dkt. 38-5 at Tr. (10/2/24)at 67:11-69:5). When asked whether requiring parents to obtain health insurance for psychiatric hospitalization is consistent with providing a FAPE, Dilk said no a school must provide FAPE regardless of whether the parent has insurance. The IDEA/Article 7 supports her opinion.

The CCC's failure to consider a residential placement is further confirmed by the fact that EVSC witness, Dr. Tina Evans-Robinson, R.O.'s psychiatrist in the fall of 2023, did not understand the concept of a continuum of placements under IDEA or Article 7. (Dkt. 38-5 at Tr. (10/3/24)at 189:6-10). She did agree that EPCC was a state hospital, not an educational placement. *Id*. at 191:9-192:13. She testified that her "only understanding was unless a particular school corporation recommends treatment at a particular facility, that they would not be the ones paying

---

[58] P. Ex. 8 at 2.
[59] EVSC IHO Closing brief at 42-43. CMLLP AR 01415-16.

for it or they're not expected to…. Again, it's out of my area of expertise." *Id*. at 189:15 -190:9. She added: "I have never been aware of a school paying for EPCC. / Q. Because EPCC is a state hospital, correct? / A. Correct." *Id*. at 191:20-24. Ultimately, she conceded that she did not know what an educational residential placement was. *Id*. at 192:14-16.[60]

It was a serious procedural violation, depriving R.O. educational benefit, for the CCC not to consider a true residential educational placement. The IHO erred by disregarding this error.

### vi. The IHO misapplied the legal standards regarding change of placement and seclusion.

The IHO failed to apply the correct legal standard in determining whether R.O.'s frequent removals, both at Thompkins and TLC, constituted a change of placement. A disciplinary change of placement occurs when removals are more than 10 cumulative days and constitute a pattern.[61] This includes disciplinary removals that may not be classified as suspensions, such as daily seclusions, "time-outs," or office exclusions, if they are for substantially similar behavior and occur repeatedly. The standard does not require formal documentation or intent by the school – it is triggered by the functional effect on the student's ability to access their education. [62]

R.O. was sent to the office or "across the hall" for seclusion on a near-daily basis, as noted above, often for multiple hours. He missed instruction almost daily and was not participating meaningfully in his special education services, including resource room time. In fact, EVSC reported in R.O.'s IEP that he received "no grade" in his special education class because he was "hasn't been in resource very much" and was "typically sent to the office due to not listening and

---

[60] EVSC relied heavily on Robinson's testimony to argue that EPCC was an appropriate placement for R.O., disregarding that her concession that she could not distinguish a hospitalization from an actual educational residential placement. *Id.*
[61] 34 C.F.R. § 300.536; 511 IAC 7-44-4.
[62] See *Letter to Sarzynski*, 59 IDELR 141 (OSEP 2012); *Queen Creek (AZ) Unified Sch. Dist.*, 123 LRP 32247 (OCR 2023) (holding that inconsistent documentation of informal removals does not absolve a district from its obligations).

disruptive behavior." P. Ex. 6 at 2. These removals were an unlawful change of placement without the required procedural safeguards, including a manifestation determination.[63]

Despite this pattern, the IHO accepted EVSC's characterization that these seclusions were not disciplinary in nature and therefore did not constitute a change of placement. She improperly dismissed these events as "cool-downs," despite clear evidence that R.O. was denied access to instruction, sometimes for more than a half day. Her conclusion that the daily removals of R.O., both in the form of out-of-class office referrals during 2022–2023 and extended seclusion in the "across the hall" room at TLC during 2023–2024, did not constitute a change in placement is unsupported by the record and inconsistent with controlling federal and state law.[64]   IHO Op. at 47.

Furthermore, EVSC's failure to document these removals was a serious violation in itself. The IDEA requires that districts maintain accurate records of disciplinary removals and notify parents when a change in placement is contemplated.[65] Here, the so-called "interval data" or seclusion logs were not shared with parents, not included in the IEP process, and, critically, not even available at hearing in a consistent format. When pressed, EVSC's Board Certified Behavior Analyst (BCBA), Caroline Paleski, admitted that the data she prepared about R.O.'s seclusion was created only in August 2024, "whenever this [lawsuit] was started to be a thing," plainly at the request of counsel, and was neither contemporaneously maintained nor shared with the family or IEP team. (Dkt. 38-5 at Tr. (10/2/24) at 265:1-266:15). Such *post-hoc* documentation, prepared for

---

[63] 34 C.F.R. § 300.530(h); *Queen Creek (AZ) Unified Sch. Dist.*, 123 LRP 32247 (OCR 2023).
[64] *See, e.g.*, *Mesa County Valley Sch. Dist. No. 1*, 124 LRP 6361 (SEA CO 2024) (change of placement found when school moved student to homebound setting without IEP team meeting); *Metropolitan Sch. Dist. of Washington Twp.*, 120 LRP 14383 (SEA IN 2020) (MDR required where removals exceeded 10 days even if for short durations).
[65] 34 C.F.R. § 300.530(h); 511 IAC 7-44-4(a).

of litigation, months after an action is filed, cannot defeat a claim of pattern-based removals under IDEA.

The IHO further ignored the critical distinction between therapeutic de-escalation and disciplinary exclusion. The Office of Special Education Programs (OSEP) and Department of Education guidance underscore that informal removals, even if not formally labeled as suspensions or expulsions, must be counted toward the 10-day threshold when they significantly reduce a student's access to instruction.[66] The repeated use of seclusion undercuts IDEA's guarantee of a meaningful education and often serves as a red flag that the student's IEP is failing.[67]

The IHO's failure to recognize these legal principles, and her reliance on EVSC's uncorroborated characterizations of the seclusion space as "non-disciplinary," resulted in a serious misapplication of IDEA. Her conclusion that R.O.'s repeated removals were simply behavioral supports, rather than *de facto* suspensions, ignores not only the law but the daily reality for this student. Seclusion is not instruction. It is not a related service. It is not a positive behavioral intervention. And when used as the default response to behavior, it is a serious IDEA/Article 7 violation, one that flouts Congress's foundational rationale for enacting the IDEA.

Accordingly, this Court should find that the repeated use of seclusion during both school years constituted a disciplinary change of placement under the IDEA/Article 77. EVSC failed to conduct timely manifestation determinations, failed to revise R.O.'s IEP or BIP in response to his worsening behavior, and failed to offer him appropriate behavioral supports. These procedural and substantive failures denied R.O. a FAPE and require reversal of the IHO's finding on this issue.

**g.  EVSC failed to reevaluate R.O. in 2023-2024.  The FBA it administered and BIP it wrote were not evaluations or reevaluations under IDEA and Article 77.**

---

[66] See *Dear Colleague Letter*, 68 IDELR 76 (OSERS/OSEP 2016); *August 2016 OSERS Letter*, at 5–6.
[67] See *Endrew F.*, 580 U.S. at 401 (requiring review and revision of the IEP when the student is not making expected progress).

The IHO's internal inconsistency continued in her conflicting holdings on EVSC's failure to reevaluate R.O. She correctly held that EVSC failed to reevaluate R.O. properly for the 2022-2023 school year. IHO Op. at 46. But her holding that EVSC's administration of an FBA and/or its writing a BIP counted as a "reevaluation" blatantly misstates the law defining reevaluations under IDEA/Article VII. IHO Op. at 45-46.

From the outset, the IHO misquoted IDEA and Article 77's requirements for evaluations. *First*, a reevaluation must take place at least once every three years.[68] There is no dispute that EVSC did not reevaluate within three years of its initial January 25, 2021 evaluation.[69] While EVSC's April 21, 2023 IEP makes reference to an undated FBA, contrary to the IHO's suggestion, is simply not an IDEA/Article 7 evaluation.[70] Moreover, R.O.'s escalating behaviors and increased needs warranted more frequent and targeted assessments beyond the triennial requirement.[71] Dr. Melody Dilk, Ph.D. confirmed that while reevaluations must occur every three years, they may be required sooner where, as here, there is lack of progress or changes in the student's circumstances. (Dkt. 38-5 at Tr. (10/2/24)at 8:21–9:9). Failure to make progress toward goals, or significant behavioral or academic deterioration, are clear triggers for earlier reevaluations. *Id*.

Next, while the IHO did list the areas of disability CCCs must consider during an evaluation, (IHO Op. at 45), she omitted the *entire checklist of procedures* they must follow when doing an evaluating/reevaluating. *First*, before any reevaluation, the CCC must give the child's

---

[68] 34 C.F.R. 300.303(b)(2).

[69] P. Ex. 75.

[70] *See D.S.*, 975 F.3d at 163 ("An FBA, standing alone, is neither [an evaluation or reevaluation]. By title and definition, an FBA is not a comprehensive assessment of a child's disability. It is a purposefully targeted examination of the child's behavior. Unlike an initial evaluation or reevaluation, which must "assess[] [the child] in all areas of suspected disability," an FBA looks at just one part: the child's behavior.").

[71] *See* 34 C.F.R. 300.303 ("A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311—If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation.").

parents written notice that, among other things, describes the evaluation process and timeline and explains to parents their rights, and then obtain parental consent for the evaluation.[72] EVSC did not do this. Special Education Director Hulsey acknowledged that as of the time the parents filed for due process in February 2024, R.O.'s reevaluation was already overdue, (Dkt. 38-5 at Tr. (9/30/24)at 43:12-19), and that no consent for reevaluation had been sought from the parents. *Id.* at 37:20-23.

*Second*, the IHO disregarded the requirement that CCCs must (1) review existing evaluation data including "evaluations and information provided by the parents of the student."[73]

*Third,* the IHO failed to determine whether the CCC conducted a reevaluation in compliance with IDEA/Article 7procedures.[74]  Ignoring the IDEA and Article 7's procedural and substantive criteria for reevaluations, the IHO excused EVSC's failure to reevaluate R.O. on the odd grounds that EVSC administered an FBA, developed a BIP, and then moved R.O. to TLC. IHO Op. at 46. She wrote: "The FBA was appropriate at this time to address his behaviors," without analyzing whether that FBA was done properly and with fidelity. *Id.* Referring to R.O.'s subsequent placement at TLC, she reasoned that the school had implemented an appropriate BIP and began "to assess his behaviors and implement his intervention strategies," ignoring that, as noted above, the school's only evidenced strategy was to place R.O. in isolation repeatedly and "hope" he would do better the next day. *Id.* Ultimately, she concluded: "There was not a need for a reevaluation at this time. The School conducted and implemented a behavior plan which cured [any] failures regarding re-evaluation." *Id.*  But she failed to explain *how* the school had addressed R.O.'s worsening behaviors or how an FBA possibly could supplant the requirement for all the

---

[72] 511 IAC 7-40-8(g), (j); 511 IAC 7-32-17 (defining consent); 34 C.F.R. § 300.304(a).
[73] 511 IAC 7-40-8(m)(1)(A); 34 C.F.R. § 300.305(a)(1).
[74] 34 C.F.R. § 300.304(b)(1-3); 34 C.F.R. § 300.304(c)(1 – 7)

subject areas to be assessed by a mandated evaluation under 511 IAC 7-40-3 and 34 CFR 300.303 (b).

To be clear, neither an FBA nor a BIP is an "evaluation."[75]  And the IHO cited no legal authority, as there is none, to support her conclusion that doing an FBA and/or writing a BIP can excuse an CCC from doing an actual psychoeducational reevaluation as contemplated by the IDEA and Article 7. Her conclusion that an FBA, BIP and change of setting satisfied the reevaluation obligation has no support in the law.

## II.    Under the "*Burlington/Carter*" test, the IHO improperly denied reimbursement for R.O.'s placement at Whetstone Boys Ranch.

The IHO erred by denying reimbursement for R.O.'s unilateral placement at Whetstone Boys Ranch. She disregarded the three-pronged "*Burlington-Carter* test" established by the Supreme Court.[76]  When an LEA fails to provide a child a FAPE, a parent may "unilaterally" remove the child, place them in a private school, and seek tuition reimbursement from the LEA. Under *Burlington/Carter*, the parent must satisfy three prongs: Prong 1: Did the IEP the parent rejected fail to offer a FAPE? Prong 2: Was the private placement appropriate to the child's needs? Prong 3: Do any equitable considerations call for reducing tuition reimbursement?

### a.   Prong 1: EVSC denied R.O. a FAPE for the 2023-2024 school year.

Plaintiffs' Prong 1 is met by the above analysis showing that EVSC denied R.O. a FAPE for the 2023-2024 school year.   EVSC failed to comply with procedural and substantive requirements of the IDEA and Article 77.  Its IEPs for 2023-2024 were not reasonably calculated

---

[75] *D.S. v. Trumbull Bd. of Educ.*, 120 LRP 28133 (2d Cir. 09/17/20).
[76] *See School Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993)

for R.O. "to make progress appropriate in light of his circumstances."[77] If Plaintiffs have shown that EVSC denied R.O. a FAPE for 2023-2024, they have satisfied Prong 1.

### b. Prong 2: Whetstone Boys Ranch was an appropriate placement for R.O.

Under Prong 2, a unilateral placement is appropriate if "it is reasonably calculated to enable the child to receive educational benefits and provides educational instruction specially designed to meet the unique needs of a handicapped child."[78] "[T]he standard applied to a parent's private placement is less stringent than that imposed on school authorities when assessing whether the state provided a student with a FAPE."[79] A private placement need not be on a list of state-approved schools or even meet state educational standards.[80] As with an assessment of an LEA's offer of FAPE, when evaluating the appropriateness of a private placement, "[r]elying on hindsight is inappropriate."[81]

Plaintiffs acted appropriately by enrolling R.O. at Whetstone. Whetstone is accredited by the State of Missouri and the Joint Commission Accreditation Agency. (Dkt. 38-5 at Tr. (10/1/24)at 233:22–234:1). It has a structured school day from 8:00 a.m. to 4:00 p.m., offering a curriculum that includes English, math, science, social studies, public speaking, art, music, and film appreciation. (Dkt. 38-5 at Tr. (10/1/24)at 220:16-221:1). Instruction is provided by certified teachers, (Dkt. 38-5 at Tr. (10/1/24)at 221:2–6), and each student receives an individualized

---

[77] *Endrew F.* 580 U.S. at 399.

[78] *Bd. of Educ. of Evanston-Skokie Cmty. Consol. Sch. Dist. 65 v. Risen*, No. 12 C 5073, 2013 U.S. Dist. LEXIS 88575, at *63 (N.D. Ill. June 25, 2013) (quoting *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364-65 (2d Cir. 2006)) (quotes omitted).

[79] *M.W. v. Bd. of Educ. of the Enlarged City Sch. Dist. of Middletown*, 2013 U.S. Dist. LEXIS 82808, at *68 (S.D.N.Y. June 12, 2013).

[80] *Carter*, 510 U.S. at 12-14 ("[I]t hardly seems consistent with the Act's goals to forbid parents from educating their child at a school that provides an appropriate education simply because that school lacks the stamp of approval of the same public school system that failed to meet the child's needs in the first place." (quoting *Carter v. Florence Cnty Sch. Dist. Four*, 950 F.2d 156, 164 (1991).

[81] *J.T. v. Dep't of Educ.*, 695 F. App'x 227, 228 (9th Cir. 2017) ("At the 'proper placement' stage, the district court need only consider whether, at the time of enrollment, the unilateral placement was 'reasonably calculated' to meet the student's needs. For this inquiry, relying on hindsight is inappropriate.").

academic curriculum developed through diagnostic testing and review of prior school records. (Dkt. 38-5 at Tr. (10/1/24)at 236:1-237:13).

Whetstone delivers comprehensive therapeutic supports, including individual counseling, family therapy, and, unlike TLC, employs therapeutic crisis intervention techniques developed by Cornell University. (Dkt. 38-5 at Tr. (10/1/24)at 221:11–24; 222:7–15).  Students benefit from a low 1:3 staff-to-student ratio, with no more than nine boys on campus at any one time. (Dkt. 38-5 at Tr. (10/1/24)at 224:18-225:2). The school has a full-time nurse and accepts students on medication, contrary to the IHO's mistaken assertion that R.O. had to stop psychiatric medication in order to attend. (Dkt. 38-5 at Tr. (10/1/24)at 223:21-224:11; 239:8-10). Executive Director Jeremy Thompson explained that many Whetstone students are prescribed medications and that any tapering of R.O.'s medications was a parental choice, not a school requirement.  (Dkt. 38-5 at Tr. (10/1/24)at 239:8-10).

The IHO should have determined whether, at the time the parents placed R.O. at Whetstone, the school was reasonably calculated to enable him to receive educational benefits and would provide instruction designed to meet his unique needs.  The record amply proves this point. Instead, she evaluated Whetstone with an arbitrary and impermissibly strict standard, relying extensively on hindsight. IHO Op. at 51-54.[82]  For example, she noted that "Whetstone has been given approximately nine (9) months and the record shows as late as September 2024, RO engages in behaviors such as stealing Amazon gift cards and making false suicide allegations against staff." Id. at AR 1521. But the rule against relying on hindsight is meant to preclude exactly such analysis. How could Whetstone be expected to cure R.O.'s behavioral disability, a disability he had shown

---

[82] The IHO correctly noted that hindsight is not appropriate when evaluating whether an IEP offered FAPE. IHO Op. at 41 (noting that hindsight or "Monday Morning Quarterbacking" is not permitted in determining whether an IEP is appropriate). It was plainly inconsistent for her to rely on hindsight in her Prong 2 analysis.

from an early age, in nine months, especially when EVSC had not done so in several years? Put differently, EVSC was not only unable to ameliorate R.O.'s behaviors, but left his IEP largely unchanged as those behaviors worsened.  Why should R.O.'s parents be denied reimbursement where they placed him in a school they reasonably believed would do a far better job? Why should EVSC benefit from its own, far lengthier failure? There is no case law in support of the proposition that a private school must "cure" a student's disability in order to be reimbursable to the parents.

The IHO also cited irrelevant and inaccurate facts to reject Whetstone. Citing nothing in the record and no law supporting her position, the IHO found that it was a "questionable requirement for admission was to remove RO from his meds." IHO Op. at 53. She made numerous other factual errors, including that that R.O. had been suspended from Whetstone, which is seen nowhere in the testimony or evidence, and that Whetstone required that students not be on medication, something directly refuted by witness testimony.

The IHO did note that "Courts have found programs like Whetstone" to be "appropriate placements." *Id*. However, despite overwhelming evidence and unrebutted testimony from experts, Whetstone staff, and the Parent supporting the appropriateness of the placement, she concluded, citing no evidence (and in impermissible reliance on hindsight), that R.O. continued to struggle. *Id*. at 54. Her statement stands in direct conflict with the documented progress R.O. made at Whetstone, the testimony at the hearing both from the Parent and Whetstone's director, as well as the testimony affirming that the program met the student's educational and emotional needs.

The Whetstone director testified about R.O.'s progress there, noting that he interacts with R.O. daily and that R.O. has made significant strides emotionally, behaviorally, and academically, and is on track to graduate early next year. (Dkt. 38-5 Tr.10/1/24, at 225:5-13, at 227:11-13).

43

The parent testified that "R.O.'s depression has declined a lot. He's had so much outdoor time that he needed. Just physical movement and the therapy has been so beneficial to him. You can just see it in his face. It seems the depression has lifted in some ways. He just seems healthier." She added that he was able to tolerate a full school day at Whetstone. (Dkt. 38-5 Tr. (10/2/2024) at 137:12-16; 138:14-19). No district witness rebutted this testimony.

This Court should reverse that ruling and order full reimbursement of tuition and related costs incurred for R.O.'s placement at Whetstone Boys Ranch.

### III.    Remedies: The IHO erroneously failed to provide compensatory education despite finding that EVSC denied R.O. and his Parents related services.

The IHO correctly held that EVSC failed to provide related services during the 2022–2023 school year. (IHO decision, AR 1509.) The factual record established, without dispute, that:

- R.O. was repeatedly removed from class or school entirely during the 2022–2023 school year, including an expulsion following a manifestation determination review that ignored the clear connection between his conduct and his disability;

- R.O. received only one hour of homebound instruction per day for an extended period;

- R.O. was denied related services, no counseling, no psychological support, no parent training, and no occupational therapy for the entirety of the two-year period;

- R.O. was placed at TLC in May 2023, where he was routinely placed in seclusion for hours at a time, frequently asleep or disengaged, and made no meaningful progress in any academic or behavioral domain;

- The family was "in crisis" and received outside supports; however, these outside services were insufficient, and that in-school supports such as counseling, social work, or psychological services were not offered.

R.O. missed weeks of instruction in total, due to school removals, hospitalization, unserved homebound days, and EVSC's refusal to provide alternative services when he stopped attending in early 2024.

This IEP is identical to the previous IEP but for the change of special educational services to place the student at The Learning Center and the addition of transportation. The present

level aligned to the goal remains identical to all those before it, the one goal remains the same, outside of transportation there are no related services for the student. Likewise, another IEP meeting held for the Student on or about 10/27/2023 did not provide any related services other than transportation to and from school. P. Ex. 7. Another IEP created on or around January 9, 2024, with a report date of January 22, 2024, contains no related services offered other than transportation. P. Ex. 8 There is no school psychologist or other psychological personnel who attend the meeting. *Id*.

Despite these findings, the IHO failed to award compensatory education. Where a child has been denied FAPE, compensatory education, an equitable remedy "aimed at restoring the child to the position he would have occupied" absent the violation, is an appropriate and necessary remedy.[83] As the D.C. Circuit explained in *Reid*, "a hearing officer who finds a denial of FAPE must determine what compensatory services are required to make up for that denial…. [and] "[i]t would be inconsistent with the purposes of the IDEA to recognize a denial of FAPE but not to require relief that seeks to cure the effects of that deprivation."[84] Failing to award even one hour of compensatory counseling, social work, or other related service is flatly inconsistent with the IDEA's and Article 7 s remedial principles.

Moreover, the IHO declined to find a continued violation in the 2023–2024 school year on the theory that EVSC's placement of R.O. at TLC, where he spent much of his time in a time-out room, somehow "cured" the deficiency. As multiple courts have held, a change in location does not relieve a school of its obligation to provide a properly designed IEP.[85]

---

[83] *See Reid*, 401 F.3d at 518; *Puyallup Sch. Dist. v. Student W.*, 31 F.3d 1489, 1497 (9th Cir. 1994); *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 625 (3d Cir. 2015).
[84] *Reid*, 401 F.3d at 524.
[85] *See Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055–56 (9th Cir. 2012); *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 397 (5th Cir. 2012).

Finally, the IHO's refusal to award remedies prospectively despite recognizing the deficiencies in EVSC's IEPs poses a continuing harm, as R.O. remains without an IEP that includes the services necessary for him to access his education. Any return to EVSC without robust behavioral, emotional, and psychological supports would simply replicate the circumstances that led to his regression and exclusion.

Multiple experts testified that R.O. required robust remedial support. Ms. Harrington and Ms. Sanders each were unrebutted and recommended a comprehensive compensatory education plan to include school-based counseling, behavioral support, functional skills instruction, and parent training. P.Ex. 23, P.Ex.25.  When discussing this student's programming over the past two years, she writes that the "repercussions of these inadequacies are profound." P.Ex. 23, pg. 9.   In terms of what R.O. needs within a School environment, Dr. Hahn made a number of recommendations. She emphasized the comprehensive support R.O. needs upon returning to school. R.O. "needs to have that one-on-one support person" who can help him develop trust, guide him through challenging behaviors, and eventually phase out once trust and skills are established. (Dkt. 38-5 Tr.10/01/24 at 55:3-7). She stressed the importance of conducting a "full evaluation" of all areas of disability, including "full intellectual ability," academic achievements, "psychological-related services," "sensory inputs," and the need for an updated FBA to put strategies in place and assess their effectiveness periodically. (Dkt. 38-5 Tr. 10/01/24 at 55:16-57:6). She also recommended evaluations for counseling, in-home trainings, parent training, social skills, OT sensory, and a psychological evaluation for emotional disturbance. (Dkt. 38-5 Tr.10/01/24 at 57:7-15).  She also made a number of recommendations regarding accommodations. (Dkt. 38-5 Tr.10/01/24 at 58:12-60:2)

Beth Boling expressed strong support for providing R.O. with counseling as a related

service, psychological services, and a one-on-one aide. She added that parent counseling and training on effective strategies for R.O. would be crucial, as well as having school social work services that coordinate with all of R.O.'s providers. (Dkt. 38-5 Tr. 10/01/24 at 137:19 -141:11). She also supplied a letter with recommendations. P.Ex.102.

Based on the missed hours and services, a compensatory package of at least 360 hours would be conservative, representing only one missed hour per school day over two years. And this does not account for the qualitative deprivation caused by repeatedly placing R.O. in seclusion instead of teaching him.

In *M.P.*,[86] the Ninth Circuit found that a student who was denied appropriate services over multiple years was entitled to compensatory education even though he had been physically present at school, because presence alone does not equal access or benefit. That principle applies with full force here: R.O.'s attendance did not equate to access, and his "education" amounted to physical confinement rather than instruction. And even if the IHO believed R.O.'s move to Whetstone or TLC provided partial benefit, that cannot erase past violations. *Compensatory education is not retrospective good will rather it is restorative justice.* When an LEA denies services, it must provide make-up services, just as failure to provide speech therapy or math instruction triggers compensatory tutoring. Failure to do so frustrates the IDEA's core purpose: to ensure that all children with disabilities receive the specialized instruction and supports they need to succeed.

This omission is not merely an oversight it is a deprivation of equitable relief and a legal error. R.O. cannot recover years lost, but he is entitled to meaningful make-up services that address the harm caused. Plaintiffs respectfully request that the Court reverse the IHO's failure to award compensatory education and order, at minimum, 360 hours of targeted services in the areas of

---

[86] 689 F.3d 1047, 1055–56 (9th Cir. 2012),

academic remediation, social-emotional instruction, and therapeutic counseling delivered by trained professionals and coordinated with the CCC and family. These services should be flexible and individualized, with an emphasis on remedying the academic, behavioral, and functional regression caused by EVSC's violations. The Court should further order the immediate inclusion of these services in any future IEP and require EVSC to revise R.O.'s educational plan with the support of licensed professionals familiar with his needs.

### IV. The IHO had no legal authority to order that R.O.'s Residential Treatment Facility options be limited to those in the state of Indiana

Despite ordering that if TLC could not meet R.O.'s needs that a CCC must be convened to discuss a residential placement, she added, without evidence or support in statute or case law, that any such residential placement must be located in Indiana. IHO Op. at 55. According to IDEA the parents of a child with a disability who place their child in a private school may receive reimbursement for tuition if a court finds that the public agency did not make FAPE available prior to the placement and that the private school placement is appropriate.[87] Neither the IDEA nor Article 7 imposes such a jurisdictional restriction.[88] To the contrary, what governs is what is appropriate for the student's needs, not the location of the facility. IHOs and courts have not hesitated to award reimbursement for out-of-state residential placements.[89] Plaintiffs respectfully request that the Court modify the IHO's order to remove any such restriction.

### V. The IHO erred by failing to order EVSC to provide Plaintiffs with R.O.'s complete educational records.

Despite admissions and unrebutted documentary evidence that Defendants failed to provide R.O.'s parents his educational records for both the 2022-2023 and 2023-2024 school years,

---

[87] 34 CFR 300.148 (c).
[88] 511 IAC 7-42-10(b)(4).
[89] *See, e.g.*, *Doe v. Newton Pub. Sch.*, 537 F. Supp. 3d 56, 68 (D. Mass. 2021) (finding out-of-state residential placement appropriate).

the IHO inexplicably found that the Defendants provided the appropriate records. This was a clear error. A public school must send the parents periodic reports of the student's progress toward his IEP goals following the schedule set forth in the student's IEP.[90]  Article 7 requires that reports on the progress the student is making toward meeting the annual goals will be concurrent with the issuance of report cards.[91]

Parent testified that she did not receive progress reports on the Student's IEP goal. (Dkt. 38-5 at Tr. (10/2/24)at 139:11-140:2). EVSC failed in both its document production and in the hearing to produce progress reports or show that it even created them in accordance with IDEA/Article 7 (but for one, single-page Fall 2023 progress report. P. Ex 67).

Documentation originally produced in response to a request for the student's educational records included a behavioral chart labeled EVSC Exhibit pages #0172-0180. Ms. Paleski testified: "This is my data collection and my data analysis of R.O.'s data." (Dkt. 38-5 at Tr. (10/2/24) at 262:10-13). She stated the documentation was created "whenever this was started to be a thing that we needed to take a look at." (Dkt. 38-5 at Tr. (10/2/24)at 265:5-8). Notably, she testified that this was in August 2024, just before the hearing began in September, and was created at the request of her school district's attorney. (Dkt. 38-5 at Tr. (10/2/24)at 265:13-17). The Petitioner established that this data was neither accurate nor complete, was not representative of the actual record of seclusion, and was never provided to the parent, doctor, or therapist.

 Paleski admitted the document was never provided to the parents. (Dkt. 38-5 at Tr. (10/2/24)at 265:24 - at 266:15). When asked about the data source, she stated: "I just transcribed it into the computer versus handwritten," implying she was digitizing observations. (Dkt. 38-5 at Tr. (10/2/24)at 266:12-15). When the IHO asked if "this was just transcribed to be usable," she

---

[90] 34 CFR § 300.320 (a)(3)(ii).
[91] 511 I.A.C. § 7-42-6(f)(3).

changed her testimony, claiming the data was maintained solely in a computer, adding, "if I have a parent that requests data for any reason, I will extract it from that hub to make it more user-friendly" (Dkt. 38-5 at Tr. (10/2/24)at 267:1-5).

Additional records, including the data used to create EVSC Exhibit pages #0172-0180, were not provided. Paleski confirmed these were created nine or ten months after the student had stopped attending, at the request of "my counsel." (Dkt. 38-5 Tr. 10/2/24, at 279:8-25).   She provided they were never shared with the parent (Dkt. 38-5 Tr. 10/2/24, at 280:11-13).

While school personnel admitted that they did not provide critical documentation to Parents, and nothing in the record establishes that these documents were created or supplied, the IHO found that Plaintiffs failed to prove that EVSC failed to provide educational records. Rather than applying the specific legal requirements of IDEA/Article 7, she improperly relied on an unrelated section of Article 7concerning the *confidentiality* of records, a parent's right to inspection of records, and amendment of records.[92] The IHO excused EVSC disregarding its core obligation to provide parents with timely, accurate IEP progress updates and written explanations of key decisions. Her reliance on irrelevant legal provisions reflects a critical legal error that invalidates her findings.

## VI.    EVSC violated the ADA and Section 504 by failing to offer R.O. a FAPE and by systematically segregating him and isolating him from his peers.

Section 504 was enacted to eliminate discrimination on the basis of disability in any program or activity receiving federal financial assistance, including public school systems.[93] EVSC receives federal financial assistance.[94] Title II of the ADA enforces the same legal prohibitions more broadly to include any place of public accommodation. "Relief under the ADA

---

[92] IHO Op. at 49 (citing 511 IAC 7- 38-1).
[93] 29 U.S.C. § 794; 34 C.F.R. § 104.1.
[94] EVSC Answer (ECF 19) at 4-5, ¶ 10.

and the RA is coextensive and the analysis under each statute is materially the same."[95] Moreover, the very same conduct may violate the IDEA, § 504 and the ADA.[96]

R.O. is a student with a disability under ADA and § 504.[97] As discussed above, he has multiple mental impairments, including disruptive mood dysregulation disorder (DMDD), ADHD, and anxiety. Each of these substantially limits his "major life activities,"[98] including his learning, concentrating, thinking, communicating, social interaction, and emotional regulation. While EVSC denies this claim, averring that it "lacks knowledge or information sufficient to form a belief as to the truth of the allegations,"[99] its own records, and outside records it produced at hearing, overwhelmingly confirm its knowledge of and information regarding R.O.'s disabilities and how they limit his major life activities.[100]

Section 504 regulations provide:

No qualified handicapped student shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, research, occupational training, housing, health

---

[95] *Hilliard v. Mariscal*, No. 23-cv-00562, 2025 U.S. Dist. LEXIS 32400, at *6 (N.D. Ill. Feb. 24, 2025) ("Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.' 42 U.S.C § 12132. Similarly, Section 504 of the RA prohibits a 'qualified individual with a disability' from being 'excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity,' as a result of his disability. 29 U.S.C. § 794(a).") (Citing *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671-72 (7th Cir. 2012)).

[96] *T.Z. v. Tippecanoe Sch. Corp.*, No. 4:22-CV-016-PPS-JEM, 2023 U.S. Dist. LEXIS 12581, at *18 (N.D. Ind. Jan. 25, 2023) (*citing Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 171 (2017)).

[97] The ADA defines "disability" with respect to an individual as "a physical or mental impairment that substantially limits one or more major life activities of such individual."42 U.S.C. § 12102(1)(A). Section 504 regulations define a "qualified handicapped person" as "a handicapped person of an age during which nonhandicapped persons are provided such services… to whom a state is required to provide a free appropriate public education under [the IDEA. 34 C.F.R. § 104.3.

[98] ADA regulations provide: "Major life activities include, but are not limited to: (i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working…" 29 C.F.R. § 1630.2

[99] *Id*. at 40, ¶ 114.

[100] *See, e.g.,* EVSC Ex. at 135 (February 14, 2023 IEP notes: "[R.O.] has been diagnosed with a mood disorder."); *id.* at 144 (April 21, 2023 IEP notes: "Health Problems: [R.O.] has been diagnosed with ADHD, anxiety, depression, [Disruptive Mood Dysregulation Disorder], and [Oppositional Defiant Disorder]"); *id.* at 147 (EVSC BIP states: "It is hypothesized [R.O.'s] unsafe physical actions occur towards peers [are] due to impulsive and extreme behaviors, which are sensory consequences of his diagnoses of ADHD and DMDD."

insurance, counseling, financial aid, physical education, athletics, recreation, transportation, other extracurricular, or other postsecondary education aid, benefits, or services to which this subpart applies.[101]

EVSC's repeated use of seclusion and exclusionary practices, described above, deprived R.O. of access to educational opportunities equal to his peers, in violation of Section 504. Then, at TLC, he was in seclusion "across the hall" placed in a exclusionary setting in that inherently discriminatory setting, that is not used for any student's that do not have a disability.

Section 504, like the IDEA, requires schools to offer a FAPE to students, and it has comparable procedural requirements for conducting evaluations and reevaluations, guaranteeing inclusion with peers, and conducting due process hearings.[102] And like IDEA/Article VII, Section 504 requires a school to offer free residential educational placement where necessary.[103]

The IHO correctly concluded that for the 2022-2023 school year, EVSC failed to provide R.O. with modifications and accommodations necessary for him to participate meaningfully in his educational program, including robust behavioral supports, counseling, and social work services. These IDEA violations also violated the ADA/§ 504. As discussed above, the IHO clearly erred in holding that substantially the same omissions and actions by EVSC during the 2023-2024 school year *were not* procedural and substantive IDEA/Article 7violations. To the extent the Court agrees

---

[101] 34 C.F.R. § 104.43.

[102] 34 C.F.R. § 104.33 ("A recipient [of federal funds]… shall provide a [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."); 104.34 (A recipient … shall educate, or shall provide for the education of, each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped person. A recipient shall place a handicapped person in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily.); 104.35 (requiring school to conduct an evaluation, following specific procedures, "before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement."); 104.36 (requiring procedural safeguards, including due process hearings "with respect to actions regarding the identification, evaluation, or educational placement of persons who, because of handicap, need or are believed to need special instruction or related services.").

[103] 34 C.F.R. § 104.33.

that EVSC did violate IDEA/Article 7for 2023-2024, it should conclude that those violations also violated the ADA/Section 504.

But apart from an IDEA analysis, EVSC's refusal to revise R.O.'s IEP to address his escalating behavioral needs, its failure to conduct comprehensive and timely reevaluations according to Section 504 procedures before changing R.O.'s educational placement to a highly restrictive homebound instruction and then to TLC, and its placing R.O. in near-daily seclusion "across the hall" / "danger to self and others"/ "reflection" room, receiving no education, were systemic discrimination on the basis of R.O.'s his disability in violation of ADA/ Section 504.

## CONCLUSION

This case is a textbook example of systemic failure by a public school district to provide a student with the educational and behavioral supports guaranteed under the IDEA and Article 7. The IHO rightly found that the Evansville Vanderburgh School Corporation denied R.O. a Free Appropriate Public Education (FAPE) during the 2022–2023 school year. Yet the IHO failed to fully remedy the denial, and her legal conclusions regarding the 2023–2024 school year, related services, seclusion and removals, reevaluation obligations, and private placement reimbursement are contrary to law, unsupported by the record, and unjust to this child and family.

The evidence presented at hearing was overwhelming and consistent: R.O. was subject to repeated removals, provided no related services despite clear clinical need, given an IEP that stagnated over three years, denied timely reevaluation, and ultimately pushed into a pattern of academic failure, emotional deterioration, and social isolation. Even after psychiatric hospitalization, an expulsion, and near-daily seclusion, EVSC failed to revise his IEP, evaluate the child under the correct disability category, or offer the robust supports recommended by

professionals. Instead, EVSC relied on superficial behavioral plans and placement changes that failed to address the core of R.O.'s needs.

The IHO's refusal to order compensatory education despite acknowledging a denial of FAPE is a clear error. Her denial of reimbursement for Whetstone Boys Ranch disregards Supreme Court precedent under *Burlington* and *Carter*, and is based on demonstrably false factual assumptions. Her failure to find that R.O.'s repeated seclusion and removals constituted a change of placement misapplies both the letter and spirit of the law.

This Court is now the only forum in which R.O.'s right to an appropriate education can be vindicated. The equities overwhelmingly favor the family. The parents acted with diligence and cooperation. They attended all but one case conference, engaged in mediation, tried EVSC's offered placements, and only turned to private residential placement when all other options had failed. Whetstone was not a luxury or convenience—it was a last resort borne of necessity and desperation after years of inaction and harm.

Accordingly, Plaintiffs respectfully request that this Court:

1. Reverse the IHO's conclusion that the 2023–2024 IEP was appropriate, and hold that EVSC denied R.O. FAPE for both school years;

2. Order compensatory education totaling no fewer than 360 hours, to include school-based counseling, functional skill instruction, therapeutic behavioral support, and parent training, to remedy the deprivation of services and instructional access over the statutory period;

3. Order reimbursement of all tuition and related expenses incurred by R.O.'s parents for his unilateral placement at Whetstone Boys Ranch, as Whetstone was appropriate under the standards articulated in Burlington and Carter, and the equities support reimbursement;

4. Order EVSC to immediately conduct a comprehensive reevaluation, including assessments in psychoeducational, behavioral, emotional, occupational therapy, and social-emotional domains, with consideration of eligibility under Emotional Disability;

5. Require EVSC to convene an IEP team meeting with appropriate professionals and revise R.O.'s IEP to reflect updated data, with individualized goals and services, including a 1:1 aide, counseling, parent training, and a revised BIP;

6. Declare that the use of repeated seclusion constituted a change in placement, triggering procedural safeguards that EVSC failed to honor;

7. Award Plaintiffs reasonable attorneys' fees and costs pursuant to 20 U.S.C. § 1415(i)(3), the ADA and § 504;

8. And grant such other relief as is just and proper to restore R.O.'s access to education and ensure future compliance with IDEA and Article 7.[104]

The IDEA, ADA and Section 504 are not symbolic pieces of legislation. Individually and collectively, they are binding, enforceable guarantees that children with disabilities receive the supports they need to grow, learn, and succeed. R.O. was denied those guarantees for years. This Court now has the authority and the obligation to provide the relief the law demands.

Dated: July 21, 2025

Respectfully submitted,

*Catherine M. Michael*

Catherine M. Michael, #22474-49
Connell Michael, LLP
550 Congressional Blvd., Ste 350-11
Carmel, Indiana 46032
Main Line: 317-343-4482
Direct Dial: 317-696-4159
catherine@connellmichaellaw.com

s/*Dorene Philpot*
Dorene Philpot, IN Bar #22055-49
**PHILPOT LAW OFFICE, PLLC**
275 Bristol Lane
Livingston, Texas 77351
(281) 989-2010
Fape4kids@gmail.com

s/Tammy J. Meyer
Tammy J. Meyer, IN Bar #14612-49
**METZGER ROSTA LLP**
32 S. 9th Street
Noblesville, Indiana 46060
(317) 219-4606

---

[104] Plaintiffs intend to respond to any arguments in EVSC's counterclaims according to the Court's Case Management Plan.  (ECF 23) They further intend to file a separate motion for reasonable attorneys' fees and costs at the conclusion of this matter.

tammy@metzgerrosta.com

*s/Benjamin J. Hinerfeld*
Benjamin J. Hinerfeld, *pro hac vice*
**LAW OFFICE OF BENJAMIN J. HINERFELD**
9 Stoddard Street
Plymouth, MA 02360
1528 Walnut Street,  Suite 1100
Philadelphia, PA 19102
447 Broadway, 2nd Floor
New York, NY 10013
Office (508) 591-0385
Cell (215) 694-7432
Ben@hinerfeldlaw.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of July 2025, pursuant to the Federal Rules of Civil Procedure, the foregoing document was electronically served on all parties through this Court's ECF system.

*Catherine M. Michael*

Catherine M. Michael, #22474-49
Connell Michael, LLP
550 Congressional Blvd., Ste 350-11
Carmel, Indiana 46032
Main Line: 317-343-4482
Direct Dial: 317-696-4159
catherine@connellmichaellaw.com