UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| L.O. and B.O. on behalf of R.O., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:25-cv-00007-MPB-CSW |
| | ) |
| Evansville Vanderburgh School Corporation, | ) |
| | ) |
| Defendant. | ) |

**EVSC'S CONSOLIDATED BRIEF
IN SUPPORT OF CROSS-MOTION FOR JUDGMENT UNDER THE IDEA[1]
AND AS TO LIABILTY ON COUNTERCLAIM,
AND
IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD**

Comes now the Evansville Vanderburgh School Corporation ("EVSC") and submits its

Consolidated Brief in Support of Motion for Judgment Under the IDEA and as to Liability on

Counterclaim, and In Opposition to Plaintiffs' Motion for Judgment on the Administrative Record

[Dkt. 49].

---

[1] The 7th Circuit has noted that review of an IDEA administrative decision is accurately labeled a "motion for judgment under the IDEA." *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611–12 (7th Cir. 2004).

## I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS ................................................................................................ 2

II.    STATEMENT OF ISSUES ......................................................................................... 4

III.    TABLE OF AUTHORITIES....................................................................................... 5

IV.    SUMMARY OF ARGUMENT.................................................................................... 9

V.    BACKGROUND ....................................................................................................... 11

   A.    PROCEDURAL HISTORY. ................................................................................. 11

   B.    STANDARD OF REVIEW ................................................................................... 11

   C.    THE FACTUAL FINDINGS ARE ENTITLED TO SUBSTANTIAL DEFERENCE..... 13

VI.    ARGUMENT.............................................................................................................. 15

   A.    RESPONSE TO PARENTS' MOTION FOR JUDGMENT ON THE RECORD............ 15

     1.    FAPE Standard. .............................................................................................. 15

     2.    IEP Standard. .................................................................................................. 16

     3.    The Decision is supported by the Findings and Record. .................................. 17

        a.    The IHO's denial of relief for any violation during the 2022-2023 school year is supported by the Record. ........................................................................... 17

        b.    The IHO's denial of relief for related services during the 2022-23 school year is supported by the findings and Record. ................................................... 18

        c.    The IHO's holding that EVSC provided a FAPE during the 2023-24 school year is supported by the Record. ................................................................ 19

        d.    The IHO's finding that EVSC complied with reevaluation requirements for 2023-2024 is supported by the findings and Record. ....................................... 23

        e.    The IHO correctly determined that R.O.'s 2023-2024 IEP was appropriate............ 25

        f.    EVSC adequately considered the full continuum of educational placements and did not fail by not offering R.O. a residential placement. ................................. 27

        g.    Parents' argument that R.O.'s cool-down removals were a disciplinary change of placement ignores the findings, including Parents' request for cool-downs. ............ 31

        (i)    Parents' argument contradicts the prior IDOE Complaint. ......................... 33

        h.    The IHO properly denied compensatory education remedies. ................................. 35

        i.    The IHO properly recommended consideration of Indiana residential placement for any future placement. ............................................................................. 35

        j.    Parents' failure to carry their burden as to educational records under 511 IAC 7-38-1 is supported by the Record. ....................................................................... 36

      k.    The IHO's denial of reimbursement for Whetstone is supported by the findings and Record. ........................................................................................................... 38

        (i)    Standard for recovering costs of private placement ................................. 39

        (ii)    Whetstone was *not* an appropriate placement .................................. 40

        (iii)    Denial of Whetstone reimbursement was also justified under Article 7 .......... 42

        (iv)    EVSC made FAPE available to R.O. prior to Whetstone placement ............... 42

        (v)    Parents unilaterally elected Whetstone despite EVSC's FAPE. ...................... 43

        (vi)    Parents' argument contradicts their evidence designations ............................ 44

    4.    Parents' Section 504 and ADA claims fail as a matter of law ....................................... 45

      a.    The applicable standards. ........................................................................... 45

      b.    Parents' conclusory assertions of EVSC discrimination fail ..................... 46

      c.    Parents cannot advance ADA and Section 504 claims solely to recover attorney fees. ........................................................................................................... 49

      d.    Parents cannot present new evidence, argument, or issue in a Reply Brief. ............. 50

  B.    EVSC'S CROSS-MOTION ................................................................................... 50

    1.    The IHO's Decision is supported by the Findings and Record and must be affirmed .. 50

    2.    EVSC is entitled to judgment as to liability on the Counterclaim ............................... 51

    3.    EVSC was the prevailing party. ................................................................... 51

    4.    Parents' advancement of settled claims was done with an improper purpose. ............. 51

      a.    The parties settled issues arising out of the 2022-23 school year. .......................... 53

    5.    Parents' request for Whetstone reimbursement was for an improper purpose ............. 55

      a.    Parents knew residential placement was not educationally required. ...................... 59

      b.    Parents knew Whetstone was not an appropriate placement ..................................... 61

VII.    CONCLUSION ................................................................................................... 65

## II.    STATEMENT OF ISSUES

1.    Whether the Independent Hearing Officer's ("IHO") Decision should be affirmed?

2.    Whether EVSC, as the prevailing party, is entitled to attorney fees against Plaintiffs (hereinafter "Parents") under 511 Indiana Administrative Code 7-45-11(b)(2) for Parent's due process complaint and this appeal which were for an improper purpose and forced EVSC to defend against (i) the 2022-2023 claim which had been settled, and (ii) requested reimbursement for Parent's unilateral residential placement at Whetstone Boys Ranch ("Whetstone") which their own expert's testimony rejected as an appropriate placement?

### III.    TABLE OF AUTHORITIES

**CASE**                                                                                                    **Page**

*A. J. T. by & through A. T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025). ....................................................................................................................    47

*Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, (7th Cir. 2004)............................................................................................................1, 13

*Bayer v. Duneland School Corp.,* 2006 WL 1544402 (N.D. Ind. May 31, 2006)................47

*Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 16-17

*Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross,* 486 F.3d 267 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15, 33, 39, 51

*Board of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Illinois State Bd. Of Educ.,* 41 F.3d 1162 (7th Cir. 1994)......................................................................14

*Brett v. Goshen Community School Corp.,* 161 F. Supp. 2d 930 (N.D. Ind. 2001)...............47, 50

*C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.,* 513 F.3d 279 (1st Cir. 2008)......................41, 59

*CTL ex rel. Trebatoski v. Ashland Sch. Dist.,* 743 F.3d 524 (7th Cir. 2014) .........................46

*Cadeau v. O'Malley,* No. 23-1887, 2024 WL 260746 (7th Cir. Jan. 24, 2024).....................51

*Carlisle Area Sch. Dist. v. Scott* P., 62 F.3d 520(3rd Cir. 1995)..............................................17

*Clifford v. Crop Prod. Servs., Inc.,* 627 F.3d 268 (7th Cir. 2010) ..........................................16, 48

*Coleman v. Pottstown Sch. Dist.,* 983 F. Supp. 2d 543 (E.D. Pa. 2013) ................................13-15

*Cooper v. Sch. City of Hammond,* No. 2:21-CV-72-PPS, 2023 WL 5898438 (N.D. Ind. Sept. 8, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15, 17, 33, 39, 51

*Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist. No. 307,* 237 F.3d 813 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 44, 62

*Devine v. Indian River County Sch. Bd.,* 249 F.3d 1289 (3rd Cir. 2001) ...............................17

*Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13 (1st Cir. 2006) ....................................................51

*Endrew F. v. Douglas County School District Re-1*, 580 U.S. 386, 137 S. Ct. 988,

197 L.Ed.2d 335 (2017) ............................................................................16-17

*Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.,* 356 F.3d 798 (7th Cir. 2004) ......17

*Fry v. Napoleon Cmty. Sch.,* 580 U.S. 154 (2017) ................................................46

*Fuhrmann v. East Hanover Bd. Of Educ.,* 993 F.2d 1031 (3d Cir. 1993) ............................16-17

*H.H. ex rel. Hough v. Indiana Bd of Special Educ. Appeals,* No. 3:06-CV-551-TS, 2008 WL 2333144 (N.D. Ind. June 3, 2008) ................................................................17

*H.P. by & Through W.P. v. Naperville Cmty. Unit Sch. Dist. #203,* 910 F.3d 957 (7th Cir. 2018)........................................................................46, 49

*Harris v. City Colleges of Chicago,* 316 F. App'x 496 (7th Cir. 2009) ...................................39

*Heather S. v. Wisconsin,* 125 F.3d 1045 (7th Cir.1997) ........................................ 13, 17

*J.D. v. Crown Point School Corp.,* 2012 WL 639921 (N.D. Ind. 2012) .................................26

*Johnson v. Astrue, No.* 108-CV-01600-JMS-LJM, 2010 WL 1190123 (S.D. Ind. Mar. 22, 2010) ..............................................................................................49

*Lauren W. v. DeFlaminis,* 480 F.3d 259 (F.3d Cir. 2007) .......................................41

*Loparex, LLC v. MPI Release Techs., LLC,* 964 N.E.2d 806 (Ind. 2012).............................51

*M.B. ex rel. Berns v. Hamilton Se. Sch.,* 668 F.3d 851 (7th Cir. 2011) .................................14, 40

*M.B. v. Hamilton Southeastern Sch.,* 2010 U.S. Dist. LEXIS 80719, 20 (S.D. Ind. Aug. 10, 2010) ...........................................................................................18

*M.S. v. Mullica Tp. Bd. of Educ.,* 485 F.Supp.2d 555 (D.N.J. 2007) ....................................41, 59

*Mathin v. Kerry,* 782 F.3d 804 (7th Cir. 2015), *as amended on denial of reh'g* (July 7, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 33, 39

*Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.,* 565 F.3d 1232 (10th Cir.2009)........................................................................47

*Mr. Catling v. York Sch. Dep't,* No. 2:19-CV-00110-DBH, 2020 WL 6309743 (D. Me. Oct. 28, 2020), *report and recommendation adopted,* No. 2:19-CV-110-DBH, 2020 WL 7233351 (D. Me. Dec. 8, 2020) .............................................................41

*Morton Cmty. Unit Sch. Dist. No. 709 v. J.M.,* 152 F.3d 583 (7th Cir. 1998)......................16

6

*Parents of Student W. v. Puyallup Sch. Dist. No. 3,* 31 F.3d 1489 (9th Cir. 1994)................36

*Patricia P. v. Bd. of Educ. of Oak Park,* 203 F.3d 462 (7th Cir. 2000) .......................13-14

*R.E. Ex Rel. J.E. v. New York City Department of Education,* 694 F.3d 167 (7th Cir. 2012). 19

*Reis v. Robbins,* No. 4:14-CV-00063-RLY-TA, 2015 WL 846526 (S.D. Ind. Feb. 26, 2015) .........................................................................................................................51

*San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1 (1973) .............................14

*Sean C. through Helen C. v. Oxford Area Scho. Dist.,* No. CV 16-5286, 2017 WL 3485880 (E.D. Pa. Aug.14., 2017).......................................................................................18

*Stanek v. St. Charles Community Unit School Dist. No. 303,* 783 F.3d 634 (7th Cir. 2015) ....................................................................................................................46-48

*T.Z. v. Tippecanoe Sch. Corp.,* No. 4:22-CV-016-PPS-JEM, 2023 U.S. Dist. LEXIS 12581 (N.D. Ind. Jan. 25, 2023) .............................................................................46

*Todd v. Duneland Sch. Corp.,* 299 F.3d 899 (7th Cir. 2002)....................................16

*United States v. Fluker,* 698 F.3d 988 (7th Cir.2012).........................................14, 33

*Wis. Cmty. Servs., Inc. v. City of Milwaukee,* 465 F.3d 737 (7th Cir. 2006) (*en banc*) ..........49

*Yorger v. Pittsburgh Corning Corp.,* 733 F.2d 1215 (7th Cir. 1984)....................................39

*Z.B. v. Dist. of Columbia,* 888 F.3d 515 (D.C. Cir. 2018)........................................17

## FEDERAL STATUTES, REGULATIONS, AND RULES

34 CFR 99.3 .......................................................................................................38

34 CFR 99.10 (a).................................................................................................38

34 CFR 300.320 (a)(3)(ii) ...................................................................................39

34 CFR 300.613(a)..............................................................................................38

20 U.S.C. § 1400(d)(1)(A)...................................................................................16

20 U.S.C. § 1415(F)(1)(B)...................................................................................19

20 U.S.C.A. § 1415(F)(1)(B)(ii) .........................................................................19

20 U.S.C. § 1415(i)(2)(c) ................................................................................13

20 U.S.C. § 1415(i)(2)(C)(iii) .........................................................................36

29 U.S.C. § 794(b) ..........................................................................................51

42 U.S.C. § 12205 ...........................................................................................51

Title II of the American with Disabilities Act ("ADA") ..................................46

Section 504 of the Rehabilitation Act ............................................................46

## STATE STATUTES, REGULATIONS, AND RULES

511 IAC 7-34-10(e) ....................................................................................40, 62

511 IAC 7-38-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 37-39

511 IAC 7-40-8(b)(1) .......................................................................................26

511 IAC 7-42-6(c) ............................................................................................20

511 IAC 7-42-6(f)(3) ...................................................................................38-39

511 IAC 7-45-11(b)(2) .................................................................................52, 65

IDEA/Article 77 ...............................................................................................33

## OTHER

Dear Colleague Letter, 68 IDELR 76 (OSERS/OSEP 2016) ..............................32

Evansville Physicatric Children's Center website ............................................32

OSEP Memorandum to Chief State School Officers, Questions and Answers on Disciplining Students with Disabilities, April 1995) ........................................32

#### IV.    SUMMARY OF ARGUMENT

After a four (4) day hearing with a dozen witnesses and over one hundred exhibits, the hearing officer issued an exhaustive fifty-six (56) page decision with substantial factual findings and conclusions denying relief to Parents under the Individuals with Disability Education Act ("IDEA"). Parents appeal the administrative ruling while also asserting ADA and Section 504 claims based on the identical assertions which the hearing officer rejected. Rather than challenge the factual findings as clearly erroneous, Parents ask this Court to reweigh the evidence and disregard the factual findings supporting the conclusions.

The hearing officer noted EVSC's constantly adapting individualized educational program ("IEPs") and numerous supports, accommodations, and interventions enabling R.O. to make academic and behavioral progress. Because of the danger R.O. presented to his siblings at home, Parents chose to ignore his progress, and against expert recommendations to keep him at EVSC, they unilaterally placed R.O. at Whetstone which did not offer the educational services Parents' own expert testified were needed. Such placement was not due to any failure on the part of EVSC to provide a free and appropriate education ("FAPE"). The Court should affirm the hearing officer's decision.

In 2023, R.O.'s Mother filed a due process complaint, in part, claiming that R.O. was not receiving educational services of a "cool down" to prevent escalation of his negative behavior. EVSC and Mother reached an agreement to place R.O. at an alternative EVSC learning environment which utilized the "cool downs" Mother requested, and Mother dismissed the complaint. After retaining counsel, Parents filed the due process complaint at issue seeking to relitigate claims resolved by the 2023 settlement and dismissal, and they now assert the "cool downs" were "seclusion" practices which violate the IDEA and were "inherently discriminatory"

under the ADA and Section 504. As the prevailing party, EVSC is entitled to recover its attorneys' fees under 511 IAC 7-45-11(b)(2) in defending (i) the 2022-2023 claims barred by the settlement agreement, and (ii) the claim seeking residential placement reimbursement which Parents knew was not educationally appropriate.

## V.    BACKGROUND

### A.  PROCEDURAL HISTORY.

On February 21, 2024, Parents filed a due process complaint with the Indiana Department of Education seeking relief under IDEA and Indiana's IDEA implementing regulation, 511 IAC § 7, *et seq*. [Dkt. 38-1 at 2-25, 34. A four-day hearing was held from September 30, 2024, to October 3, 2024. [Dkt. 1-4 at 1]. All Exhibits were admitted at the start of the hearing per agreement of the parties. [*Id.* at 4]. At the hearing, Parents called Ellyn Husley, Director of Exceptional Learners for the Evansville Vanderburgh Schools; Dr. Janet Hahn, Special Education Advocate; Beth Bolling, Counselor, Blue Cross Church; Janice Sanders, Clinical Social Worker; Jeremy Thompson, Director at Whetstone Boys Ranch; Carissa Rice, Behavior Consultant; Dr. Melody Dilk, Esq., Clinical Neuropsychologist; Mother; and Stanley K. Metzger, License Clinical Social Worker as witnesses during the Petitioner's case-in-chief. [*Id.* at 5]. EVSC (interchangeably "Respondent") called Caroline Paleski, Board Certified Behavioral Analyst; Brenna Kelley, Director Psychological Services; Dr. Jillian Wise, Psychologist; and Dr. Tina Evans-Robinson, Adolescent Psychiatrist. [*Id.* at 5]. No rebuttal witnesses were called by either party. [*Id.* ]. "[A]fter considering all oral testimony and written evidence admitted at [the] hearing," the IHO entered her fifty-six (56) page Due Process Hearing Decision containing thirty-one (31) pages of Findings of Fact with separate Conclusions of Law containing additional factual findings (the "Decision") [*Id.* at 1-56].

### B.  STANDARD OF REVIEW

#### 1.  EVSC and Parents' sole reliance on the Administrative Record affords substantial deference to the IHO.

In terms of judicial review of the Independent Hearing Officer's ("IHO") Decision, the IDEA provides: "the court - (i) shall receive the records of the administrative proceedings; (ii) shall

hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c). *Cooper v. Sch. City of Hammond*, No. 2:21-CV-72-PPS, 2023 WL 5898438, at *5–6 (N.D. Ind. Sept. 8, 2023). In challenging the outcome of the state administrative proceeding, Parents bear the burden of proof. *See Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221, 375 F.3d 603, 611 (7th Cir. 2004) (*citing *Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997)); Patricia P. v. Bd. of Educ., 203 F.3d 462, 466–67 (7th Cir. 2000).*

Neither Parents nor EVSC has submitted additional evidence beyond the Administrative Record ("Record") [Dkt. 38 and 38-1 through 38-12]. "When no fresh evidence is taken, 'the fact that [the district judge] disagrees with the [administrative law judge or other administrative hearing] officer is not enough to justify setting aside the latter's order; he must be strongly convinced the order is erroneous.'" *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 611–12 (7th Cir. 2004) (quoting *Dale M. ex rel. Alica M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist.* No. 307, 237 F.3d 813, 815-16 (7th Cir. 2001)). "This level of review is akin to the standards of clear error or substantial evidence." *Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 612 (7th Cir. 2004).

Once the record is complete, the Court is to base its decision on "the preponderance of the evidence" and to grant "such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The Supreme Court has interpreted this to require the initial reviewing court - that is, the district court - to make an independent decision based on the preponderance of the evidence. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). At the same time, the court must give "due weight" to the determinations made during the state administrative process. *Id.* The *Rowley* Court emphasized that "the provision that a

reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id; See Patricia P. v. Bd. of Educ. of Oak Park,* 203 F.3d 462, 466 (7th Cir. 2000). The Supreme Court further noted that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." 458 U.S. at 208 (citing *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, at 1, 42 (1973). The Court must keep in mind that "because courts do not have special expertise in the area of educational policy, they must give "due weight" to the results of the administrative decisions…" *Board of Educ. of Murphysboro Cmty. Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166-1167 (7th Cir. 1994) (citing *Rowley,* 458 U.S. at 202).

Findings of fact are given deference, and a court will reverse only if those findings are clearly erroneous. *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross,* 486 F.3d 267, 270–71 (7th Cir. 2007); *United States v. Fluker,* 698 F.3d 988, 1001 (7th Cir. 2012) ("Findings of fact are clearly erroneous only when, after considering all the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made."). Legal issues are reviewed de novo, *M.B. ex rel. Berns v. Hamilton Se. Schs.,* 668 F.3d 851, 859 (7th Cir. 2011); *Cooper v. Sch. City of Hammond,* No. 2:21-CV-72-PPS, 2023 WL 5898438, at *5 (N.D. Ind. Sept. 8, 2023).

## C.  THE FACTUAL FINDINGS ARE ENTITLED TO SUBSTANTIAL DEFERENCE.

Parents' Brief does not cite the "clearly erroneous" standard of review for challenging a factual finding in an IDEA decision. *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross,* 486 F.3d 267, 270–71 (7th Cir. 2007) (findings of fact are given deference and court will reverse only if those findings are clearly erroneous). [Dkt. 50 at 13-14]. The reason is simple: Parents do ***not***

specifically identify Findings of Fact or other factual findings in the Decision as being clearly erroneous. Instead, Parents argue, *e.g*.,:

- The IHO disregarded overwhelming evidence . . .

- The evidence presented at hearing was overwhelming and consistent . . .

- extensive expert testimony and evidence provided at hearing, which unequivocally demonstrated . . .

- despite clear evidence . . .

- despite overwhelming evidence and unrebutted testimony from experts . . .

[Dkt. 50 at 13, 63, 36, 46, 53]. The IHO had the opportunity to consider all the evidence and make credibility determinations. Parents' request for the Court to reweigh the evidence is contrary to the applicable standard. *Ross, supra*.; *Cooper v. Sch. City of Hammond*, No. 2:21-CV-72-PPS, 2023 WL 5898438, at *1 (N.D. Ind. Sept. 8, 2023) ("At bottom, almost all of the supposed genuine issues of facts in dispute identified by plaintiffs are nothing more than a challenge to the findings of fact made by the IHO without a showing that the findings were clearly erroneous."); *Mathin v. Kerry*, 782 F.3d 804, 811 (7th Cir. 2015), *as amended on denial of reh'g* (July 7, 2015) ("Mathin wants us to make a contrary credibility determination, but the finding by the court was not clearly erroneous and it is not our role to reweigh evidence.").

In their "Factual Background," Parents do not cite or challenge the IHO's factual findings, but rather present other facts which they ask the Court to reweigh while inserting argument of counsel as "facts," *e.g*.:

But it was not comprehensive, not sufficiently individualized, and did not assess R.O. in all suspected areas of disability.

EVSC failed to assess him for all areas of suspected disability, including an emotional disability, autism, and speech-language needs.

14

>The resulting IEPs over the subsequent years, relied on this inadequate, incomplete evaluation, and failed to address R.O.'s core disability.

>It was essentially recycled through the 2023-2024 school year. It was inadequate to meet R.O.'s identified (and unidentified) needs, and was essentially recycled through the 2023-2024 school year.

[Dkt. 50 at 21, 23]; *Clifford v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 273 n.6 (7th Cir. 2010) (argument of counsel is not evidence). Thus, the IHO's factual findings in the Decision are entitled to substantial deference.

## VI.    ARGUMENT

### A.  RESPONSE TO PARENTS' MOTION FOR JUDGMENT ON THE RECORD.

#### 1.  FAPE Standard.

To receive federal funding, schools must provide disabled children "with a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." *Morton Cmty. Unit Sch. Dist. No. 709 v. J.M.*, 152 F.3d 583, 584 (7th Cir. 1998) (quoting 20 U.S.C. § 1400(d)(1)(A)). FAPE requires an educational program to be "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982). Courts employ a two-prong analysis to determine whether a school provided FAPE: "(1) Whether the state has complied with IDEA's administrative procedures; and (2) whether the IEP is reasonably calculated to provide some educational benefit to the child." *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905 (7th Cir. 2002) (citing *Rowley*, 458 U.S. at 206-07.)

The Supreme Court held in *Endrew F. v. Douglas County School District Re-1*, 580 U.S. 386, 137 S. Ct. 988, 999, 197 L.Ed.2d 335 (2017) that, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP that is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id*. The standard of appropriateness is

"not guaranteed to produce any particular outcome." *Rowley*, 458 U.S. at 192 (internal cite omitted). Nor does the IDEA require the "furnishing of every special service necessary to maximize each handicapped child's potential." *Rowley*, 458 U.S. at 199. An appropriate education does not mean the best possible one or even the placement the parents prefer. *H.H. ex rel. Hough v. Indiana Bd of Special Educ. Appeals*, No. 3:06-CV-551-TS, 2008 WL 2333144, at *5 n. 4 (N.D. Ind. June 3, 2008) (citing *Heather S. v. State of Wis.*, 125 F.3d 1045, 1057 (7th Cir.1997)).

### 2. IEP Standard.

EVSC is required to provide an IEP that is reasonably calculated to enable R.O. to "make measurable and adequate gains in the classroom," as opposed to being required to provide each and every specific request by the parent. *Devine v. Indian River County Sch. Bd.*, 249 F.3d 1289, 1293 (3rd Cir. 2001); *see also, Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.*, 356 F.3d 798, 802 n.3 (7th Cir. 2004). The "key inquiry" in determining an IEP's adequacy is whether, "taking account of what the school knew or reasonably should have known of a student's needs at the time," the IEP it offered was reasonable. *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018) (citing *Endrew F.*, 137 S. Ct. at 999). This standard calls for evaluating an IEP as of "the time each IEP was created" rather than with the benefit of hindsight. *Id.*

"[A]n IEP is a snapshot, not a retrospective document, and it must take into account what was objectively reasonable at the time the snapshot was taken (or when the IEP was promulgated). *Cooper*, No. 2:21-CV-72-PPS, 2023 WL 5898438, at *9 (citing *Carlisle Area Sch. Dist. v. Scott* P., 62 F.3d 520, 530 (3rd Cir. 1995). "The measure and adequacy of an IEP can only be determined at the time it is offered to the student, not at a later date – 'Monday Morning quarter backing' is inappropriate. *Id.* (citing *Fuhrmann v. East Hanover Bd. Of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993)).

As the IHO noted in the Decision, "the adequacy of an IEP must be judged considering the available information upon which it was based." [Dkt. 1-4 at 41 (citing *M.B. v. Hamilton Southeastern Sch.*, 2010 U.S. Dist. LEXIS 80719, 20 (S.D. Ind. Aug. 10, 2010) ("the Court should not engage in a reexamination with hindsight that is enlightened by additional evidence or information not provided or available to the CCC at the time of either case conference.")].

### 3. The Decision is supported by the Findings and Record.

#### a. The IHO's denial of relief for any violation during the 2022-2023 school year is supported by the Record.

Parents claim error because R.O.'s goals remained the same or similar. However, such did not constitute a denial of FAPE because EVSC diligently took steps to address R.O.'s behaviors. [Dkt. 38-5 at 76]. Courts have consistently held that there is no denial of FAPE when a school fails to identify measurable goals because the school district took proactive steps to address the student's behavior. *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 571 (E.D. Pa. 2013), aff'd in part, 581 F. App'x 141 (3d. Cir. 2014); *See also Sean C. through Helen C. v. Oxford Area Scho. Dist.,* No. CV 16-5286, 2017 WL 3485880 at *12 (E.D. Pa. Aug.14., 2017) ("although the IEP team created no specific goals addressing [student's] behavior or executive functioning issues until the end of 11th grade, the School District put SDI's in place to address behavioral issues and [student] received verbal prompting in the classroom to help him remain on task and attended an academic lab, which was designed to address his difficulties with completion of work and focus.").

While the IHO stated: "The failure to review and add additional services and support, prior to the behavioral intervention plan made the IEP defective. It appears that the staff at Thompkins constantly reported his behaviors to his parents but failed to seek additional interventions to address the escalating behaviors." [Dkt. 38-5 at 174 (Decision, 5.32)]. It was appropriate for the IHO to recognize no relief was warranted because the applicable law to the defect states, "That a

school district that inadvertently or in good faith omits a required service from the IEP can cure that deficiency during the resolution period once it receives a due process complaint." *R.E. Ex Rel. J.E. v. New York City Department of Education*, 694 F.3d 167, 188 (7th Cir. 2012); 20 USC.§ 1415(F)(1)(B).

EVSC cured any deficiency as the IHO recognized that EVSC, as part of the mediation process for the April 2023 Indiana Department of Education due process complaint, engaged Mother in settlement talks which resulted in an agreement to place R.O. in The Learning Center ("TLC") and Mother to dismissed the complaint. [Dkt. 38-5 at 174, Decision, 5.32]. By agreeing to the settlement and dismissal of the due process complaint, Mother agreed that R.O.'s placement at TLC nullified the need for a due process hearing. 20 U.S.C.A. § 1415 (F)(1)(B)(ii). The IHO correctly determined that placement at TLC "essentially cured any deficiency regarding measurement of behaviors and related services in the IEP." [*Id.*]. As the IHO found, "The pre-mediation agreement allowed RO to receive FAPE at The Learning Center." [Dkt. 38-5 at 185 (Decision), *Id.* at 174 (Decision, 5.32)].[2] Thus, the Record supports the IHO's holding that any deficiency was cured by the parties' agreement to place R.O. at TLC and no relief was necessary.

**b. The IHO's denial of relief for related services during the 2022-23 school year is supported by the findings and Record.**

Parents claim "the IHO erroneously failed to provide compensatory education despite finding that EVSC denied R.O. and his Parents related services" during the 2022-2023 school year. [Dkt. 50 at 54]. As noted above, not every violation requires relief. *See Section (VI)(A)(3)(a), supra.* at 17. The IHO correctly found:

> The placement at TLC essentially cured any deficiency regarding measurement of behaviors and related services in the IEP. TLC's program was designed to monitor

---

[2] Parents do not challenge the finding that Parents' settlement and dismissal of the complaint was an agreement which provided a FAPE to R.O. [Dkt. 38-5 at 185 (Decision)].

and measure progress while implementing the BIP. . . . The April 13, IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

[Dkt. 38-5 at 174-175 (Decision, 5.32)]. Parents did not challenge these findings as clearly erroneous. The IHO's decision not to award related services during the 2022-2023 school year is supported by the findings and Record.

### c. The IHO's holding that EVSC provided a FAPE during the 2023-24 school year is supported by the Record.

Parents allege that the 2023-2024 IEP fails because it had the same defects as the 2022-2023 IEP. [Dkt. 50 at 35]. In claiming the 2023-2024 IEPs lacked necessary accommodations, special education and related services, supplementary aid and services, Parents argue that the IHO lacked "coherent rationale," "ignored" evidence, "disregards the record," advanced arbitrary analysis, lacked cogent explanation, failed to weigh Parents' expert testimony, and "she should have concluded that the [2023-2024] IEP was also inappropriate." [Dkt. 50 at 35, 39-40]. While asking the Court to reweigh the evidence, they also fail to recognize the extensive support provided by EVSC to R.O. as found by the IHO, including her detailed review of the IEPs. [Dkt. 38-5 at 151-152 (Decision, F 0.26 through F 0.32), *Id.* at 154 (Decision, F 0.40 through F 0.43), *Id.* at 155-156 (Decision, F 0.46), *Id.* at 156-157 (Decision, F 0.54 through F 0.61), *Id.* at 165-178 (Decision, 1.01 through 7.11)]. In addition, the IHO included numerous additional factual findings within her Conclusions of Law to support her determination that the 2023-2024 IEP was appropriate and EVSC provided R.O. a FAPE., including: [3]

> The April 2023-2024 IEPs included updated Present Level of Academic Achievement. The School conducted a complete Functional Behavioral Analysis that included the required components of 511 IAC 7-42-6(c). The FBA included the

---

[3] The Decision noted, "All Conclusions of Law that can be deemed Findings of Fact are hereby deemed Findings of Fact. All Findings of Fact that can be deemed Conclusions of Law are hereby deemed Conclusions of Law." [Dkt. 38-5 at 178 (Decision, C.01)].

required positive behavioral interventions and supports, to address any of the student's behaviors that impede the student's learning or the learning of others.

The April 13, 2023 IEP and the subsequent IEPs met the required components of 511 7-42-6. . . . The question is whether the IEP addresses the student's individual needs. Id. The April 13, 2023 and subsequent IEP did just that. The IEP included the BIP which was being successfully implemented by TLC. The student decided not to participate in his education, due to a couple of factors; 1) denial of the request to attend ½ day school and 2) being increasingly aware that his parents were planning to send him away to a boys ranch. The parents did not participate in the January 7, 2024 case conference (due to Mom's illness) but she communicated to the CCC that she wanted to place the student on homebound. The CCC informed mother that she must obtain a physician's consent for medical homebound. The CCC would not recommend home school for the student. The CCC forwarded a medically necessary form to Mom for completion by the student's physician. Yet his psychiatrist, Dr. Evans-Robinson determined that RO did not have a medical condition that would necessitate a homebound placement. Mom did not return the form and the student did not return to school. Mom testified that she had decided to home school the student until his placement into a residential therapeutic facility.

The April 7, 2023, IEP recognized the Student's behavioral issues and set out behavioral interventions to address these issues including, emotional behaviors, functional and executive functioning and set out special education services specifically designed to address the student's needs.

The data provided during the CCC on October 27, 2023 indicated that RO met exit criteria from TLC. The RO was successful in the program and was scheduled to transition to Thompkins Middle School. His attendance and subsequent behavior at the CCC changed the minds of the CCC and RO was returned to TLC. RO became extremely angry and noncompliant because he was not allowed to attend school ½ day. His behaviors escalated to a point where he was suspended from TLC. He shared with a wraparound facilitator that he was not going to do his school work because he wanted to return to Thompkins. Mom decided to home school RO until his placement in April of 2024 at Whetstone Boys Ranch in Missouri.

The pre-mediation agreement allowed RO to receive FAPE at The Learning Center. The Functional Behavioral Analysis and the subsequent implementation of the BIP at TLC cured any deficiency (failure) by the school to adequately address his behavioral needs.

The IEP was reasonably calculated to enable the student to make progress appropriate in light of the child's circumstances.

The FBA in this case was appropriately conducted by a Board Certified Analyst. [Parents'] experts discussed the inadequacies within the IEPs. The April

2024 IEP included goals, specially designed instruction, and related services that targeted the deficits of RO.

[Dkt. 38-5 at 179-180 (Decision), *Id.* at 182 (Decision), *Id.* at 184-185 (Decision), *Id.* at 190 (Decision)].

As a result of the parties' settlement agreement reflecting that R.O. would attend TLC, the May 1, 2023, IEP was implemented and included additional supports, interventions, and more frequent data collection. [Dkt. 38-6 at 762-772 (EVSC EXHIBIT PAGE #012-22)]. TLC included a Board-Certified Behavior Analyst ("BCBA") who oversees the work of the special education teacher, the behavior interventionist, and the behavior technician. [Dkt. 38-5 at 259 (Sept. 30 Trial Tr., 58:3-6)]. There was no provision in the IEP relating to social work because every student who attends TLC has access to the social worker. [*Id*. at 249 (Sept. 30 Trial Tr., 58:8-10)].

Most importantly, as part of R.O.'s placement in TLC, he was placed in a small classroom with numerous supports, including (1) a licensed special-education teacher who provided academic content to R.O., (2) a behavioral interventionist who provided social-emotional work at least once a day for 30 minutes, and (3) a behavior technician who assisted in both academic and behavioral progress and who collected intensive behavioral data, which documented, among other things, whether R.O. was on task, whether he was safe, and whether he was using verbally-appropriate communication. [Dkt. 38-5 at 376-378 (Sept. 30 Trial Tr., 175:15-177:6); *see also,* Dkt. 38-7 at 136-144 (summary of data collected on RO while at TLC admitted as EVSC EXHIBIT PAGE #0172-0180)].

Along with the additional individuals who were provided to assist R.O., he was also receiving 360 minutes of special education services each day at TLC with the narrative stating, "[R.O.] will attend a self-contained behavior based program" and that the reasons for such provisions were because "the committee feels like the supports of the program will be beneficial

21

for his socialization" with the goal of having R.O. "learn the skills needed to be successful in a traditional school setting." [Dkt. 38-6 at 767-769 (EVSC EXHIBIT PAGE #00017-0019)]. As BCBA Paleski testified, data was also collected on R.O. every thirty minutes of every day he was in School regarding three different behaviors [Dkt. 38-5 at 1070 (Oct. 2 Trial Tr., 233:11-14)], and EVSC used the "time or interval data" looking at the behavior of concern for each student and the operational definitions of those behaviors of concern. [Dkt. 38-5 at 1070 (Oct. 2 Trial Tr., 233:17-20)].

The behavioral intervention plan developed at Thompkins School was utilized by TLC for a number of reasons, including to proactively "build a visual schedule" for R.O., to individualize his learning, and to even help TLC set up the physical structure of the classroom for R.O. since he had preferential seating and other accommodations. [Dkt. 38-5 at 1075-1076 (Oct. 2 Trial Tr., 238:16-239:16)]. BCBA Paleski further testified to the vast number of supports and accommodations R.O. received while at TLC:

> A:    He received small group learning or small group instruction. So he would work either one-on-one with a teacher or two-to-one with a teacher specifically on academics that were needed for his needs. [] Like I said, preferential seating [sic]. He had basically like a cubical in the back of the room to kind of help us with some of that anxiety and peer to peer interaction that we had been made aware that he often struggled with peer interactions. So that preferential seating [sic] for us looks like giving him his own space that he could really focus on work. He was given movement breaks with a preferred staff. So that looked like he either requested it or the staff kind of preemptedly could tell a behavior cycle was starting. He was prompted to take a break or he could request that at any point.
>
> We also used the 2 by 10 strategy with him, which is twice a day for 10 minutes a staff will build a relationship. We don't talk about things like behavior or academics during that time. I did some of those 2 by 10's with him; just kind of walking the halls and combine those with movement breaks for him. He also had 4 to 1 praise strategy. So any time he would get the redirection, we made an effort to give four positive redirections as well or four positive praises.

[Dkt. 38-5 at 1076-1078 (Oct. 2 Trial Tr., 239:23-241:1)].

Dr. Wise, a pediatric neuropsychologist who is also qualified to and does provide services as a psychologist for youth, adolescents and young adults [Dkt. 38-5 at 1241-1244 (Oct. 3 Trial Tr., 37:3-40:23)], testified that the EVSC was providing an appropriate education at TLC through their extensive data collection, supports, accommodations, and interventions, and that residential for R.O. would be more likely to cause harm than good. [Dkt. 38-5 at 1247-1248, 1265 (Oct. 3 Trial Tr., 43:22-44:7; 61:5-16)].

The IHO stated,

> The Learning Center is the appropriate place to provide services to RO. ***The records show that TLC had all of the services the [Parents'] experts stated RO needed***. TLC's team was working with RO and making progress until RO attended the CCC meeting and demanded a ½ day school schedule.

[Dkt. 38-5 at 194 (Decision); emphasis added]. Accordingly, Parents assertion that "EVSC made no changes in its inadequate 2022-2023 or 2023-2024 IEPS" is baseless. [Dkt. 50 at 34]. Thus, the Record supports the IHO's holding that Parents did not meet their burden to prove the 2023-2024 IEP caused a denial of FAPE.

### d. The IHO's finding that EVSC complied with reevaluation requirements for 2023-2024 is supported by the findings and Record.

While ignoring the ongoing efforts of EVSC to provide a FAPE to R.O. as found by the IHO above, Parents argue that EVSC failed to reevaluate R.O. in 2023-2024. [Dkt. 50 at 47]. The IHO found:

> On April 13, 2023, while at Thompkins Middle School, there was an IEP titled Reevaluation Review and Manifestation Determination. The Goal Statement included "RO has had 45 behavior incidents documented on RDS during the 3rd quarter". The student was eventually expelled and suspended for his behaviors. The student was removed from Thompkins and placed on homebound. Mom requested Mediation through the Indiana Department of Education. After pre-mediation conversations, the parties agreed that the student should be placed at The Learning Center. Once the parties agreed to transfer the student to The Learning Center, the

school implemented the appropriate BIP to assist the student with his emotional needs. TLC begin [sic] to assess his behaviors and implement his intervention strategies. There was not a need for a reevaluation at this time. The School conducted and implemented a behavioral plan which cured and [sic] failures regarding re-evaluation.

On October 27, 2024 the Case Conference Committee (CCC) wrote in its *Determination After Review of Existing Data* statement, "[t]he CCC determined that there is sufficient data to plan appropriately for the student. Therefore, reevaluation is not required at this time for the purposes of considering eligibility or providing additional information regarding the student's special education and related service needs. The school must consider reevaluation for each student receiving special education and related services a least once every three (3) years unless the parent and the school agree that it is unnecessary. In addition, the school must consider reevaluation if the school determines at any time during the three (3) year cycle that additional information is need to address the special education or related services needs of the student, or if the student's parent or teacher requests and evaluation".

**Revaluation, Review, Manifestation IEP of 04/13/2023**
5.01 Reevaluation, Review, Manifestation IEP 04/13/23 – 10/28/2023.

5.02 On April 13, 2023 the student was a sixth grader at Thompkins Middle School the CCC convened for reevaluation review and Manifestation Determination.

5.30 The parents, Teacher of Record, Instructional Strategist, Assistant Principal, Special Education Coordinator, School Psychologist, General Education Teacher and Public Agency Representative participated in the case conference committee meeting.

5.31 The stated purpose of this meeting was re-evaluation review to address and discuss the functional behavioral assessment.

[Dkt. 38-5 at 187, 154 (Decision, F 0.40), 170 (Decision 5.01-5.02), 174 (Decision, 5.30-5.31)].

The IHO's findings outline the numerous Case Conference Committee meetings with Parents and revisions to the various IEPs to best serve R.O. and his needs in providing FAPE. [Dkt. 38-5 at 165-178 (Decision, 1.01-7.11)]. Parents do not challenge these findings, including the IEPs noting the meetings with Parents and the conclusions that there was sufficient data such that reevaluation of R.O. was not necessary. [*Id.*]. Therefore, even if EVSC was required to conduct a reevaluation as the Parents contend, it satisfied the law because it regularly met with Parents who

24

agreed a revaluation was not necessary. [*Id.*]; *See* 511 IAC 7-40-8 (b)(1) (reevaluation need not occur if the parent and the public agency agree that it is unnecessary).

Accordingly, the IHO correctly determined that "[Parents] failed to meet their burden of proof to show that [EVSC] failed to provide the student with an appropriate evaluation and/or reevaluation during the 2023-2024 statutory period." [Dkt. 38-5 at 187 (Decision)].

**e. The IHO correctly determined that R.O.'s 2023-2024 IEP was appropriate.**

Parents argue that the IHO lacked "coherent rationale," "ignored" evidence, "disregards the record," advanced arbitrary analysis, lacked cogent explanation, failed to weigh her expert testimony, and "she should have concluded that the [2023-2024] IEP was also inappropriate." [Dkt. 50 at 35, 39-42]. Yet again, Parents do not claim any factual finding by the IHO is "clearly erroneous." Parents simply rely on argument of counsel and ask this Court to reweigh evidence.

The IHO determined that the April 13, 2023, IEP and following IEPs met the required components under 511 7-42-6. [Dkt. 38-5 at 182 (Decision)]. Specifically, the IHO pointed to the fact that an IEP need not directly address every possible need of the student. [*Id.* citing *See J.D. v. Crown Point School Corp.*, 2012 WL 639921 (N.D. Ind. 2012)]. The IHO heard compelling testimony from BCBA Paleski that the BIP developed at Thompkins School was utilized by TLC and there were a vast number of supports and accommodations R.O. received while at TLC. [Dkt. 38-5 at 1076-1078 (Oct. 2 Trial Tr., 239:23-241:1)]. *See supra* (VI)(A)(3)(c), at 19-23 (explaining the array of supports offered to R.O. at TLC).

As the IHO correctly noted, an IEP is a snapshot, not a retrospective document, and it takes into account information available when the IEP was devised. [Dkt. 38-5 at 184 (citations omitted)].

Parents further fail to recognize that R.O. was in fact given accommodations. Dr. Wise ultimately testified that the EVSC was providing an appropriate education at TLC through their extensive data collection, supports, accommodations, and interventions. [Dkt. 38-5 at 1247-1248, 1265 (Oct. 3 Trial Tr., 43:22-44:22; 61:5-16)]. Additionally, these educational services evidenced that EVSC's IEPs and numerous supports, accommodations, and interventions enabled R.O. to make academic and behavioral progress. [Dkt. 38-5 at 1081-1082 (Oct. 2 Trial Tr., 244:20-245:11), Dkt. 38-7 at 136-143 (EVSC EXHIBIT PAGE #0172-0175)] . Rather than acknowledge the accommodations offered and the progress R.O. was making, Parents chose to disregard these developments and remained fixated on securing a residential placement:

> Mom did not attend the meeting, but expressed to the Exceptional Learning Specialist via the phone call, that Reed is emotionally hurting the family at home and that the outside therapies he has had in the past have not been effective on him. She stated that he seems to be getting worse at home. Parent stated that Reed is on a waitlist at 3 different residential facilities. Star Guides in Utah, EPCC, and one in Northern Indiana. She stated that she is worried that if she sent him to school he would disrupt the learning environment and get into trouble. [Dkt. 38-5 at 177 (Decision, 7.06), Dkt. 38-4 at 160 (CCC Report dated 01/22/24 with IEP effective date of 10/30/23- 10/29/24)].

> The Written Notes and Other Relevant Factors included the Meeting Purpose: Mom discussed with the Public Agency Representative about her desire for him to go to a residential facility due to instances that were occurring outside of school. Homebound services were brought up as an option during the conversation and could be discussed at the conference as he was on the waiting list for residential through the outside placement agency. Mom gave permission to hold the meeting without her in attendance. [Dkt. 38-5 at 177 (Decision, 7.07), Dkt. 38-4 at 160 (CCC Report dated 01/22/24 with IEP effective date of 10/30/23- 10/29/24)].

> Mom does not feel safe taking pt home at this time as pt again began to decompensate, hitting/kicking walls, saying he hates mom, etc. Dad states they have tried everything and they do not what else to do anymore. (P. Ex. 32, page 46)[4]. [Dkt. 38-5 at 152 (Decision, F 0.34 at n.10)].

> The IEP records show that Mom is seeking residential placement, due to problems at home. [Dkt. 38-5 at 192 (Decision)].

---

[4] [Dkt. 38-9 at 176].

Accordingly, the findings and Record support the IHO's conclusion that Parents failed to establish by a preponderance of the evidence that the IEP lacked necessary accommodations.

Parents next contend that EVSC did not include appropriate special education and related services. However, the IHO specifically determined that the April 13, 2023, IEP and subsequent IEPs addressed R.O.'s individual needs. [Dkt. 38-5 at 182 (Decision)]. The IEP included the BIP which was being successfully implemented by TLC. [*Id.*]. However, it was R.O. who decided not to participate in his education due to the denial of ½ day school days and becoming aware that his parents were planning to send him to a residential boys ranch. [*Id.*]. Accordingly, the IHO correctly determined that the 2023-2024 IEP was appropriate.

Parents then circulate the same argument and reweighing of evidence rather than make a showing that any factual finding was clearly erroneous with relation to failure to include supplementary aids and services, and specific and measurable goals. They again fail to consider the implementation of the 2023-2024 IEP which the IHO held was appropriate and provided a FAPE to R.O. [Dkt. 38-5 at 176 (Decision, 6.16), *Id.* at 180 (Decision), *Id.* at 182-187 (Decision)]. The IHO held that the IEPs "recognized [R.O.'s] behavioral issues and set out behavioral interventions to address these issues including, emotional behaviors, functional and executive functioning and set out special education services specifically designed to address the student's needs." [Dkt. 38-5 at 184 (Decision)]. Thus, the Record supports the IHO's holding that the 2023-2024 IEP did not cause a denial of FAPE. [Dkt. 38-5 at 186 (Decision)].

### f.  EVSC adequately considered the full continuum of educational placements and did not fail by not offering R.O. a residential placement.

Parents argue, "EVSC failed to consider the full continuum of educational placements, and failed to offer R.O. a residential placement." [Dkt. 50 at 42]. The IHO held otherwise.

Mom is a teacher with EVSC. She maintains a license to teach special education. Mom attended every CCC except in January, 2024. Mom testified that "when it came to finding in all the research for years, we decided that it was in his best interest for a residential placement with academic focus. (Tr. Oct 2 page 137:5-7)[5]. The IEP records show that Mom is seeking residential placement, due to problems at home. Mom testified that the school did not educate her about systems like Devereux, Meridell and Eagle Ranch. (Tr. Oct 2, page 138:1-4)[6]. She hired Ashton O'Keefe to assist the family with placement. Mom advised CCC that she had three placements including Star Guides in Utah, EPCC and one in Northern Indiana. The student was accepted at Wheatfield Academy and Whetstone Ranch. The record reflects that the school offered the therapeutic day school and medical homebound placements on the continuum. The school offered residential placement. They believed they could service the student at the therapeutic day school. Mom was determined to place the student in residential therapeutic school. The [Parents] failed to show by a preponderance of the evidence that the School did not offer a continuum of placement.

[Dkt. 38-5 at 192 (Decision)]. Parents cite evidence the IHO considered and argue "there was ample support for Parents' request." [Dkt. 50 at 43-44]. This again simply asks the Court to reweigh the evidence.

Parents had a predetermined goal to place R.O. at a residential placement without regard to any educational benefit he was receiving at EVSC. Parents sought residential placement for R.O. despite expressly stating that wrap-around services were "remarkably helpful," despite admitting that R.O. was making academic progress, and despite Dr. Evans-Robinson refusing to sign a medical homebound form because R.O. did not have a medical condition that necessitated such placement. [Dkt. 38-7 at 196 (EVSC EXHIBIT PAGE #0232), *Id.* at 401 (EVSC EXHIBIT PAGE #0437), Dkt. 38-8 at 178 (EVSC EXHIBIT PAGE #0684)]. Those facts coupled with the undisputed evidence that Parents (i) slowly stopped sending R.O. to school after the October 27 ACR before removing him altogether, (ii) took R.O. off his medications against clinical advice,[7]

---

[5] [Dkt. 38-5 at 974 (Oct. 2 Trial Tr., 137:5-7)].

[6] [Dkt. 38-5 at 975 (Oct. 2 Trial Tr., 138:1-4)].

[7] As the IHO found, R.O. communicated that "his anger was ten times worse since his meds stopped." [Dkt. 38-5 at 156 (Decision, F 0.49).

(iii) failed to comply with wrap-around services, and (iv) then chose to place R.O. at Whetstone against the advice of their expert and other experts. [Dkt. 38-8 at 272-273 (EVSC EXHIBIT PAGE #0777-0778), Dkt. 38-5 at 154-156 (Decision, F 0.40- F 0.53, F 0.55), *Id.* at 157 (Decision, F 0.56-F 0.61), *Id.* at 158 (Decision, F 0.63-F 0.61)].

Moreover, and as set forth in Sections (VI)(A)(3)(k)(ii), *infra* at 40-42, Whetstone was not a necessary or appropriate residential placement for R.O. Therefore, residential placement was not proper even after EVSC considered all educational placements. Parents argue:

> Ultimately, the IHO herself agreed that R.O. could benefit from a residential facility, ordering EVSC to consider one (improperly limiting consideration to Indiana schools) *if TLC could not meet R.O.'s needs*. IHO Op. at 55.[8]

[Dkt. 50 at 43; emphasis added]. This admits the propriety of the IHO's determination, and her recommendation to "discuss" residential placement *if EVSC cannot meet R.O.'s needs <u>in the future</u>.* (Decision, p. 55, ¶ 7). Such recommendation is based on the holding that EVSC adequately considered the full continuum of educational placements and did not fail by not offering R.O. a residential placement.

Despite noting the January 22, 2024, IEP offering placement at the Evansville Psychiatric Children's Center (EPCC), Parents argue that "EPCC is not a residential educational placement at all." [Dkt. 50 at 44]. This argument of counsel again contradicts Parents' own representations:

> F 0.46 On November 10, 2023 … Ashton O'Keefe, System of Care Coordinator, Southwestern Behavioral Healthcare stated that "The family is pursuing residential whether we approve to refer him to Evansville Childrens Psychiatric Center (EPCC) or not but we feel EPCC would be more beneficial than what they have planned. Currently, the family is planning to send RO to a therapeutic boarding school (Whetstone) in Missouri when they have an open bed in January. We feel

---

[8] The IHO did not "agree" to residential placement or find that it was appropriate. Rather, she rejected residential placement. The IHO only recommended that if R.O., in the future, was unsuccessful at TLC, EVSC should "discuss" residential placement. [Dkt. 38-5 at 196].

EPCC would be better as there is significant family strain and family therapy is going to be a crucial part of treatment". (EVSC Ex. page 0526)[9].

F 0.59 In an email dated January 23, 2024 parent stated "Ashton …approved his admittance and gave his name on fast track for Evansville Children's Psychiatric Center.

F 0.60 On 2/15/2024 the wrap facilitator discussed youth and family with SOF gatekeeper, SDS and Wrap Coordinator. Discussion was regarding residential treatment at EPCC is no longer what family wants but instead wants Wheatfield Academy, RO being upset at mothers comment and family staying in Wraparound. (EVSC Ex. page 0718)[10].

F 0.61 Wrap facilitator, Lisa Lantaff and team at Southwestern Behavioral Healthcare, Inc., discussed the family's desire to admit RO to EPCC and then remove him in May when a bed at Wheatfield Academy becomes available. "I do not feel that it is appropriate to admit RO to EPCC if family plans to have him discharge in May to transfer to a less restrictive environment. Lisa and Cody discussed current behaviors w/RO being safe and more compliant recently but concerned that this due to him not attending school and having little to no responsibilities or expectations. The team reviewed that family has openly discussed that they do not feel that Wraparound is helpful and only continue to participate to receive skills. Cody expressed feeling that sessions have little direction dt lack of symptomology at this time and family's lack of communication w/any concerns". (EVSC Ex. page 0719)[11].

In a letter dated September 12, 2024 to whom it may concern Janice Sanders, MSW,LCSW,LMSW, states: "I have been retained by the parent of RO to assist in securing a residential placement. It is my understanding that he has already been accepted at Evansville Children's Psychiatric Center (EPCC).

The IEP records show that Mom is seeking residential placement, due to problems at home. . . She hired Ashton O'Keefe to assist the family with placement. Mom advised CCC that she had three placements including Star Guides in Utah, EPCC and one in Northern Indiana.

[Dkt. 38-5 at 155-156 (Decision, F 0.46), *Id.* at 157 (Decision, F 0.59-F 0.61), *Id.* at 165

(Decision, n 18 at F 0.68), *Id.* at 192 (Decision)].

---

[9] [Dkt. 38-8 at 20].
[10] [Dkt. 38-8 at 212].
[11] [Dkt. 38-8 at 213].

Again, Parents' actions and representations admitted that EPCC was a residential educational facility. Only after they retained counsel and filed the complaint and this appeal did they advance the new argument that CPCC was not a residential educational facility. [Dkt. 50 at 44]. A simple EPCC website search rejects the argument of counsel. https://www.in.gov/fssa/dmha/state-psychiatric-hospitals/evansville-psychiatric-childrens-center/programs/ ("Evansville Vanderburgh School Corporation provides the formal education program where children have individualized education plans which allows them to earn school credits to have a smoother transition to their home school at discharge). Parents claim of error is meritless.

### g. Parents' argument that R.O.'s cool-down removals were a disciplinary change of placement ignores the findings, including Parents' request for cool-downs.

Parents claim the IHO misapplied the law in finding that the removals of R.O. from the classroom to "cool-down" were therapeutic and ***not*** disciplinary in nature. [Dkt. 50 at 45]. As the IHO held:

> In this case the removals were designed to calm the student. Caroline Paleski, BCBA stated "*the Seclusion Room refers to the de-escalation, what we would call a de-escalation. TLC does have a space that has four rooms that are, they don't have anything in them. So, if a student is in danger to themselves or others, we can remove them from the classroom, really work on that de-escalation piece, bring them down. There are no doors. There's an adult with them at all times in that section, and they do have the ability to exit. Should they need to, you know, something arise that they have to leave that area. So they are not secluded alone or behind the door. There are no doors in the rooms ... a reset I would call it.* (Tr Oct 2 page 232:10-21)[12]. These removals were as a part of TLC response to his specific behaviors. The [Parents] failed to show that these removals triggered a change of placement.

---

[12] [Dkt. 38-5 at 1069 (Oct. 2 Trial Tr., 232:10-21)].

[Dkt. 38-5 at 189 (Decision)]. Parents did not challenge, as clearly erroneous, the IHO's factual finding that the cool down removals were therapeutic to address his specific behaviors. Instead, Parents argue the IHO relied on "EVSC's uncorroborated characterizations of the seclusion space as non-disciplinary." [Dkt. 50 at 47]. This argument concedes there was evidence to support the IHO's finding, but Parents just disagree with the IHO's finding. Parents state: "Accordingly, this Court **should find** that the repeated use of seclusion during both school years constituted a disciplinary change of placement under the IDEA/Article 77. [*Id.* (emphasis added)]. This again improperly asks the Court to reweigh evidence to make a different factual finding. *Cooper, supra; Mathin, supra*. The Court only reverses a finding of fact if it is clearly erroneous. *Ross, supra; Fluker, supra*. Parents advance no such argument of clear error.

The IHO made additional findings from the evidence in the Record:

- It is reported that he is able to express himself after a ***cool down*** time as long as its used before he escalates.

- The CCC provided accommodations, including: "3. Offered a ***cool-down***. . ."

- RO is able to express himself after a ***cool down*** time, and has done better at handling being told 'no'. . . RO does respond well to using ***cool down*** techniques as long as they are used before he escalates.

[Dkt. 38-5 at 169 (Decision, 3.09), *Id.* at 167 (Decision, 1.18), *Id.* at 166 (Decision, 1.14) (emphasis added)].

In addition, the IEPs noted the same cool down accommodation:

- IEP Effective Date (2/24/2021- 2/24/2022)
    - Description of additional accommodations… "offered a ***cool down***"
        - Also says in this IEP "Reed is able to express himself after a ***cool down*** time"
- IEP Effective Date (4/7/2022-4/7/2023)
    - Description of additional accommodations… "offered a ***cool down***"
        - Also says in this IEP "Reed is able to express himself after a ***cool down*** time"

- IEP Effective Date (4/13/2023- 10/28/2023)
  - o Description of additional accommodations… "offered a ***cool down***"
    - ▪ Also says in this IEP "Reed is able to express himself after a cool down time"

- IEP Effective Date (10/30/2023- 10/29/2024)
  - o Description of additional accommodations… "offered a ***cool down***"
    - ▪ Also says in this IEP "Reed is able to express himself after a ***cool down*** time"

[Dkt. 38-4 at 66, 94, 21, 163]. Thus, the IHO's conclusion that Parents failed to meet their burden of proof to show the cool down or "seclusion" of R.O. was a disciplinary change of placement is supported by the factual findings and Record.

### (i)    Parents' argument contradicts the prior IDOE Complaint.

When Mother filed the IDOE Complaint in April 2023, she alleged IDEA violations that the IEP was not being followed, including:

> Accommodations were not followed: "offered a cool down was not followed by every teacher"

[Dkt. 38-4 at 6].[13] After an agreement was reached as to the 2023 Complaint, the IEP was revised on 5/1/2023, and it maintained the "offered a cool down" understood by Parents to be therapeutic and not disciplinary. [*Id.* at 21]. Thus, Parents' contradictory assertion of the cool down as being a "seclusion" and disciplinary change of placement is baseless.[14]

Parents next assert that EVSC failed to document the removals, but then claim the data was "not included in the IEP process, and, critically, not even available at hearing in a consistent format." [Dkt. 50 at 46]. First, this is a belated objection to Hearing exhibits which was waived.

---

[13] As Mother communicated, "These more sever (*sic*) behaviors are reported to occur at least once per month, in both home and school environments, and ***RO is able to calm himself when left alone***, rather than being engaged with. [Dkt. 38-5 at 149-150 (Decision, F 0.19)].

[14] After obtaining counsel and filing the Due Process Complaint and this appeal, Parents changed their terminology for the "cool downs" to "seclusions." [Dkt. 50 at 45-47]. Parents further misrepresent that the IHO "improperly dismissed these events as "cool-downs." [*Id.* at 45].

Secondly, it misrepresents the evidence. Parents "cite" testimony of BCBA Paleski as "admit[ing] that the data she prepared about R.O.'s seclusion was created only in August 2024, 'whenever this [lawsuit] was started to be a thing,' plainly at the request of counsel, and was neither contemporaneously maintained nor shared with the family or IEP team." [*Id.*]. BCBA Paleski actually testified:

> Q: And when did you create it
> A: I created it when I looked at the data whenever this was started to be a
>    thing that we needed to look at.
>
> Q: When "this was starting", you mean when the case was filed or in the last
>    couple weeks?
> A: I couldn't tell you the exact date. . . .
>    We have the data compiled in the student's hub. So the data is in the hub with
>    this information. That hub is not user friendly for someone who is not a
>    BCBA. So I extracted that data and created these in a more user-friendly
>    manner that I would use as a clinical BCBA.

[Dkt. 38-5 at 1102 (Oct. 2 Trial Tr., 265:5-12, 265:18-23)]. BCBA Paleski did not testify that counsel requested her to do anything.

> Q: …Who asked you to create that chart?
> A: No one. I created it.
>
> Q: You spontaneously came up with the chart?
> A: I didn't spontaneously come up with the chart because the data was already
>    collected. So I just transcribed it into the computer versus handwritten.

[Dkt. 38-5 at 1103 (Oct. 2 Trial Tr., 266:8-15]. Thus, Parents' assertion that (i) the data did not exist, (ii) that it was created for a lawsuit, and (iii) it was created at the request of counsel is meritless.

Even if this Court were to find the cool downs to be disciplinary, they were still not a disciplinary removal. Without citation to legal authority, Parents claim that disciplinary removals include "daily seclusions, time-outs, or office exclusions." [Dkt. 50 at 45]. In fact, the Office of Special Education Programs and Department of Education reject such argument of counsel.

- o In some schools, staff are properly trained to implement and document measures such as the use of study carrels, time outs, and restrictions in privileges, in a manner consistent with a child's right to FAPE.
  - ▪ The Department has previously stated that the use of measures such as study carrels, time outs, or other restrictions in privileges is permissible so long as such measures are not inconsistent with a student's IEP.

[Dear Colleague Letter, 68 IDELR 76 (OSERS/OSEP 2016) (citing OSEP Memorandum to Chief State School Officers, Questions and Answers on Disciplining Students with Disabilities, April 1995)]. It is undisputed that R.O.'s IEPs included the cool down accommodation requested by Parents. Thus, Parents claim of error is meritless.

### h. The IHO properly denied compensatory education remedies.

Parents argue that remedies for compensatory education should have been ordered by the IHO. The IHO properly determined that because EVSC provided FAPE, compensatory education remedies were not appropriate. The IHO held that any procedural violation was cured by the 2023-2024 IEP and EVSC's actions. [Dkt 38-5 at 174, 182-184, 187 (Decision)]. Under the IDEA, "[t]here is no obligation to provide a day-for-day compensation for time missed." *Parents of Student W. v. Puyallup Sch. Dist*., No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994). Rather, compensatory education is an equitable remedy that is determined based on a fact-specific analysis. *Id*. While an IHO is authorized to "grant such relief as…is appropriate," "appropriate relief is designed to ensure that the student is appropriately educated within the meaning of the IDEA. 20 U.S.C. § 1415(i)(2)(C)(iii); *Parents of Student W. v. Puyallup Sch. Dist*., No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994). The IHO found that any defect in the 2022-2023 IEP was cured by the 2023-2024 IEP and R.O.'s placement at TLC. [Dkt. 38-5 at 174 (Decision, 5.32)]. Thus, the IHO properly determined no remedy for compensatory education was appropriate.

### i. The IHO properly recommended consideration of Indiana residential placement for any future placement.

The IHO Decision states:

> If the student is unsuccessful at The Learning Center the CCC shall **discuss** the placement of the student in a residential facility, within the State of Indiana, at the school's expense.

[(Dkt. 38-5 at 196 (Decision) (emphasis added)]. From this, Parents argue:

> The IHO had no legal authority to order that R.O.'s Residential Treatment Facility ***options be limited to those in the state of Indiana***.

[Dkt. 50 at 58 (emphasis added)]. Contrary to Parents' argument, the plain language of the recommendation requested only that there be a ***discussion*** of placement in an Indiana residential facility. There is no mandate or language requiring that "options be limited to those in Indiana." The IHO recommendation related to a ***possible future event*** where EVSC cannot provide FAPE. Parents seek to manipulate the language into something clearly it is not to further a baseless claim.

The IHO makes an advisory recommendation should R.O. return to EVSC. If EVSC cannot satisfy R.O. needs, the IHO recommended that Indiana residential placement be ***discussed***. The Decision found that Parents recited residential facilities in Indiana which could satisfy R.O.'s needs if EVSC cannot, and they further "refused two in the Evansville area." [Dkt. 38-5 at 155-156 (Decision, F 0.46), *Id.* at 165 (Decision, F 0.68, including n.18), *Id.* at 192-193 (Decision), *Id.* at 177 (Decision, 7.06)]. The experts noted that residential placement near R.O.'s family would ensure the family therapy "crucial" to his treatment. [*Id.* at 155-156 (Decision, F 0.46)]. The recommendation of future placement for R.O. is merely advisory but is based on evidence in the Record. Parents' assertion is meritless.

### j. Parents' failure to carry their burden as to educational records under 511 IAC 7-38-1 is supported by the Record.

After hearing the testimony and considering the evidence, the IHO determined that Parents failed to show that EVSC lacked production of educational records. [Dkt. 38-5 at 190 (Decision,

ISSUE 5)]. On appeal, Parents (i) raise issues as to documents admitted without objection, (ii) rely on legal authority never raised below, (iii) fail to show that EVSC refused any request by Parents for records, and (iv) fail to show prejudice or damage from any alleged failure to provide records.

The IHO noted that all Hearing Exhibits were admitted without objection "per the agreement of the parties." [*Id.* at 145 (Decision)]. Parents now argue, for the first time, that they were not provided certain data prior to the Hearing which formed the basis for certain admitted Hearing Exhibits. [Dkt. 50 at 49]. This is nothing but a belated and waived objection to Hearing Exhibits admitted by agreement of the parties.

The issue before the IHO was whether EVSC failed to provide educational records in accordance with 511 IAC 7-38-1. Parents argue on appeal that EVSC failed to provide records in accordance with 34 CFR 300.320 (a)(3)(ii) and 511 IAC 7-42-6(f)(3). (*Id.* at 49 [nn.90, 91]. Parents did not raise an issue based on 34 CFR 300.320 (a)(3)(ii) or 511 IAC 7-42-6(f)(3) in their Response to the IHO's Proposed Issues for Hearing as Stated in the Order Framing the Due Process Hearing Issues:

> h. [Whether] Respondent failed to provide accurate educational records in a timely manner, including IEP progress reports, daily sheets, and disciplinary action which had a negative substantive impact on both the provision of a FAPE. 511 IAC 7-38-1. See also 34 CFR 99.3; 34 CFR 99.10 (a); and 34 CFR 300.613 (a).[15]

[Dkt. 38-2 at 64]. Despite specifically citing 511 IAC 7-38-1 for such issue, Parents now argue the IHO "improperly relied on an unrelated section of Article 7 concerning the *confidentiality* of records, a parent's right to inspection of records, and amendment of records." [Dkt. 50 at 60 (n.92 *citing 511 IAC 7-38-1*)]. Parents cannot claim error based on the very regulation, *i.e.*, 511 IAC 7-38-1, which they proposed, and the IHO adopted. Their claim of IHO error is meritless.

---

[15] On appeal, Parents advance no argument based on 34 CFR 99.3, 34 CFR 99.10 (a), or 34 CFR 300.613(a).

Additionally, Parents cannot raise a new argument based on 34 CFR 300.320 (a)(3)(ii) and 511 IAC 7-42-6(f)(3) for the first time on appeal. *Harris v. City Colleges of Chicago*, 316 F. App'x 496, 498 (7th Cir. 2009) (arguments raised for the first time on appeal are waived); *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1220 (7th Cir. 1984) (It is well-settled that an issue not presented below cannot be raised for the first time on appeal and form a basis for reversal).

Moreover, 511 IAC 7-38-1 provides that a parent can request records. Parents make no argument that they requested any specific record of R.O. which was refused by EVSC. In fact, Parents advance no argument that they lacked information or records from EVSC to make informed decisions about R.O.'s education. Lastly, Parents designate no evidence of prejudice, much less damage, from any purported lack of compliance with 511 IAC 7-38-1. The IHO's determination is supported by the Record.

### k. The IHO's denial of reimbursement for Whetstone is supported by the findings and Record.

Parents argue the IHO improperly denied reimbursement for residential placement at Whetstone. But again, Parents simply cite evidence they believe supports reimbursement, while ignoring the Decision, findings, and Record evidence to the contrary. This too asks the Court to reweigh the evidence which it will not do. *Ross, supra; Cooper, supra, and Mathin, supra*. The IHO Decision found:

> C. 04 Whetstone Boys Ranch is not an appropriate placement for the Student because it does not provide all of the behavioral supports the student needs. Whetstone operates with a Headmaster his Assistant and one license professional counselor, for up to nine students. Whetstones response to maladaptive behaviors include kinesthetic kind of activities and interventions like pushups or running extra laps around the campus. ***Whetstone does not have a board certified behavioral analyst, teacher certified in special education, a behavior interventionist, or behavior technician***.
>
> [Parents] presented no evidence of the academic progress, progress monitoring, grades, behavior plans outside of kinesthetics, although, the weekly social work

sessions were entitled Progress Monitoring. Mom suggested that EVSC implement the modalities of Whetstone. This IHO believe it would be impossible for a school district to require push-ups, laps and extra chores as appropriate response to maladaptive behaviors. While it is true that RO meet with the social worker one hour each week *that service does not meet the robust interventions [Parents'] expert believes RO should receive*. In fact many of them agreed that if he was not receiving these services the placement is inappropriate.

[Dkt. 38-5 at 179 (Decision, C. 04), *Id.* at 193-194 (Decision) (emphasis added)]. The undisputed evidence supports the IHO's determination. [*Id.*; *See also* Dkt. 38-5 at 155-156 (Decision, F 0.46), Dkt. 38-5 at 157-160 (Decision, F 0.62- F 0.67[16]), Dkt. 38-5 at 192-195 (Decision)]. Not only does the Record support the IHO's denial of Whetstone reimbursement, but Parents also failed to comply with the notice requirement for unilateral placement, and EVSC provided FAPE to R.O. prior to Whetstone placement. [Dkt. 38-5 at 184-185 (Decision), *Id.* at 155-157 (Decision, F 0.46 through F 0.61), *Id.* at 176 (Decision, 6.16), *Id.* at 180 (Decision), *Id.* at 182-187 (Decision)].

### (i) Standard for recovering costs of private placement.

Under Article 7, the IHO could only require EVSC to pay for residential if (1) EVSC did not make a free appropriate public education available to R.O., and (2) the residential placement is appropriate. 511 IAC 7-34-10(e) (emphasis added). Parents "who unilaterally change their child's placement without state or local school officials' consent are entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA *and* that the private school placement was proper under the Act." *M.B. ex rel. Berns v. Hamilton Se. Sch.*, 668 F.3d 851, 864 (7th Cir. 2011). Parents bear the burden to show a proper private placement. *Id*. While the placement does not need to be perfect, it must provide services allowing the student to "make

---

[16] This citation includes the misnumbered second use of the numbering of the Decision Facts F 0.61 and F 0.62 at Dkt. 38-5 at 158.

progress in reaching his academic, social, and behavioral goals." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 276-277 (F.3d Cir. 2007).

In *Mr. Catling v. York Sch. Dep't*, No. 2:19-CV-00110-DBH, 2020 WL 6309743, at *8 (D. Me. Oct. 28, 2020), *report and recommendation adopted*, No. 2:19-CV-110-DBH, 2020 WL 7233351 (D. Me. Dec. 8, 2020), the district court upheld the hearing officer's denial of reimbursement for private placement when the record showed that the student "made meaningful progress within the public school system immediately preceding parents' unilateral decision to place [the student in a private placement]." *Id.* The court based its holding on the fact that the student's academic test results showed improvement relative to the previous year. *Id.* The parents' argument that their student's progress had stalled prior to enrolling him in private placement was unpersuasive because such argument "ignore[d] the progress [the student] made in math relative to the previous year and on the reading portion of the same assessment." *Id.*

Similarly, in *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 287 (1st Cir. 2008), the First Circuit Court of Appeals affirmed both the hearing officer's and district court's denial of reimbursement for residential placement when "the parents harbored a fixed purpose: to effect a residential placement for their daughter at the School District's expense, come what may." *Id.* The court stated, "[o]nce the parents realized that the School District was focused on a non-residential placement, they essentially lost interest in the IEP process," which supported an inference of parental obstruction. *Id.* Therefore, the court held that the parents "unreasonable obstructionism of an otherwise promising IEP process fully justif[ied] a denial of reimbursement under the IDEA." *Id.* (citing *M.S. v. Mullica Tp. Bd. of Educ.* 485 F.Supp.2d 555, 568 (D.N.J. 2007) (denying reimbursement because parents failed to cooperate in completion of IEP).

### (ii)    Whetstone was *not* an appropriate placement.

Whetstone is a therapeutic boarding school for boys who are struggling with things like apathy, or screen addiction, or pornography, or mild drug use or other types of rebellion. [Dkt. 38-5 at 159 (Decision, F 0.64[17])]. As the IHO noted from testimony of Parents' experts and other experts, Whetstone provides neither the supports necessary for R.O. nor services that would make progress in his academic, social, or behavioral goals. [Dkt. 38-5 at 735 (Oct. 1 Trial Tr., 231:12-24), *Id.* at 737-738 (Oct. 1 Trial Tr., 233:5-7 and 233:18-234:3), *Id.* at 739-740 (Oct. 1 Trial Tr., 235:19-236:1)]. Whetstone is a "Christian therapeutic boarding school," the executive director does not hold any educational license, much less a special education license, and he does not even know what the IDEA is. [Dkt. 38-5 at 736 (Oct. 1 Trial Tr., 232:6-17), *Id.* at 735 (Oct. 1 Trial Tr., 231:12-25), *Id.* at 737 (Oct. 1 Trial Tr., 233:5-7)]. Further, Whetstone's mission is "to sharpen the character of young men," without a mention of any special education related services. [Dkt. 38-5 at 737 (Oct. 1 Trial Tr., 233:18-19)]. Whetstone had only two teachers in the entire program, neither of whom were certified in special education, compared to the services offered by EVSC through TLC where R.O. had a BCBA, a special education teacher, a behavior interventionist, a behavioral technician, and access to a school social worker. [Dkt. 38-5 at 739-740 (Oct. 1 Trial Tr., 235:16-236:1), *Id.* at 220 (Sept. 30 Trial Tr., 19:10-25), *Id.* at 179 (C. 04), Dkt. 38-5 at 194].

Instead of prioritizing education, Whetstone utilizes and enforces punitive measures unrelated to education such as running laps, push-ups, writing essays, manual labor, extra house chores, privilege restriction, and memorization. [Dkt. 38-5 at 744-745 (Oct. 1 Trial Tr., 240:23-241:7)]. These measures have no correlation with furthering R.O.'s education. Whetstone's Lifepac curriculum is designed for grades 9-12 [Dkt. 38-5 at 159 (Decision, F 0.65), *Id.* at 742-

---

[17] Citation is to the second Decision Finding numbered F 0.64.

743 (Oct. 1 Trial Tr., 238:15-239:8)], but R.O. was in seventh grade when he went to Whetstone. [Dkt. 38-5 at 148 (Decision F 0.3) and *Id.* at 149 (Decision F 0.18)].

Along with Whetstone's failure to provide adequate educational services, the IHO heard testimony that Parents signed a waiver with Whetstone stating, "I understand that Whetstone Boys Ranch uses the Lifepac home school curriculum from the Alpha Omega Institute. I further understand that while the Lifepac curriculum is fully accredited, ***the diploma/credits earned at Whetstone are not.***" [Dkt. 38-8 at 293 (EVSC EXHIBIT PAGE #0799 at ACCREDITATION) (emphasis added)]. See also, Section (VI)(B)(5), *infra.* at 55-65. Thus, the IHO correctly found that Whetstone was not an appropriate placement.

### (iii)    Denial of Whetstone reimbursement was also justified under Article 7.

The IHO had authority to reduce or deny reimbursement for placement if (i) Parents failed to inform EVSC at the last CCC meeting that they were enrolling R.O. in residential placement at the public's expense, or (ii) at least ten (10) business days prior to the removal of R.O., Parents failed to give written notice to the EVSC that they intended to enroll R.O. in a residential placement. 511 IAC 7-34-10(g). Parents sent their 10-day letter on April 5, 2024 - more than four (4) months after Mother admitted she removed R.O. from school in December of 2023. [Dkt. 38-8 at 284-284 (EVSC EXHIBIT PAGE #0790-91); Dkt. 38-5 at 1012 (Oct. 2 Trial Tr., 175:8-10), Dkt. 38-5 at 156 [Decision F 0.53]). Parents' delay is further support for the IHO's denial of Whetstone reimbursement.

### (iv)    EVSC made FAPE available to R.O. prior to Whetstone placement.

The IHO held that EVSC did not violate IDEA as to the 2023-2024 school year. [Dkt. 38-5 at 174-175 (Decision, 5.32), *Id.* at 180 (Decision), *Id.* at 182-187 (Decision)]. The IHO found

that EVSC provided FAPE to R.O. prior to his unilateral departure to Whetstone. [Dkt. 38-5 at 176 (Decision, 6.16), *Id.* at 180 (Decision), *Id.* at 182-187 (Decision)]. This alone precludes Whetstone reimbursement. *Hamilton Se. Sch.*, *supra*.

(v)     <b>Parents unilaterally elected Whetstone despite EVSC's FAPE.</b>

Even though R.O. was making progress at TLC, Parents had a predetermined plan to place R.O. in residential, regardless of his progress with EVSC. Dr. Evans-Robinson testified that R.O. did not meet eligibility criteria for residential placement at this time, which was discussed with Parents as reflected in the medical notes. [Dkt. 38-5 at 1354-1355 (Oct. 3, Trial Tr., 150:13-151:6). The Father became angry and hung on the Wrap-Facilitator after being informed R.O. did not meet residential requirements. [Dkt. 38-7 at 452 (EVSC EXHIBIT PAGE #0488)]. The Father's outburst toward Wrap-Facilitator Lantaff occurred on October 27, 2023, *i.e.,* the same day when the Case Conference Committee discussed R.O.'s significant academic and behavioral progress. [*Id*., Dkt. 38-5 at 154 (Decision, F 0.41 and F 0.42)]. Thus, the same day Parents are informed of R.O.'s measurable academic and behavioral progress, Father still calls the Wrap-Facilitator about residential and angrily hung up after being told R.O. does not qualify for residential. [*Id.,* Dkt. 38-7 at 452 (EVSC EXHIBIT PAGE #0488)].

When asked if a residential placement was being considered for R.O.'s academic needs, Dr. Evans-Robinson testified, "**No. It was for his psychiatric needs** . . ." [Dkt. 38-5 at 1357 (Oct. 3 Trial Tr., 153:4-8) (emphasis added)]. In other words, even if residential were necessary, which it was not, it would be primarily for non-educational, psychiatric reasons with the financial burden falling on Parents. S*ee, Dale M. ex rel. Alice M. v. Bd. of Educ. of Bradley-Bourbonnais High Sch. Dist*. No. 307, 237 F.3d 813, 817 (7th Cir. 2001) (distinguishing services "primarily oriented toward enabling a disabled child to obtain an education and services oriented more toward enabling

the child to engage in noneducational activities" and denying reimbursement for residential placement because the student's needs were primarily psychiatric and behavioral, and were therefore unrelated to his ability to obtain an education.)

As the IHO found:

> The Learning Center is the appropriate place to provide services to R.O. The records show that TLC had all services that [Parents'] experts stated R.O. needed.

[Dkt. 38-5 at 194 (Decision)]. Further, the IHO recognized that TLC's team was working with R.O. and making progress until the Case Conference meeting where he demanded a ½ day school schedule. [*Id.*]. However, the IHO found that Parents did not give TLC an opportunity to adjust behavioral strategies. [*Id.*]. Accordingly, denial of reimbursement for Parents' unilateral placement at Whetstone is supported by the Record.

### (vi)    Parents' argument contradicts their evidence designations.

Parents claim the IHO failed to correctly apply the law because "she evaluated Whetstone with an arbitrary and impermissibly strict standard, relying extensively on hindsight." [Dkt. 50 at 52]. In other words, Parents claim that because the IHO cited R.O.s issues at Whetstone, it was error. Yet, Parents' issue for review states,

> 3. Under the *Burlington/Carter* test for unilateral private placements, a private school is appropriate where it allows the child to make meaningful academic progress. The standard for appropriateness of private schools is lower than that for public schools. ***Here, R.O made progress at the Whetstone Boys Ranch***. Did the IHO err by holding Whetstone to a higher standard and denying Parent reimbursement for R.O.'s tuition there?

[Dkt. 50 at 10 (Issue 3)]. At the Hearing, evidence was presented as to R.O.'s purported progress at Whetstone. [Dkt. 38-5 at 731 (Oct. 1 Trial Tr., 227:11-13), *Id.* at 729 (Oct. 1 Trial Tr., 225:5-13)]. In their Post-Hearing Brief, Parents cited evidence and argument as to R.O.'s purported progress at Whetstone. [Dkt. 38-5 at 108 (Paragraph 111. citing Dkt. 38-5 at 729, 731) (Oct. 1 Trial

Tr., at 225:5-13, 227:11-13)]. In their Brief, Parents again argue as to R.O.'s progress at Whetstone.[18] [Dkt. 50 at 43-44]. That the IHO noted evidence in the Record as to R.O. at Whetstone does not alter the determination that it was ***not*** an appropriate placement. [Dkt. 38-5 at 179 (Decision, C. 04)]. This further supports that Parents just want EVSC to pay for a residential placement because of R.O.'s ongoing issues at home, which EVSC has no responsibility to do. [19] Parents' claim of error as to evidence ***they designated*** is meritless.

### 4. Parents' Section 504 and ADA claims fail as a matter of law.

Aside from the appeal of the Decision, Parents assert independent claims under Title II of the American with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").

### a. The applicable standards.

The ADA and Section 504 prohibit disability discrimination against qualified individuals participating in public programs. *H.P. by and through W.P. v. Naperville Community School Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018). "Given the similarities between the statutes, [courts] apply the same analysis to a plaintiff's claim under either one." *Id.*

While Parents note the general concept that "the very same conduct may violate the IDEA, § 504 and the ADA,"[20] the 7th Circuit has held one must prove "something more than a bare violation of IDEA" to establish discrimination in an educational program. *Stanek v. St. Charles*

---

[18] Parents ignore the significant issues that continued at Whetstone. [Dkt. 38-5 at 159 (Decision, Finding 0.67)]. While claiming progress, the IHO found that Parents failed to provide progress records from Whetstone. [Dkt. 38-5 at 195 (Decision)].

[19] "Mom discussed with the Public Agency Representative about her desire for him to go to a residential facility due to instances that were occurring outside of school." [Dkt. 38-4 at 160 (CCC Report dated 01/22/24 with IEP effective date of 10/30/23- 10/29/24)].

[20] [Dkt. 50 at 61 (n.96, citing *T.Z. v. Tippecanoe Sch. Corp.*, No. 4:22-CV-016-PPS-JEM, 2023 U.S. Dist. LEXIS 12581, at *18 (N.D. Ind. Jan. 25, 2023) (*citing Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 171 (2017)].

*Community Unit School Dist. No. 303*, 783 F.3d 634, 641 (7th Cir. 2015); *CTL v. Ashland Sch. Dist.*, 743 F.3d 524, 529 (7th Cir. 2014) citing *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.,* 565 F.3d 1232, 1246 (10th Cir.2009) ("[A] denial [of a free, appropriate public education] under the IDEA does not ineluctably establish a violation of § 504.").

"The IDEA's educational and procedural requirements supply the legal standards to evaluate" corresponding ADA and Section 504 claims and "courts have simply analyzed the IDEA standard and then applied that analysis summarily to the claims under the ADA and Rehabilitation Act." *Brett v. Goshen Community School Corp.*, 161 F. Supp. 2d 930, 939-40 (N.D. Ind. 2001); *See also, Bayer v. Duneland School Corp.*, 2006 WL 1544402 (N.D. Ind. May 31, 2006) (no Section 504 or ADA violation when school complied with FAPE requirements of IDEA). Nevertheless, "courts have found section 504's education requirement to be less exacting than the IDEA's." *CTL v. Ashland School Dist.*, 743 F.3d 524, 529 (7th Cir. 2014). The Supreme Court in *Osseo*, recently held that schoolchildren bringing claims under the ADA and Rehabilitation Act relating to their education do not need to make a heightened showing of bad faith or gross misjudgment, but instead are subject to the same standards that apply in other disability discrimination contexts. *A. J. T. by & through A. T. v. Osseo Area Sch., Indep. Sch. Dist. No. 279*, 605 U.S. 335 (2025).

### b. Parents' conclusory assertions of EVSC discrimination fail.

Parents first argue:

The IHO correctly concluded that for the 2022-2023 school year, EVSC failed to provide R.O. with modifications and accommodations necessary for him to participate meaningfully in his educational program, including robust behavioral supports, counseling, and social work services. ***These IDEA violations also violated the ADA/§ 504.***

> ***To the extent the Court agrees that EVSC did violate IDEA/Article 7 for 2023-2024, it should conclude that those violations also violated the ADA/Section 504***.

[Dkt. 50 at 62 (emphasis added)]. These arguments are readily rejected by the 7th Circuit's holding in *Stanek* that a bare violation of IDEA does ***not*** establish discrimination in an educational program.

Parents next argue that EVSC's (i) alleged refusal to revise R.O.'s IEP, (ii) its alleged failure to conduct reevaluations, and (iii) placing R.O. in a "reflection room" to cool down constitute "systemic discrimination on the basis of R.O.'s disability." [Dkt. 50 at 63]. Once again, Parents rely solely on an alleged IDEA violation. These arguments further rely on the Record and require the Court to improperly reweigh the evidence and ignore the findings in the Decision which reject such conclusory assertions of discrimination. [*See* Dkt. 38-5 at 151 (Decision, F 0.26, F 0.30, F 0.31), *Id.* at 154 (Decision, F 0.40), *Id.* at 156 (Decision, F 0.55), *Id.* at 170 (Decision, 5.01, 5.02), *Id.* at 165-178 (Decision, 1.01-7.11), *Id.* at 179-180, 182-189 (Decision), Dkt. 38-6 at 762-772 (EVSC EXHIBIT PAGE #012-22)].

As noted in Section (VI)(A)(3)(g), *supra* at 31-33, the IHO found that the cool down practices Parents now claim as "seclusion and exclusionary practices" were to address R.O.'s specific behaviors and not a disability. [Dkt. 38-5 at 189 (Decision)]. An adult was present with R.O. at all times in the reflection room. [*Id.*]. Yet, Parents conclude, without cogent argument or legal authority, that such cool down room was "inherently discriminatory." [Dkt. 50 at 63]. Parents' conclusory assertions are merely argument of counsel which is not evidence. *Clifford v. Crop Prod. Servs., Inc.,* 627 F.3d 268, 273 n.6 (7th Cir. 2010). Without citation to legal authority, Parents argue that EVSC's actions were "inherently discriminatory." [Dkt. 50 at 62-63].

Mother, on behalf of R.O., filed a Complaint with the Indiana Department of Education on April 17, 2023, alleging IDEA violations, in part, because R.O. was **_not_** "offered a cool down . . . by every teacher." [Dkt. 38-4 at 6].[21] After receiving the benefits of the Settlement Agreement, Parents retained counsel and assert that EVSC violated the ADA and Section 504 because R.O. was "offered a cool down," *i.e.*, "the seclusion and exclusionary practices." [Dkt. 1 at 8, 10-11, 30-31 (Plaintiffs' Original Complaint and Appeal, ¶¶ 25, 37, 40, 115, 118), [Dkt. 50 at 60-63]. These contradictory assertions further show the baseless nature of the ADA and Section 504 claims.

A strategy of simply referring to self-asserted conclusions without evidentiary citation, legal authority, or legal analysis [Dkt. 50 at 60-63] does not constitute cogent argument and results in a waiver. *See, e.g., Johnson v. Astrue*, No. 108-CV-01600-JMS-LJM, 2010 WL 1190123, at *6 (S.D. Ind. Mar. 22, 2010) citing *Reese v. Astrue*, 2009 WL 499601, *5 (S.D.Ind.2009) ( "[A] bare listing of evidence not specifically addressed by the ALJ fails to present an issue on review.").

> Regardless of a plaintiff's theory of liability, "[w]e have consistently held that the statutory language in both the Rehabilitation Act and the ADA requires proof of causation." *Id.* at 592–93 (citing *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006) (en banc)). As we explained in *A.H.*, "both statutes prohibit discrimination against individuals 'by reason of' the disability, or 'on the basis of' the disability," and this "language requires [the plaintiff] to prove 'that, 'but for' his disability, he would have been able to access the services or benefits desired.' " *A.H.*, 881 F.3d at 593 (citation omitted).

*H.P. by & Through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960–61 (7th Cir. 2018). In *Naperville*, the Court found that the District disallowed H.P. from attending NCHS because of its residency policy, and not because of H.P.'s alleged disability. *Id.* "The only reason H.P. could not attend NCHS is because she resided outside the District - a fact unrelated to her disability." *Id.*

---

[21] As Mother communicated, "These more sever (*sic*) behaviors are reported to occur at least once per month, in both home and school environments, and **_RO is able to calm himself when left alone_**, rather than being engaged with. [Dkt. 38-5 at 149-150 (Decision, F 0.19)].

The IHO found that any violation of FAPE in the 2022-2023 school year was "substantially cured" by the addition of the BIP into the IEP in 2023-2014. [Dkt. 38-5 at 174 (Decision, 5.32)]. The IHO found that R.O.'s removals were part of TLC's response to his specific behaviors, *i.e.*, not his disability, and Parents failed to prove that these removals triggered a change of placement. [Dkt. 38-5 at 189 (Decision)]. The IHO's findings that EVSC complied with the IDEA in 2023-2024 further reject the conclusory allegations of discrimination under the ADA and Section 504. [Dkt. 38-5 at 174-175 (Decision, 5.32), *Id.* at 176 (Decision, 6.15-6.16), *Id.* at 179-180, 182-192 (Decision)], *Brett, supra; Bayler, supra*. Moreover, the IHO's finding that EVSC provided FAPE and that R.O. was making academic progress also precludes alleged discrimination by EVSC. [Dkt. 38-5 at 176 (Decision, 6.16), *Id.* at 180 (Decision), *Id.* at 182 (Decision), *Id.* at 194 (Decision)].

### c. Parents cannot advance ADA and Section 504 claims solely to recover attorney fees.

Parents' sole relief requested for the ADA and Section 504 claims is attorney fees[22]. [Dkt. 50 at 65 (at ¶ 7)]. While the Complaint alleged compensatory damages for R.O. [Dkt. 1 at 33 (Plaintiffs' Original Complaint and Appeal at ¶ x), Parents (i) designate no evidence in the Record of compensatory damage sustained by R.O., (ii) submit no additional evidence of compensatory damage, and (iii) make no argument of compensatory damages. [Dkt. 50]. Despite being home on break from Whetstone and having the opportunity to testify at the Hearing about alleged emotional or other damage, R.O. elected to remain silent. [Dkt. 38-5 at 145 (Decision, n.4) citing Dkt.38-5 at 746 (Oct. 1 Trial Tr., 242:15-24)]. Such is not without consequence. In reality, Parents assert the ADA and Section 504 claims solely to recover attorney fees. As the Record sets forth no compensatory damage suffered by R.O., the ADA and Section 504, and public policy preclude a

---

[22] Despite requesting fees, Parents advance no argument for fees in their Motion.

lawsuit solely to recover attorney fees.[23] 42 U.S.C § 12205; 29 U.S.C. § 794a(b); *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 19 (1st Cir. 2006); *Loparex, LLC v. MPI Release Techs., LLC*, 964 N.E.2d 806, 817 (Ind. 2012) (the American Rule excludes the award of attorney fees from compensatory damages).

As a result, Parents' ADA and Section 504 claims fail as a matter of law, and EVSC is entitled to judgment thereon.

### d.  Parents cannot present new evidence, argument, or issue in a Reply Brief.

Parents rely solely on the Record, and they chose not to submit additional evidence, including any evidence of alleged compensatory damage sustained by R.O. It is settled that a moving party cannot sandbag another party and present new evidence or argument or raise new issues in a reply brief and such are waived. *Reis v. Robbins*, No. 4:14-CV-00063-RLY-TA, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015); *Cadeau v. O'Malley*, No. 23-1887, 2024 WL 260746, at *1 (7th Cir. Jan. 24, 2024). Thus, Parents cannot submit new evidence, argument, or issues in their Reply Brief on the Motion for Judgment on the Administrative Record.

## B.  EVSC'S CROSS-MOTION.

### 1.  The IHO's Decision is supported by the Findings and Record and must be affirmed.

In appealing the Decision, Parents asks this Court to reweigh the evidence and judge the credibility of witnesses. This, the Court will not do. *Ross, supra; Cooper, supra*. The IHO's fifty-six (56) page Decision is detailed, thorough, and sets forth the facts and legal authority supporting

---

[23] The Complaint also sought injunctive relief under the ADA and Section 504 seeking to "Order Defendant to develop and implement policies, practices, and procedures to ensure compliance with Section 504 and the ADA, including appropriate training for staff on disability rights, reasonable accommodations, and non-discrimination." [Dkt. 1 at 33 (¶ ix)]. Parents, however, do not designate evidence, advance argument, cite legal authority, or seek relief as to an injunctive remedy in their Motion. [Dkt. 50 at 60-65 (¶ 7)].

her conclusions. (*See* (VI)(A), *supra* at 15-50). The Decision's factual findings and the Record establish that EVSC neither denied R.O. a FAPE nor discriminated against him. *Id*. Parents, on behalf of R.O., are not entitled to Whetstone reimbursement or other relief under the IDEA, ADA, or Section 504. *Id*. The Court should affirm the Decision and enter judgment on the Complaint in favor of EVSC and against Parents.

### 2. EVSC is entitled to judgment as to liability on the Counterclaim.

As noted in the Decision and pursuant to 511 IAC 7-45-11(b)(2), a school, as a prevailing party, may seek, from a court with jurisdiction, an award of attorneys' fees and related costs "against the parent, if the parent's request for a due process hearing or subsequent action was presented for any improper purpose, such as to: (A) harass; (B) cause unnecessary delay; or (C) needlessly increase the cost of litigation." [Dkt. 38-5 at 197 (Decision)]. By (1) advancing the 2022-2023 claims which were settled more than a year prior to the Hearing and this appeal, and (2) seeking reimbursement for Whetstone placement when Parents knew such was not an appropriate placement, Parents caused unnecessary delay and have needlessly increased the costs of litigation. EVSC is entitled to an award of attorney's fees and related costs from Parents in defending against the 2022-2023 claims and Parents' request for Whetstone reimbursement.

### 3. EVSC was the prevailing party.

EVSC prevailed on the claims relating to the 2022-2023 school year and Whetstone reimbursement. The IHO denied relief to Parents on such claims. The fact that Parents appeal the Decision as to such claims further evidences that EVSC was the prevailing party.

### 4. Parents' advancement of settled claims was done with an improper purpose.

On April 17, 2023, Mother filed the due process complaint with the IDOE on behalf of R.O. alleging that the EVSC was not following R.O.'s IEP and requesting "more special education

services be looked at to help meet the needs of our son." ("IDOE Complaint") [Dkt. 38-8 at 440-441 (P.Ex. 9, Page 6 of 7)], [Dkt. 38-5 at 151 (Decision, F 0.28)]. Mother and EVSC agreed to mediate said IDOE Complaint, and, on May 1, 2023 at 09:29:36 AM CDT, EVSC's Director of Exceptional Learners, Ellyn Hulsey ("Director Hulsey"), emailed mediator Janet Mitchell ("Mediator Mitchell") with Mother copied on the email chain advising of a settlement:

> We met with the family today. We came to an agreement with the family. Both parties have agreed to drop the complaint and mediation.
>
> EVSC will update the IEP to reflect provisions for an LRE of a 53. He will attend The Learning Center from 8-2 daily.
>
> The family would like to take him Thursday for a tour. The family will drop him off and leave him at school.
>
> Thanks,
> Ellyn

[Dkt. 38-8 at 467], [Dkt. 38-6 at 758 (EVSC EXHIBIT PAGE #0008)]. At 10:39 AM on May 1, 2023, Mother responded by email stating, "I have agreed to drop the complaint[24]. The school will update the IEP to reflect he will begin attending The Learning Center beginning on Thursday May 4." [Dkt. 38-6 at 759 (EVSC EXHIBIT PAGE #0009)]. Then at 11:51 AM, Mediator Mitchell responded via email, asking Mother, "Are you also dropping the request for mediation?" [*Id.*] At 6:05 pm, Mother replied, "Yes I am." [*Id.*] Thus, EVSC and Parents reached a settlement that EVSC would revise R.O.'s IEP and place him at TLC where he would receive additional special education services and supports, in exchange for Mother dismissing the IDOE Complaint (the "Settlement Agreement").

---

[24] Mother's IDOE complaint [Dkt. 38-8 at 435-441].

Consistent with the Settlement Agreement, Mother dismissed the IDOE Complaint, and EVSC revised R.O.'s IEP and began teaching him at TLC in May of 2023. [Dkt. 38-6 at 760-771 (EVSC EXHIBIT PAGE #0010-0021)].

On February 20, 2024, Parents, by counsel, filed their Education Due Process Complaint and Request for Hearing with Indiana's Department of Education Special Education Division at issue herein ("Parents' Due Process Complaint"). [*See* Dkt. 1-3.] Parents' Due Process Complaint asserted claims for denial of a FAPE to R.O. during both the 2022-2023 and 2023-2024 school years for allegedly providing an inadequate IEP and special education supports. [*Id.*]

On April 26, 2024, EVSC's counsel sent a letter, with supporting documentation, to Parents' counsel advising that claims arising during the 2022-2023 school year had been resolved pursuant to the Settlement Agreement and stating that EVSC would seek fees incurred in defending the settled claims. Contrary to the Settlement Agreement, Parents advanced the 2022-2023 claims during the Hearing and this appeal.

In the Decision, the IHO found:

> F 0.30 Parties met prior to scheduled mediation and agreed on or about May 1, 2023, the student would be placed at The Learning Center (TLC) in a self-contained classroom from 8-2pm.

> F 0.31 Parties advised the Mediator that they came to an agreement and that both parties had agreed to drop the complaint and the mediation. (EVSC Ex. page 0012).

[Dkt. 38-5 at 151 (Decision)]. The IHO further found: "the pre-mediation agreement allowed R.O. to receive FAPE at The Learning Center." [Dkt. 38-5 at 185 (Decision)]. Parents do not challenge such findings as clearly erroneous.

**a. The parties settled issues arising out of the 2022-23 school year.**

It is undisputed that Mother filed her IDOE Complaint with the IDOE on April 17, 2023 [Dkt. 38-8 at 435-441 (P.Ex. 9, Page 1-7)] (*i.e.,* at the end of the 2022-23 school year) alleging that EVSC failed to follow R.O.'s IEP, including that "specifically designed instruction was not implemented," "accommodations were not followed: 'offered a cool down' was not followed by every teacher," R.O. was not given an FBA, and that "the school did not implement any goals laid out in the BIP."   [*Id.* at 440 (P.Ex. 9, Page 6 of 7)]. In other words, Mother alleged in her lengthy narrative that the EVSC was not following R.O.'s IEP or providing FAPE. [*Id.*].

Thereafter, the parties agreed to mediate, and, at a pre-mediation meeting held on May 1, 2023, Director Hulsey and the Assistant Director of Special Education met with Parents and Beth Boling in an attempt to resolve the IDOE Complaint. [Dkt. 38-5 at 371 (Sept. 30 Trial Tr., 170:14-21)], *see also* [Dkt. 38-6 at 758-759 (EVSC EXHIBIT PAGE #0008-0009)].  At this meeting, Director Mother and EVSC "worked through all of the concerns in the IEP," came to a detailed agreement, and informed the mediator that an agreement was reached. [Dkt. 38-5 at 371-372 (Sept. 30 Trial Tr., 170:24-171:7)], *see also* [Dkt. 38-6 at 758-759 (EVSC EXHIBIT PAGE #0008-0009)]. The Settlement Agreement was also confirmed in writing via email. [Dkt. 38-6 at 753, 758-759 (EVSC EXHIBIT PAGE #0003, #008-0009)], [Dkt. 38-8 at 467 (P.Ex. 18, Page 1 of 1)].  The terms of the agreement were definite and clear: EVSC agreed to place R.O. at TLC and update his IEP in exchange for Mother dismissing the IDOE Complaint. [Dkt. 38-6 at 753, 758-759 (EVSC EXHIBIT PAGE #0003, #008-0009)], [Dkt. 38-8 at 467 (P.Ex. 18, Page 1 of 1)]. When asked by the mediator if she was in agreement with this, Mother responded, "I have agreed to drop the complaint. The school will update the IEP to reflect he will begin attending The Learning Center beginning on Thursday May 4." [Dkt. 38-6 at 759 (EVSC EXHIBIT PAGE #0009)]. The mediator

then asked Mother if she was also dropping the request for mediation, to which she replied, "Yes I am." [*Id.*].

Following this agreement, EVSC's Assistant Director of Special Education emailed Mother on May 1, 2024, stating, "I am pleased we could discuss and make a plan to support [R.O.]" and that the IEP was updated to reflect the services at TLC in addition to medication changes. [Dkt. 38-6 at 760 (EVSC EXHIBIT PAGE #010)]. BCBA Paleski also emailed Mother later that same day stating, "We are looking forward to welcoming [R.O.] to TLC! Please let me know if there is anything you need before he starts." [*Id.*].  A new IEP dated May 1, 2023, was implemented pursuant to the Settlement Agreement and R.O. began attending TLC a few days later. [Dkt. 38-6 at 762-771 (EVSC EXHIBIT PAGE #0012-0021)]. Therefore, the terms here were not only definite and certain as required, but each party fully performed under the Settlement Agreement. [*Id.*]. It is only because the applicable statute of limitations allows a two-year look back period that Parents attempted to resurrect and relitigate matters which were settled to the parties' satisfaction. The IHO, however, recognized the Settlement Agreement [Dkt. 38-5 at 151 (Decision, F 0.31), *Id.* at 174-175, 185, 187)], and then held that even considering the 2022-2023 period, Parents were not entitled to relief. [Dkt. 38-5 at 174 (Decision, 5.32), *Id.* at 174-175, 185, 192 (Decision)]. Parents advancement of claims precluded by the Settlement Agreement was for an improper purpose, and it needlessly increased the litigation costs to EVSC at the Hearing and on appeal.

### 5.  Parents' request for Whetstone reimbursement was for an improper purpose.

Mother testified that R.O. has presented challenges at home virtually since the day he was born. [Dkt. 38-5 at 989-999 (Oct. 2 Trial Tr., 161:23-162:2)]. She testified that R.O. was treated by at least four (4) psychiatrists in addition to numerous counselors, social workers, mental health providers, and wrap-around services with Southwestern Behavioral—none of which were

successful in remedying his behaviors at home. [Dkt. 38-5 at 1000-1002 (Oct. 2 Trial Tr., 163:1-165:11)]. As early as October of 2022, Parents sought a residential placement for R.O., with Father even telling R.O. that Parents identified a treatment facility for him to go to in Missouri. [Dkt. 38-7 at 179 (EVSC EXHIBIT PAGE #0215)].

From that point forward, the LifeStance and Southwestern Medical Records reveal that Parents would do whatever necessary to effect a residential placement no matter how much progress R.O. made with the EVSC: on October 13, 2022, "mother states that she and father continue to be at wits ends in [sic] dealing with [R.O.]" and that "[R.O.] will likely be sent to an AIS alternative school in the near future" as Mother and Father "continue to consider alternative placements for the patient" [Dkt. 38-7 at 182 (EVSC EXHIBIT PAGE #0218)]; on November 23, 2022, "father states openly that they would like to see about placing the patient but they have to wait until he is 12 years of age for the facility they have identified in Missouri" [Dkt. 38-7 at 185 (EVSC EXHIBIT PAGE #0221)]; on March 7, 2023, Mother stated, "they continue to look at possibility of group homes for the patient" [Dkt. 38-7 at 188 (EVSC EXHIBIT PAGE #0224)]; on August 2, 2023, Mother stated that wrap-around services were "remarkably helpful" [Dkt. 38-7 at 196 (EVSC EXHIBIT PAGE #0232)]; on August 15, 2023, Mother stated that R.O. "was not happy about beginning school but thus far seems to be off to a good start" [Dkt. 38-7 at 198 (EVSC EXHIBIT PAGE #0234)]; on October 4, 2023, Mother stated, "[R.O.] can pay attention at school and mostly cooperates with doing his schoolwork, and is doing well academically [at The Learning Center] but not behaviorally" [Dkt. 38-7 at 401 (EVSC EXHIBIT PAGE #0437)]; on October 27, 2023, Southwestern Wrap-Facilitator Lantaff writes how she attended the October 27 Annual Case Review ("ACR") where she learned that R.O. was doing good academically and behaviorally at TLC and that R.O. met exit criteria but notes that Parents were "still wanting to visit a Chrisitan

residential facility next week—Whetstone in Missouri" [Dkt. 38-7 at 448 (EVSC EXHIBIT PAGE #0484)]; on December 7, 2023, Mother confirmed that she took R.O. off medications to prepare him for private placement in Missouri [Dkt. 38-8 at 91 (EVSC EXHIBIT PAGE #0597)]; on January, 29, 2024, Dr. Evans-Robinson writes that Mother wanted her to sign a medical homebound form to place R.O. in a more restrictive environment but Dr. Evans-Robinson denied this request and "explained that [R.O.] does not have a medical condition that requires homebound schooling . . ." [Dkt. 38-8 at 178 (EVSC EXHIBIT PAGE #0684)].

Wrap-Facilitator Lantaff's detailed discharge note on April 3, 2024, revealed that Parents were essentially set on residential no matter what—they took R.O. off his medications, discontinued services with Southwestern Behavioral Health against clinical advice, and were overall noncompliant with Southwestern Behavioral Health's program:

> [R.O.] is not attending group, parents pulled him out - parents wanted to switch groups for him. Parents cancelled appointments with Dr. Evans because they have taken him off all of his medications. [R.O.] has not attended therapy regularly and parents are not making consistent appointments for him. [R.O.] is not attending school in person at this time nor will he attend virtually as the school is preferring. Parents are giving him some instruction at home but they are not serious about it as he does not want instruction at home. He avoids doing homework and has a lot of leisure time at home doing whatever he wants.
>
> [R.O.] is not currently taking any medications. [R.O.] knows skills to use - anger management skills, frustration tolerance skills to name a few but does not have any reason to use them as he is not challenged with situations where he has to cooperate or comply. [R.O.] has been in therapy for years and knows more skills to use such as coping skills. [R.O.] will eventually have to get back into school and cooperate with authority figures. [R.O.] is depressed about being sent away from his family to Whetstone. There is attachment issues with mother and she avoids interactions with him at all cost due to her own breast cancer diagnosis and her being stressed out. They need family therapy to help with the attachment. [] [R.O.] is not in school so he does not have to listen, cooperate or follow directions. Since [R.O.]'s parents have taken him out of all services he is not able to process his feelings nor build him up to use his strengths. [R.O.] is not enrolled in skills sessions, group or seeing his therapist, Don any longer as mother removed him. He is also not seeing his outside therapist.

> [R.O.] only partially completed services and wraparound as his parents took him out of all services since they are looking at residential. [R.O.] was somewhat trying to control anger at home but was not challenged at all to use his skills. He met maximum benefit from skills sessions as he already knew these skills but chose not to use them. He did not attend therapy sessions on a regular basis. He was wanting to switch groups but family chose not to do that since admission to residential would happen soon. []

[Dkt. 38-8 at 271-272 (EVSC EXHIBIT PAGE #0777-0778)].

The Administrative Record supports that Parents knew Whetstone was not an appropriate residential placement, and they sought residential placement for R.O. despite expressly stating that wrap-around services were "remarkably helpful," despite admitting that R.O. was making academic progress, and despite Dr. Evans-Robinson refusing to sign a medical homebound form because R.O. did not have a medical condition that necessitated such placement. [Dkt. 38-7 at 196 (EVSC EXHIBIT PAGE #0232), *Id.* at 401 (EVSC EXHIBIT PAGE #0437), Dkt. 38-8 at 178 (EVSC EXHIBIT PAGE #0684)]. Those facts coupled with the undisputed evidence that Parents (i) slowly stopped sending R.O. to school after the October 27 ACR before removing him altogether, (ii) took R.O. off his medications against clinical advice, (iii) failed to comply with wrap-around services, and (iv) then chose to place R.O. at Whetstone against the advice of their expert and other experts, support a finding that the Parents' actions were unreasonable and constituted obstructionism such that reimbursement for residential placement should be denied. [Dkt. 38-8 at 272-273 (EVSC EXHIBIT PAGE #0777-0778), Dkt. 38-5 at 154-156 (Decision, F 0.40- F 0.53, F 0.55), *Id.* at 157 (Decision, F 0.56-F 0.61), *Id.* at 158 (Decision, F 0.63-F 0.61)], *C.G. ex rel. A.S.*, 513 F.3d at 287 (parents "unreasonable obstructionism of an otherwise promising IEP process fully justif[ied] a denial of reimbursement under the IDEA"); *see also, M.S. v. Mullica Tp. Bd. of Educ.* 485 F.Supp.2d 555, 568 (D.N.J. 2007) (denying reimbursement because parents failed to cooperate in completion of IEP). This sequence of events further suggests that Parents

were primarily focused on removing R.O. from the home due to ongoing domestic issues, at EVSC's expense. *See Supra* n.19, at 45.

> ### a. Parents knew residential placement was not educationally required.

Both Dr. Jillian Wise and Dr. Tina Evans-Robinson testified that residential placement was not necessary in order to provide R.O. with FAPE. Dr. Wise, a pediatric neuropsychologist who regularly conducts psychological evaluations and works with schools in developing IEPs, provided a detailed analysis as to why residential was not appropriate. [Dkt. 38-5 at 1242-1244 (Oct. 3 Trial Tr., 38:10-40:23)].

As evidenced by the numerous IEP meetings set forth above, Dr. Wise reiterated that the Case Conference met on a frequent basis, that the data showed R.O. was making academic and behavioral gains until the October 27 ACR, and that EVSC provided FAPE. [Dkt. 38-5 at 1247 (Oct. 3 Trial Tr., 43:22-25)]. She testified that this doesn't mean everything was perfect or that behaviors stopped, as such simply wouldn't happen when you have a student with R.O.'s diagnosis, but both the academic data and the extensive behavioral data collected by the EVSC showed R.O. "was certainly making gains and functioning in the school setting." [Dkt. 38-5 at 1247-1248 (Oct. 3 Trial Tr., 43:22-44:7)].

Regarding residential placement, Dr. Wise testified that, in her experience, residential is a placement of "last resort" because it's not well received by the child—it causes friction between the child socially and the child's family because the child is essentially being told "we can't handle you" and "you need to go get better here," and, importantly, oftentimes does not solve the problem [Dkt. 38-5 at 1264-1265 (Oct. 3 Trial Tr., 60:15-61:4)]. She testified that residential in this situation could have very harsh consequences for R.O.:

> A:    And what that does to a child's self-esteem is very, very difficult, especially at this age. We see individuals with, you know . . . substance abuse or those

> types of things go to residential. And that's a bit different. And those don't always go well either. But we think about kids going to residential and living without their mom and dad -- we don't go to college until we're 18 for a reason. That's very challenging for somebody of that age to understand why this is being done. I just don't recommend residential unless I truly believe it's necessary for the child's safety.

[Dkt. 38-5 at 1265 (Oct. 3 Trial Tr., 61:5-16)].

Dr. Wise concluded that residential was not appropriate for R.O. and that Parents were set on a residential placement regardless of what happened due to the behaviors and stressors occurring at home, as evidenced by the LifeStance and Southwestern records. [Dkt. 38-5 at 1265-1266 (Oct. 3 Trial Tr., 61:17-62:14)]. She testified that, while behaviors at school were happening, Parents were looking at residential placement during summer break when school was not even in session. [*Id.*]. Dr. Wise ultimately testified that the EVSC was providing an appropriate education at The Learning Center through their extensive data collection, supports, accommodations, and interventions, and that residential for R.O. would be more likely to cause harm than do good. [Dkt. 38-5 at 1247-1248 (Oct. 3 Trial Tr., 43:22-44:7), *Id.* at 1265 (Oct. 3 Trial Tr., 61:5-16)].

Dr. Tina Evans-Robinson, a child and adolescent psychiatrist with Southwestern Behavioral Health who treated R.O. and was not retained by the EVSC, also opined that residential was not necessary to provide R.O. with FAPE. When asked about her October 4, 2023, note discussing R.O.'s academic progress at TLC up to that point, Dr. Evans-Robinson testified:

> A:    Oftentimes children with behavioral problems at school will refuse to do their work. But he was doing his work, and he wasn't struggling. He wasn't, for example, two grade levels behind in math or anything like that. He was, as far as I know, on grade level academically in his subjects and he was cooperating and completing his work. Or at least at the time of this appointment he was.

[Dkt. 38-5 at 1346 (Oct. 3 Trial Tr.,142:10-18)].

Dr. Evans-Robinson testified that her note was also consistent with the EVSC's position that R.O. was in fact doing well academically up to the October 27 ACR. [Dkt. 38-7 at 1347 (Oct. 3 Trial Tr., 143:17-23)]. She further testified that the Southwestern Behavioral note showed Wrap-Facilitator Lantaff attended the October 27 ACR and that TLC "was willing to collaborate and communicate back and forth with [Southwestern] in the child's best interest." [Dkt. 38-5 at 1349 (Oct. 3 Trial Tr., 145:3-5)]. Importantly, Dr. Evans-Robinson testified that R.O. did not meet eligibility criteria for residential placement at this time, which was discussed with Parents as reflected in the medical notes. [Dkt. 38-5 at 1354-1355 (Oct. 3, Trial Tr., 150:13-151:6)].

When asked if a residential placement was being considered for R.O.'s academic needs, Dr. Evans-Robinson testified, "***No. It was for his psychiatric needs*** . . ." [Dkt. 38-5 at 1357 (Oct. 3 Trial Tr., 153:4-8) (emphasis added)]. In other words, even if residential were necessary, which it was not, it would be primarily for non-educational, psychiatric reasons with the financial burden falling on Parents. *Dale M. ex rel. Alice M., supra*. The Decision further notes that residential placement was ***inconsistent*** with Parents' own expert testimony. [Dkt. 38-5 at 194 (Decision)]. Thus, the Record evidences that Parents' request for Whetstone reimbursement was for an improper purpose.

### b. Parents knew Whetstone was not an appropriate placement.

Under Article 7, the hearing officer may only require the EVSC to pay for residential if (1) the EVSC did not make a free appropriate public education available to the student, and (2) the residential placement is appropriate. 511 IAC 7-34-10(e) (emphasis added). EVSC provided FAPE to R.O. and residential costs should be denied on that ground alone. [Dkt. 38-5 at 176 (Decision, 6.16), *Id.* at 180 (Decision), *Id.* at 182-187 (Decision)]. The IHO Decision and Administrative Record further established that Whetstone Boys Ranch was not an appropriate placement.

The Executive Director of Whetstone testified that Whetstone is a "nonprofit Chrisitan therapeutic boarding school." [Dkt. 38-5 at 736 (Oct. 1 Trial Tr., 232:8-9)]. He does not hold any educational license whatsoever, much less a special education license, nor does he have any degrees in the field of education. [Dkt. 38-5 at 735 (Oct. 1 Trial Tr., 231:12-24)]. The Executive Director testified that he does not even know what the IDEA is, much less the details of its nuanced requirements. [Dkt. 38-5 at 737 (Oct. 1 Trial Tr., 233:5-7)].

The current mission of Whetstone is "to sharpen the character of young men," which is a shortened version of their previous mission "to sharpen the character of young men by modeling the life of Christ, mentoring them through authentic relationships, and preaching [sic] the love of creation and teaching the joy of work, thus equipping them to be servant leaders in their families and communities." [Dkt. 38-5 at 737-738 (Oct. 1 Trial Tr., 233:18-234:3)]. Their mission makes no mention of providing special education and related services to students. [*Id.*].

Whetstone only has two (2) teachers in the entire program, neither of whom are certified in special education. [Dkt. 38-5 at 739-740 (Oct. 1 Trial Tr., 235:19-236:1)]. Compare that with TLC where R.O. had a BCBA, a special education teacher, a behavior interventionist, a behavioral technician, and access to a school social worker. [Dkt. 38-5 at 259 (Sept. 30 Trial Tr., 58:3-6)]. Parents' expert, Carissa Rice, testified that any placement where R.O. doesn't have the many supports she advocated for, including a highly trained behaviorist, OT services, social work, a revised IEP, and a more detailed BIP, would not be appropriate for R.O. [Dkt. 38-5 at 789-791 (Oct. 1 Trial Tr., 285:20-287:10)]. Whetstone admittedly lacks the services and supports Ms. Rice deemed necessary for R.O. as it does not have special education staff, does not have a BCBA, and it takes students to the local psychiatrist when necessary (as of the Hearing date, they had not

deemed it necessary to take R.O. to the psychiatrist at all during his near six-month stay). [Dkt. 38-5 at 745 (Oct. 1 Trial Tr., 241:9-16)].

Whetstone also utilizes harsh punitive measures unrelated to education. Mr. Thompson testified that their programs uses "kinesthetic" redirection by making kids run laps or do push-ups. [Dkt. 38-5 at 726-730 (Oct. 1 Trial Tr., 222:25-226:7)]. Further, Parents had to sign a waiver prior to enrolling R.O. into Whetstone, which stated, "[Whetstone] uses many forms of discipline, including essays, manual labor, extra house chores, privilege restriction, pushups, running, memorization and work detail." [Dkt. 38-8 at 293 (EVSC EXHIBIT PAGE #0799)]. Parents had to further consent that their Child "will engage in various strenuous activities," including calisthenics, that their "Child may participate in construction work and activities related to physical plant maintenance," and that their Child may also interact with "exotic animals" for which Whetstone could not be held liable. [*Id.*].  A program designed to push a student's physical limits through running, manual labor, push-ups, house chores, construction work, and interaction with exotic animals can hardly be deemed educational. [*Id.*].

Aside from Whetstone's academic programming being inadequate, Parents failed to produce R.O.'s grades, academic progress, or behavior plans outside of kinesthetics. [Dkt. 38-5 at 193 (Decision)]. Whetstone's required waiver informed Parents that "***the diploma/credits earned at Whetstone are not [fully accredited]***." [Dkt. 38-8 at 293 (EVSC EXHIBIT PAGE #0799 at ACCREDITATION) (emphasis added)]. Parents chose Whetstone for non-educational reasons which were not required to provide R.O. with FAPE. As early as October of 2022, the Parents "identified a treatment facility for [R.O.] to go to in Missouri," presumably Whetstone. [Dkt. 38-7 at 179 (EVSC EXHIBIT PAGE #0215), Dkt. 38-5 at 365-366 (Sept. 30 Trial Tr., 164:19-165:18)].

Multiple times thereafter, the Parents stated they were looking for "Christian" or "faith-based" facilities. [*See,* Dkt. 38-7 at 448 (EVSC EXHIBIT PAGE #0484) (Parents "wanting to visit Christian residential facility"); Dkt. 35-8 at 246 (EVSC EXHIBIT PAGE #0752) (Mother stating family is "seeking placement at a faith-based private pay facility" and looking at options in Texas, Missouri, Utah, and Montana)]. Dr. Evans-Robinson also testified that she recalls Mother sating they wanted R.O. to attend Whetstone "because it was Chrisitan-based." [Dkt. 38-5 at 1358 (Oct. 3 Trial Tr., 154:3-7)].

Parents rejected residential placement at Evansville Psychiatric Children's Center ("EPCC") despite Dr. Evans-Robinson advising Mother how attending EPCC locally would be best because it was a good residential program with a highly structured schedule in town that enabled the family to participate in EPCC's in-person family therapy sessions. [Dkt. 38-5 at 1366-1368 (Oct. 3 Trial Tr., 162:21-164:8)]. Dr. Evans-Robinson further advised that EPCC would have been a better fit for R.O. since "it's difficult for children to be placed in a residential facility away from their families." [*Id.*]. Southwestern Gatekeeper, Ashton O'Keefe, also wrote that "EPCC would be better [than Whetstone] as there is significant family strain and family therapy is going to be a crucial part of treatment." [Dkt. 38-8 at 20 (EVSC EXHIBIT PAGE #0526)]. Despite Southwestern Behavioral Health's staff highly recommending EPCC's structured programming and ability to offer in-person family therapy, Parents ignored their advice and ultimately sent R.O. to Whetstone after being told "by her attorney" not to send R.O. to EPCC. [Dkt. 38-8 at 195 (EVSC EXHIBIT PAGE #0701)]. Parents knew Whetstone was not an appropriate placement and their decision to send R.O. to Whetstone for non-educational and religious reasons was improper and needlessly increased the litigation costs to EVSC.

The Court should enter judgment on EVSC's Cross-Motion as to Parents' liability under 511 IAC 7-45-11(b)(2) for attorneys' fees and costs incurred in defending (i) the 2022-2023 claims barred by the Settlement Agreement and (ii) the claim seeking Whetstone reimbursement.

## VII.    CONCLUSION

The Cout should grant EVSC's Cross-Motion and (i) affirm the IHO's Decision, (ii) enter judgment in EVSC's favor on Parents' Complaint, (iii) enter judgment in EVSC's favor as to liability on the Counterclaim and set a further hearing to determine the amount of attorneys' fees, and (iv) for all other just and proper relief.

Respectfully submitted,

ZIEMER STAYMAN WEITZEL & SHOULDERS, LLP

*/s/ Patrick A. Shoulders*
Patrick A. Shoulders #308-82
Robert Burkart # 16664-82
20 NW First Street, 9th Floor
PO Box 916
Evansville, IN 47706-0916
Phone: (812) 424-7575
Email: pshoulders@zsws.com
           rburkart@zsws.com

Attorneys for EVSC

## CERTIFICATE OF SERVICE

I certify that on October 20, 2025, the forgoing document or pleading was electronically served on all parties through this Court's ECF system.

*/s/ Patrick A. Shoulders*
Patrick A. Shoulders